Yolanda Huang (Cal. Bar No. 104543)
LAW OFFICES OF YOLANDA HUANG
P.O. Box 5475
Berkeley, CA 94705
Ph/Fax: (510) 329-2140
Email: yhuang.law@gmail.com

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO/OAKLAND DIVISION**

| | |
|---|---|
| JILLIAN PIERCE, on behalf of herself and all others similarly situated,<br><br>       Plaintiff,<br><br>vs.<br><br>COUNTY OF SAN FRANCISCO, et al., and DOES 1-50, Jointly and Severally,<br><br>       Defendants. | Case No.:       19-cv-07659-JSW<br>                      3:26-cv-5508-SK<br><br><br><br>**DECLARATION IN SUPPORT OF CARR PLAINTIFFS' OPPOSITION TO DEFENDANT CITY AND COUNTY OF SAN FRANCISCO'S ADMINISTRATIVE MOTION TO CONSIDER WHETHER CASES SHOULD BE RELATED PURSUANT TO CIVIL LOCAL RULES 3-12 AND 7-11** |
| LACARLA CARR, ALEXCIS HERRERA, THEA HOPKINS, SILVIA MONTOYA, DAMENA PAGE, GIOVANNA RAMIREZ-HERNANDEZ, MARILYN SAHAGUN-LOPEZ, KIMBERLY BOYD, and KATELYN WILLIAMS,<br><br>              Plaintiffs,<br><br>       vs.<br><br>CITY AND COUNTY OF SAN FRANCISCO, et al.,<br><br>       Defendants. | |

- 1 -
**DECLARATION OF YOLANDA HUANG-- 19-CV-07659-JSW; 3:26-CV-5508-SK**

- 2 -

I, YOLANDA HUANG do declare and state:

1.     If sworn as a witness, I could and would testify to my personal knowledge of the facts set forth herein.

2.     I am the attorney of record for the Carr plaintiffs herein.  If called as a witness I can and will testify as stated herein.

3.     Attached as Exhibit A is a true and correct copy of the Finding of Facts in the Brackens, et al. v. City and County of San Francisco et al., Case No. 3:19-cv-02724 SK, Federal District Court, Northern District of California. (Dkt. 478).

4.     On June 26, 2026, Edmund Wang, deputy City Attorney for the City and County of responded by email to my earlier query and stated that they believed the issue of the  consent to Magistrate Kim and the relation of Carr to Brackens would be a moot issue if this Court related Carr to Pierce.

I make this declaration under penalty of perjury under the laws of the United States of America, executed this 29th day of June, 2026 in Berkeley, California

By:   *Yolanda Huang*
      **YOLANDA HUANG**

- 2 -

**DECLARATION OF YOLANDA HUANG-- 19-CV-07659-JSW; 3:26-CV-5508-SK**

# EXHIBIT A

DECLARATION OF YOLANDA HUANG-- 19-CV-07659-JSW; 3:26-CV-5508-SK

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MONTRAIL BRACKENS, et al.,

Plaintiffs,

v.

CITY AND COUNTY OF SAN FRANCISCO,

Defendant.

Case No. 19-cv-02724-SK

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

The Court issues the following Findings of Fact and Conclusions of Law after bench trial was held on August 8-11 and 15-17, 2023.

**FINDINGS OF FACT**

This case concerns the conditions of County Jail 3 ("CJ3") located in San Bruno, California, run by Defendant the City and County of San Francisco ("Defendant.")  Plaintiffs, who are inmates, seek relief under the Fourteenth Amendment to the U.S. Constitution and Article I, Section 7 of the California Constitution.  Plaintiffs challenge the condition of confinement that denied them access to direct sunlight,[1] i.e., sunlight not filtered through a window or other surface, and the failure to provide sufficient out-of-cell time, as of August 19, 2022.  Plaintiffs are pre-trial detainees who have not yet been adjudicated as guilty.  Plaintiffs have been incarcerated as pretrial detainees for an astonishing length of time because they have waived their rights to a speedy trial. Plaintiff Montrail Brackens has been incarcerated on his pending criminal charges for approximately 11 years; Plaintiff Jose Poot has been incarcerated on his pending criminal charges for approximately seven years; and Plaintiff Troy McAlister has been incarcerated on his pending criminal charges for approximately three years.

---

[1] All references to "direct sunlight" are to sunlight not through a window or other surface that blocks ultraviolet light.

CJ3 is located at One Moreland Drive in San Bruno, California, for male inmates who are incarcerated before trial and who are incarcerated shortly after sentencing. (Transcript ("Tr.") 906:4-6; (Dkt. No. 448 (Stipulation ¶ 4).) Ninety percent of the inmates are pretrial detainees. (Dkt. No. 448 (Stipulation ¶ 4).) The San Bruno property holds CJ3 in addition to another jail that was not in use during August 2022, currently known as the CJ3 Annex (the "Annex"). CJ3 is a Type II facility. (Dkt. No. 448 (Stipulation ¶ 16). Defendant operates both facilities. (Tr. 1003:16-1004:4.) As of August 2022, there were no inmates housed in the Annex. (Tr. 1004:5-9.) The Annex is a dormitory style housing facility. (Tr. 1003:16-1004:4.) This means that, unlike the pods in CJ3, the Annex has an open housing area with single and double bunks spread out in a common area where all inmates mix together rather than individual cells each holding one to two inmates. (Tr. 1005:24-1006:6.) For this reason, the Annex cannot be used to house certain inmates who require enhanced safety and security.[2] (Tr. 1006:8-15.)

Before 2006, the previous version of CJ3 contained an outdoor exercise yard, attached to CJ3. (Tr. 1208:5-16.) Defendant owns the land where CJ3 is sited—approximately 242 acres. (Tr. at 34:10-16.) The property includes the area formerly used as the outdoor exercise yard. (Tr. at 907:9-908:18; 35:11-36:1.) The former outdoor yard was approximately the size of one and a half football fields. (Tr. at 1238:3-4.) The former outdoor yard is approximately 300 feet from the current CJ3. (Tr. at 908:1-18.)

CJ3 opened in 2006 and was not designed to include any secure outdoor space. (Dkt. No. 448 (Stipulation ¶ 3).) Between 2006 and August 2022, Defendant never offered outdoor access to inmates at CJ3. (Dkt. No. 448 (Stipulation ¶ 3); Tr. 5 909:11-15.)

**A. Layout of County Jail 3**

CJ3 is organized as a system of pods of cells around a central building. (Tr. 1046:8-23.) The center of the building on the second floor is the education corridor, which looks like a typical public high school with classrooms on either side. (Tr. 1046:8-23.) Spreading out from the education corridor, CJ3 has a "pod" style structure and is organized into 16 identical pods, named

---

[2] These inmates are housed in "administrative segregation" or "administrative separation," described more fully below.

United States District Court
Northern District of California

with numbers one through eight and letters A or B.  (Dkt. No. 448 (Stipulation ¶¶ 5-6]); Trial 1116:16-25.)  Each pod has two floors, with 12 two-person cells on each floor,  for a maximum capacity of 48 inmates.  (Dkt. No. 448 (Stipulation ¶¶ 5-6); Tr. 1116:16-25.)  Each pod has a common area and gym on the ground floor in addition to the cells..  Exhibit 1071 is an accurate representation of the first floor of CJ3,  showing the locations of cells, common areas, and gyms inside each pod.  (Dkt.  No. 448 (Stipulation ¶ 18); Tr. 1117:1-15.)

**EXHIBIT 1071**



The layout of the pods used for general population housing is identical to the layout of the pod used for administrative segregation housing. (Tr. 868:2-12; 1118:19-25.)

### 1.  Pod Common Areas

Inside each pod, there are two tiers of cells, with 12 cells on each tier. (Tr. 868:13-17.)  On the bottom tier, in addition to 12 cells each pod has a central common area with tables, benches, phones, showers and a television.  All cells on both tiers face the common area. (Dkt. No. 448 (Stipulation ¶¶ 3, 6-7).)  Each pod also has its own gym, sometimes referred as the yard. (Tr. 1082:1-15.)

### 2.  Layout of a Cell Inside CJ3

Each cell in CJ3 has an exterior-facing window through which inmates can see outside, including views of trees, grass, and houses for some but not all cells.  (Tr. 154:17-19; 155:15-18;

3

305:11-18; 475:8-11.) These windows provide access to sunlight and are sufficient for inmates to tell the passage of time—whether it is day or night outside. (Tr. 155:19-22; 233:12-17; 305:19-21; 473:13-474:6.) Exhibit 1159 shows the exterior facing windows in each cell.



Exhibit 1172 shows the view out of a sample window.



The cells are big enough for inmates to do large muscle group exercises such as sit-ups, push-ups, burpees, and dips. (Tr. 233:18-234:5; 1584:9-11.)  Inmates can pursue exercise inside their cells by using their  bunk beds, the floor space, the partition in front of the toilet, and other fixtures in the room to exercise. (Tr. 721:13-25.)

Exhibit 1156 shows a picture of a cell in CJ3.



Each cell has its own air vents next to the window. (Tr. 221:19-21.)  Air can also exchange in and out of the cell into the common room through the edges of the door. (Tr. 224:5-7.)  The air vents as well as the gap in the door are visible in Exhibit 1156.

Fresh air is circulated to CJ3, including the housing units, by one of eight air handling units ("AHU") with one AHU serving 48 cells—the equivalent of an A and B side of a pod. (Tr. 1086:20-22; 1091:1-25.) The AHUs are controlled by a computerized system. (Tr. 1087:9-1088:2.)  The amount of fresh air coming into the building is controlled and adjusted electronically byCJ3's superintendent and the AHU vendor. (Tr. 1088:14-24.)

Exhibit 1033 is a diagram of the AHU. Exhibit 1034 is a diagram of the heating coils that ensure the air in the AHU is at the right temperature and Exhibit 1035 is a diagram of the exhaust fans in the AHU.

/ / /

United States District Court
Northern District of California

### 3. Gym Layout

Exhibit 1134 is a diagram of the gym in each pod. (Exh. 1134.)



Each gym is approximately 1,000 square feet, measuring 21 feet by 40 feet, and includes a toilet and wash area that measure approximately 5 feet by 7 feet. (Tr. 1082: 1-1083:21; 1082:1-15; Exhibit 1134.)  The gym also has a basketball hoop. (Tr. 234:19-20.)  Each gym has screened windows that allow air to flow directly from outside CJ3 into the gym and housing unit. (Tr. 235:20-236:8; 1084:13-21; Exhibit 1171.)  Each window measures 8 feet by 6 feet and allows natural light into the gym. (Tr. 472:17-473:5; Tr. 1086:4-10; Exhibit 1171.)  There are screens and louvers over the windows, to prevent weather intrusion, but do not obstruct air flow.  (Tr. 1085:4-20.)

/ / /

/ / /

/ / /

/ / /

/ / /

6

Exhibits 1167 and 1171 show the windows in the gym.





**B. Weather and Fog at CJ3**

San Bruno has temperate weather, with the lowest monthly average temperatures I the range of 50-55 degrees Fahrenheit, and an average of slightly less than 80 degrees Fahrenheit in the hottest month, September. (Tr. 812:3-17.) San Bruno also experiences high rates of fog

because of its elevation and its proximity to the ocean. (Tr. 786:6-21.)  Fog affects visibility at CJ3 and can roll in quickly given the area's high elevation. (Tr. 782:24-783:10.)  When present, fog can bring visibility down to less than a quarter of a mile and at certain times reduced visibility to close to zero. (Tr. 782:24-783:10.)  Fog at CJ3 is common nearly every day in the spring and summer months, and can happen any time of year. (Tr. 783:23-784:9.)  Although fog is most common in the evening and morning hours, it can also occur in the afternoon because of San Bruno's proximity to the San Francisco bay; the sea breeze carries inland fog that cooled over the ocean. (Tr. 783:23-784:9.)

When the old CJ3 had the outdoor yard attached to CJ3, outdoor recreation was cancelled when fog reduced visibility. (Tr. 1208:5-16.)  This happened two to three times per week. (Tr. 1208:17-1209:3.)  When the old CJ3 existed, there were no indoor gyms at the old jail, so if the conditions were too foggy to exercise outside, inmates had no recreation at all. (Tr. 1215:10-16.)

### C.  Statistics on Inmate Population in County Jail 3

CJ3 is rated to hold a maximum of 768 inmates. (Dkt. No. 448 (Stipulation ¶ 2).)  As of August 15, 2022, CJ3 held a total of 532 inmates. (Dkt. No. 448 (Stipulation ¶ 19).) Of those 532 inmates, 306 (57.5%) had been in custody for less than one year; 106 (19.9%) had been in custody greater than or equal to one year, but less than two years; 35 (6.5%) had been in custody greater than or equal two years, but less than three years; 18 (3.3%) had been in custody greater than or equal to three years, but less than four years; and 67 (12.5%) had been in custody greater than or equal to four years. (Dkt. No. 448 (Stipulation ¶ 19).)

Of those 532 inmates, 385 (72.3%) were housed in general population; 157 (29.5%) were housed in administrative segregation; and two were recently transferred to the facility and had not yet been assigned a housing classification. (Dkt. No. 448 (Stipulation ¶ 19).)

Of the 306 inmates in custody for less than one year; 241 (78.7%) were housed in general population, 63 (20%) were housed in administrative segregation; and two (0.6%) were recently transferred to the facility and had not yet been assigned a housing classification. (Dkt. No. 448 (Stipulation ¶ 19).)

United States District Court
Northern District of California

Of the 106 inmates in custody greater than or equal to one year, but fewer than 2 years, 67 (63.2%) were housed in general population and 39 (37.14%) were housed in administrative segregation. (Dkt. No. 448 (Stipulation ¶ 19).)

Of the 35 inmates in custody greater than or equal two years, but fewer than three years, 22 (62.8%) were housed in general population and 13 (37.1%) were housed in administrative segregation. (Dkt. No. 448 (Stipulation ¶ 19).)

Of the 18 inmates in custody greater than or equal to three years, but fewer than four years, six (33.3%) were housed in general population and 12 (66.6%) were housed in administrative segregation. (Dkt. No. 448 (Stipulation ¶ 19).)

Of the 67 inmates in custody greater than or equal to four years, 37 (55.2%) were housed in general population and 30 (44.7%) were housed in administrative segregation. (Dkt. No. 448 (Stipulation ¶ 19).)

Defendant does not determine how long an inmate remains in its custody. (Tr. 1014:1-6.) The courts determine the speed of an individual's criminal trial and whether to accept a criminal defendant's request for additional time to prepare his case. (Tr. 1014:7-8; 13-15.) Defendant also has no control over whether a criminal defendant chooses to waive his right to a speedy trial in connection with his underlying criminal case. (Tr. 1014:16-21.)

**D. Classification and Classification Levels**

Defendant has a Classification Unit whose mission is to promote safety in the jails for all staff and inmates by assessing inmates for security risks, escape risks, potential for violence, and vulnerability within the jail population. (Tr. 840:25-841:6; Exh. 1073 at CCSF-NORBERT_009037.) Staff in this unit receive six weeks of specialized training. (Tr. 841:6-25.) As of August 2022, CJ3 housed inmates at three classification levels: minimum, medium, and maximum. (Tr. 842:19-843:3.) An inmate's classification level is different from his housing assignment. There are maximum security inmates in general population and minimum security inmates in administrative separation. (Tr. 843:13-18.) Although an inmate's classification level does not exclude him from any particular housing assignment, it can affect his housing because it limits who an inmate could have as a cellmate within a pod.

United States District Court
Northern District of California

Defendant determines an inmate's classification level based on an objective points-based system to reduce the risk of bias or prejudice in classification assignments. (Tr. 844:5-9; 848:3-25.) Exhibit 1073 includes the criteria Defendant uses to assign an inmate's classification level, which considers: (1) the severity of an inmate's current charges, (2) the seriousness of the inmate's prior offense history, (3) the inmate's escape history, (4) the inmate's history of institutional discipline, (5) any prior felony convictions, (6) history of alcohol or drug abuse, and (7) any stability factors which can lower a person's classification score. (Exh. 1073 at CCSF-NORBERT_009058- CCSF-NORBERT_009060.)

Defendant does not house inmates who are minimum security in the same cell with inmates who are maximum security for safety reasons. (Tr. 843:4-12.) For example, there is a risk to an inmate who is new to the jail system on a low-level charge (minimum security), if he is housed with a more sophisticated inmate with a more serious charge (maximum security). (Tr. 846:10-18.) In that situation, the more sophisticated inmate might prey on the less sophisticated inmate, for example, by preventing the less sophisticated inmate from using the phone or reaching out to others, stealing the less sophisticated inmate's food, and/or potentially taking physical or sexual advantage of the less sophisticated inmate. (Tr. 846:16-13.)

Over time, the population and classification levels of individuals housed at CJ3 has changed. (Tr. 1012:9-1013:8.) Previously, CJ3 did not hold inmates who were ordered to have a high bail or charged with serious or violent offenses, such as murder. As an example, CJ3 did not house individuals who were gang-affiliated or who had mental or behavioral health issues. (Tr. 1012:9-1013:8.) Instead, those inmates were housed at County Jail 4, which was a maximum-security facility located in downtown San Francisco. (Tr. 1012:9-1013:8.) However, County Jail 4, located at 850 Bryant Street in San Francisco, closed several years ago, and the inmates previously held there are now housed at CJ3 in San Bruno. (Tr. 1012:9-1013:8.)

As of August 2022, CJ3 housed inmates accused of serious violent offenses, inmates who were gang affiliated, inmates who had a maximum-security classification, and inmates who had mental or behavioral health issues. (Tr. 1013:9-25.)

/ / /

10

### E. Housing Assignments

The primary two housing assignments in CJ3 are the (1) general population or (2) administrative segregation, although some inmates in the jail system are housed in medical housing or psychiatric sheltered living units. (Tr. 849:21-25.)

Entire pods in CJ3 are designated as either general population pods or administrative segregation pods, meaning all inmates in that pod share the same housing assignment. (Tr. 863:13-23.) There are no pods that mix inmates assigned to general population with those assigned to administrative segregation. (Tr. 864:2-10.)

Defendant classifies an inmate into the least restrictive level of housing possible, with due regard for the safety of other prisoners, deputized staff, and members of the public, all while offering inmates the opportunity to participate in jail programs to assist them in preparing for community reentry. (Exh. 1073 at CCSF-NORBERT_009038.)

#### 1. General Population

The majority of inmates in CJ3 are housed in general population, which is the least restrictive housing assignment. (Tr. 850:15-22.)  There are periods of the day where all inmates in a general population pod (maximum 48 inmates) can be out of their cells at the same time. (Tr. 854:8-11.)

#### 2. Administrative Separation[3]

Defendant does not use administrative separation as punishment. (Tr. 1181:10-13; 864:11-14.) Instead, the housing classification is used only when necessary for the safety and security of the inmate population, the staff, and/or jail volunteers and visitors. (Tr. 864:15-19.)  Defendant uses a questionnaire to assess whether it is necessary to house an inmate in administrative segregation.  There is a lengthy list of factors to consider, including whether the inmate is prone to assault staff and other inmates, whether the inmate is disruptive, whether the inmate is a gang member, whether the inmate needs protection from other prisoners, whether the inmate has special

---

[3] At the time this lawsuit was filed,  administrative segregation was renamed to be "administrative separation."  However, the change in title did not change the criteria Defendant uses to assess whether an inmate can safely be housed in general population or if he must be housed in administrative separation. (Tr. 849:10-20.)  For purposes of this Order, the Court uses the terms administrative separation and administrative segregation interchangeably.

11

medical needs, and whether the inmate requests administrative segregation. (Exh.1241; Tr. 861:18-862:19.)

One feature of administrative separation is that inmates in this housing assignment have fewer programming and out-of-cell opportunities as compared to inmates housed in general population. (Tr. 884:14-16.) The reason inmates in administrative separation generally have less out-of-cell time opportunities compared to inmates in general population is that, unlike general population, all inmates in an administrative segregation pod (maximum of 48) cannot safely be out of their cells at the same time. (Tr. 862:20-863:12.) The reasons for this are the same reasons that the Classification Unit uses to assess someone's housing assignment, as described above. (Tr. 864:20-865:2.)

There may be inmates in administrative segregation housed in different cells within the same pod who have a history of fights with each other, and it would therefore be unsafe to have them use the common areas together. (Tr. 866:21-867:15.)

Stephen Tilton, who as a captain was the Facility Commander of CJ3 from August 2019 to August 2022, applied the direct supervision model in CJ3. (Tr. 1109:25-1110:2; 1114:12-13; 1146:17-1147:21.) Tilton took an active role in attempting to reduce the population in administrative segregation, but the majority of inmates that he attempted to reclassify into the general population returned to administrative segregation based on their behavior. (Tr. 1179:25-1180:6.)

Defendant's expert on corrections (Tr. 1298:5-7; 1299: 3-7), Julian Martinez, confirmed that administrative separation in CJ3 is used for the same reasons described by Defendant's personnel: to protect both staff and incarcerated persons based on escape history, assaultive behavior, gang affiliation, and protective custody needs. (Tr. 1311:7-1312:1.) Plaintiffs did not offer testimony that contradicted the evidence of Defendant's appropriate use of administrative separation at CJ3.

/ / /

/ / /

/ / /

United States District Court
Northern District of California

**F. Out-of-Cell Time Before the COVID-19 Pandemic**

**1. General Population**

Before the COVID-19 pandemic, inmates in general population were out of their cell for most of the day.  (Tr. 236:25-237:18; 1153:4-13.)  Specifically, inmates came out of their cells around 8:00 a.m. for programming, ate lunch and went back to their cells for 20 to 30 minutes, then came out for more programming and free time, then went back into their cells from 2:00 pm to 3:00 pm, and then came out again for dinner and stayed out until the cells were closed for bedtime around 9:00 p.m. or 10:00 p.m.  (Tr. 237:15-238:10.)  During this out-of-cell time, inmates in general population had access to the gym all day long except when they were in programming in the education corridor.  (Tr. 238:11-14.)  That programming, described in more detail below, included educational, rehabilitation, anger management, and/or parenting classes.  (Tr. 238:23-239:11.)

Defendant seeks to maximize the amount of out-of-cell time that inmates in administrative segregation receive by using "walk groups" of inmates in the same pod who are determined to be able to safely recreate together. (Tr. 865:3-11.)  A "walk group" is a slight misnomer, as a walk group is a group of people who can come out of cells together.  (Tr. 1174: 24-1175:5.)  Walk groups existed both before the COVID-19 pandemic and during the COVID-19 pandemic.  (Tr. 1175: 6-7.)  Defendant determines which inmates in administrative segregation can be in a walk group, and Defendant obtains input from inmates themselves.  (Tr. 865:3-11.)  The concept of walk groups existed in jail vernacular and in CJ3 specifically prior to the COVID-19 pandemic; this was not a new invention.  (Tr. 1174:13-1175:11.)

**2. Administrative Segregation**

Before the COVID-19 pandemic, inmates in administrative segregation received out-of-cell time one hour per day and had access to the gym during that time.  (Tr. 157:4-6; 157:11-14: Tr. 1148:21-23.)  Multiple cells within an administrative segregation pod, up to four cells (eight inmates), would be offered out-of-cell time together. ( Tr. 1148:25-1149:20.)  If inmates in administrative separation received an hour of out cell time and there were additional hours in the day available, deputies were instructed to begin the cycle of out-of-cell time again.  (Tr. 1149:24-

13

United States District Court
Northern District of California

1150:24.)  Out-of-cell time was available from 8:00 a.m. to 10 a.m., from 12 p.m. to 2:00 p.m. and from 3:30 p.m. or 4:00 p.m. until 9:00 p.m.  (Tr. 1153:19-1155:1.)

When possible, CJ3 has worked to identify larger groups of inmates housed in administrative segregation who could all safely be out of their cells together and then rehoused those individuals in one pod, which then operates with the same level of out-of-cell time available in general population.  (Tr. 865:12-866:20.)  One example of this is the "Special Needs Yard" ("SNY").  The SNY is a subset of administrative segregation for inmates who are in administrative segregation for their own protection, for example, because they are in protective custody based on their charges or are gang drop-outs.  (Tr. 865:12-866:9.)  Defendant is able to pull those individuals into a pod together to provide them the same out-of-cell time that someone in general population receives, because that combination of inmates does not pose the same kind of safety or security concerns as other administrative segregation pods when out of their cells together.  (Tr. 866:1-9.)

**G. Outdoor Access for All Inmates During COVID-19 Pandemic**

It is undisputed that, before August 2022, Defendant offered no inmate housed at CJ3 access to the outdoors and thus no access to direct sunlight.  Before August 2022, Defendant undertook efforts explore how it could safely provide outdoor access to incarcerated persons.  (Tr. 1073:13-15.)  Specifically, Defendant contemplated using two outdoor yards to the Annex, measuring 40 feet by 80 feet.  (Tr. 1077:18-1078:8.)  In addition to the outdoor areas at the Annex, Defendant also considered using a catwalk between CJ3 and the Annex to provide outdoor access.  (Tr. 1076:15-20.)  The catwalk has a chain link fence (but no walls), from floor to ceiling on both sides of the walkway.  (Tr. 1077:6-17.)  Defendant started modifications to the outdoor space prior to August 2022.  This included moving a fence, adding a sallyport (gated area), making modifications to flooring, and performing concrete work.  (Tr. 1075:2-14.)  However, the outdoor space was not available for use in August 2022 because it still lacked a number of security requirements.  (Tr. 1075:15-22.)  As of August 2022, additional work was still needed to strengthen fence lines, develop a drone prevention mechanism, and update CJ3's video systems.  (Tr. 1080:6-17.)  Additionally, the COVID-19 pandemic limited Defendant's ability to move

14

incarcerated persons to the outdoor space because movement would have to occur through the CJ3 hallways and there were restrictions on movement due to social distancing protocols and cleaning protocols. (Tr. 1081:4-25.)

## H. Programming Opportunities Before the COVID-19 Pandemic

During intake into CJ3, inmates have an orientation where programming staff provide presentations about the programming opportunities in CJ3. (Tr. 1047:1-19.) Inmates who want to participate in programming can fill out an action request. (Tr. 1047:1-19.) The classification process is a second opportunity to connect eligible inmates with programming. (Tr. 1047:1-19.)

The determination of whether Defendant opens a program to inmates in administrative segregation or only those in general population is based on whether the programming material is designed to be offered individually or as part of a group; group programs can only be offered to those in general population, but individual programs can be offered to individuals of any housing classification. (Tr. 1058:23-1059:3.)

Defendant's Programs Unit spends considerable time thinking about how to increase programming access to inmates in administrative segregation. (Tr. 1059:4-7.) Before the COVID-19 pandemic, CJ3 offered programming to inmates in administrative segregation where the program could be modified to be provided one-on-one services. (Tr. 1052:4-1056:5.) For example, the COVER program, which was offered to veterans, had a group component for those in general population, but for those in administrative segregation, staff members would meet with that inmate individually and work through the program materials with him one-on-one. (Tr. 1052:4-1056:5.) During the COVID-19 pandemic, when all programming converted to independent study, inmates in both general population and administrative segregation were able to continue work in the COVER program using the independent study model previously applied to inmates in administrative segregation. (Tr. 1056:6-12.)

The Roads to Recovery Program is a substance abuse and disorder treatment program CJ3 offers to inmates. (Tr. 1051:15-20.) The RSVP Program is a batterers' intervention and violence prevention program also offered to inmates in CJ3. (Tr. 1051:21-23.) Before the COVID-19 pandemic, both of these programs were offered to inmates in general population

because the learning model was based on all of the participants living in the same housing pod. (Tr. 1051:24-1052:1; 1053:2-11.)  However, during the COVID-19 pandemic, the in-person aspect of the programs had to be shut down as a result of social distancing, and the programs continued as independent study packets for individuals to complete own their own.  (Tr. 1053:12-25.) At that point, Defendant opened the programs up to inmates in administrative segregation.  (Tr. 1053:12-25.)

CJ3 also offers educational programming to inmates.  (Tr. 156:16-22.)  Inmates in general population are able to participate in programming in the education corridor in a high school setting, and inmates in administrative segregation are able to complete independent study courses to earn a GED or high school diploma in their pod.  (Tr. 1056:16-1057:7.)

Before the COVID-19 pandemic, the San Francisco Public Library distributed books and resource materials to inmates.  (Tr. 1057:8-22.)  During the early phase of the COVID-19 pandemic, the library staff was not permitted into CJ3, so Defendant's staff distributed the library books that were already in CJ3.  (Tr. 1057:23-1058:6.)  Librarians were allowed back into CJ3 by May of 2021 and were back working with inmates in August 2022.  (Tr. 239:12-20; 1058:7-10.)

CJ3 also has resources for non-English speakers. Non-native English speakers in CJ3 have access to language lessons and CJ3's library also includes books in other languages including Spanish.  (Tr. 156:14-15.)  Staff provide inmates with enrichment activities that are not language based, such as sudoku puzzles, so that inmates who speak any language can use them.  (Tr. 155:23-156:7.)

**I.  COVID-19 in the Jail**

Defendant responded to the COVID-19 pandemic by taking steps to decrease the transmission of the virus, including in its jails.  Lisa Pratt, M.D., the Director of Jail Health Services under the umbrella of the San Francisco Department of Public Health, worked directly with CJ3's staff to implement COVID-19 protocols in CJ3 to mitigate the risks of transmission and infections.  (Tr. 615:25-616:4; 630: 3-631:9.)  The COVID-19 pandemic-specific policies that limited incarcerated person's out-of-cell time and the effects therefrom were made after balancing

16

the risks to inmates from less out-of-cell time against the risk of death from COVID-19 exposure. (Tr. 717:19-718:11; 737:22-738:21.)

Plaintiffs offered no evidence or witnesses to contradict or criticize the COVID-19 protocols that Defendant implemented in consultation with Pratt, and Plaintiffs produced no medical expert to critique Defendant's policy changes in response to the COVID-19 pandemic. (Tr. 415:23-25.) There was testimony about the number of lockdowns caused by staffing shortages during the COVID-19 pandemic, though, discussed below

The Court finds Pratt's testimony regarding the COVID-19 pandemic credible. Plaintiffs attempted to impeach Pratt with a prior investigation involving Pratt's disclosure of additional employment. (Tr. 745:7-756:5.) Pratt credibly testified that she sought, received, and understood that she had prior written approval for her to participate in additional employment. (Tr. 760:20-764:17.) Pratt's secondary employment did not interfere with her work as the Director of Jail Health; she worked up to 16-hour days for Jail Health Services in order to manage the COVID-19 pandemic. (Tr. 754:19-755:25; 772:1-20; 773:18-774:4.)

## 1. Staffing During the COVID-19 Pandemic

Defendant's Sheriff's Office operated under a hiring freeze imposed by Defendant for nine months in 2020 and 2021. (Tr. 946:18-20, 1018:15-21.) During the three years that Tilton was the facility commander of at CJ3, CJ3 ran with staffing below the minimum set by the collective bargaining agreements with the sheriff's deputies' union. (Tr. 1131:16-21.) As of August 2022, CJ3 was allocated 187 fulltime positions, but only had 132 custody positions filled, with a shortfall of 55 deputy sheriffs. (Exh. 209 at 4.) As of August 2022, the Sheriff's Office was trying to catch up with the attrition rate because of the impacts of the nine months that the Sheriff's Office was not allowed to fill any of its open requisitions. (Tr.1019:3-10.)

As of April 2022, the Sheriff's Office relied heavily on the use of overtime to staff its operations. (Tr. 948:17-20.) On some days, CJ3 would not be able to meet its minimum staffing requirements without the imposition of mandatory overtime on sheriff's deputies. (Tr. 929:13-16, 930:6-9.) There were times between 2019 and August 2022 when CJ3 did not have enough deputies available to meet minimum staffing levels, and that shortage led to lockdowns, during

United States District Court
Northern District of California

which time the inmates were confined to their cells. (Tr. 924:15-925: 16; 926:23-927:1.) A Level 4 lockdown is a facility-wide lockdown. There were other lower level lockdowns that affected only one floor or one housing area, or certain operations like the kitchen and laundry, or a section of CJ3. (Tr. 1023:16-1024:2.) Lockdowns occurred frequently, on a weekly, sometimes daily, basis. (Tr. 1277:19-25.) There were 39 Level 4 lockdowns in the period of time six months to a year before July 2022. (Tr. 926:18-22.) Other issues such as an incident or medical calls – not just staffing shortages – could lead to a lockdown. (Tr. 1024:7 -19.) Level 4 lockdowns could also occur if there was information that there were weapons in cells or when a large group of new inmates entered CJ3, and that would lead to a housing security search, and there could be four to six Level 4 lockdowns per month based on the need for a housing security search. (Tr. 1195:15-1196:25.) Those usually lasted three to four hours. (Tr. 1191:25-1192:19, 1196:21-25, 1197:14.) Lockdowns could range in length from "immediate reopening to days long in regard to whatever the severity of the challenge is." (Tr. 1025:14-18.) Being short-staffed by one or two deputies would not generally lead to a Level 4, facility-wide, lockdown. (Tr. 1026:2-8.)

## 2. Risks of COVID-19

Inmates who experienced COVID-19 described typical symptoms, such as having difficulty breathing, experiencing muscle weakness and fatigue to the point where they could not stand up for long periods of time, strong discomfort, and feelings of emotional distress based on the concern for the risk of permeant health effects. (Tr. 1587:11-1588:13.) The inmates who experienced COVID-19 wish they had not caught the virus. (Tr. 1589:12-15.) However, the risks of the COVID-19 pandemic in CJ3 did not stop at the risks posed to an individual patient. Pratt explained that an outbreak of COVID-19 in CJ3 created risks not just for the inmate population, but for the entire San Francisco bay area. An outbreak in CJ3 would lead to hospitalization of inmates in local hospitals that could overwhelm the San Francisco health system, which could in turn affect the entire San Francisco bay area community, because, if there were not enough beds for ill people in San Francisco, patients would be transported to hospitals in neighboring counties, creating a cascading effect. (Tr. 631:10-632:16.) In fact, the COVID-19 pandemic did overwhelm city-wide health systems in other areas like New York, Los Angeles, and cities in the state of

18

Wisconsin, where there the number of COVID-19 hospital admissions were so high that there were not enough beds or ventilators for patients. (Tr. 632:17-633:4.) In those areas, mortality rates from the COVID-19 pandemic were so high there was ultimately not enough space in morgues for people that had died. (*Id.*) But the health system in the San Francisco bay area was able to avoid that level of crisis. (*Id.*)

The risk of COVID-19 transmission among inmates was higher than the risk of transmission outside incarcerated settings because jails are by definition congregate living centers. Inmates within the same pod exposed each other to COVID-19. (Tr. 1593:2-5.) Inmates are also exposed to staff who must go physically to CJ3 to operate the facility and are exposed to individuals at local hospitals when they have to travel for medical care. (Tr. 637:10-639:1.) All of these are additional avenues of potential transmission. (Tr. 637: 10-639:1.)

Although inmates in CJ3 have contracted COVID-19 (Tr. 1584:15-18), no inmate in CJ3 died from COVID-19. (Tr. 629:13-17; 1279:4-9.) In contrast, inmates in other local jails and prisons did die of COVID-19. (Tr. 629:18-630:2.)

### 3. County Jail 3's Policies During the COVID-19 Pandemic

As Director of Jail Health Services, Pratt was involved in discussing and implementing COVID-19 protocols in CJ3, in coordination and communication with Department of Public Health COVID command, San Francisco General Hospital, CJ3's staff and/or Sheriff Paul Miyamoto, San Francisco's Sheriff during the COVID-19 pandemic, "every day all day." (Tr. 634:9-16.) The restrictions for incarcerated persons in CJ3 ebbed and flowed as they did for the population in San Francisco under public health orders. (Tr. 644:24-645:2.) Those ebbs and flows can generally be categorized into three general periods: (1) the early outbreak from roughly March 2020 through early 2021; (2) mid-2021 when vaccinations became available; and (3) subsequent outbreaks in CJ3 from mid-2021 through summer 2022.

For example, McAlister confirmed that out-of-cell time in his general population pod was limited to one hour per day at first; then increased to one and a half hours per day; then with a resurgence of COVID-19 reduced to one hour per day; then again by April 2022 increased to one and a half hours; and increased again to two and a half hours per day in July 2022. (Tr. 299:8-25.)

19

Masking in CJ3 remained a requirement during the entirety of the COVID-19 pandemic. (Tr. 300:4-7.)

### a. Early Outbreak: March 2020-Early 2021

During this the early phase of the COVID-19 pandemic, from March 2020 through early 2021, there were serious concerns about the potential for a COVID-19 outbreak in CJ3's congregate living setting. (Tr. 1030:7-25; 631:10-632:16.) CJ3 is designed to bring individuals—inmates, staff, and volunteers, in and out on a continuing basis, so Defendant's initial concern was limit the exposure of COVID-19 into CJ3. (Tr. 1030:7-25; 633:5-22.) At this time no one fully understood the ways COVID-19 was transmitted, and there was no vaccine. Accordingly, Miyamoto personally worked on issues related to the COVID-19 pandemic every day and spoke with members of his staff and other city partners including the Department of Public Health every week. (Tr. 1031:20-1032:9; 634:20-635: 3; 1162:12-22.) Pratt was in direct communication with the CJ3 facility commander of CJ3, Tilton. (Tr. 640:23-641:6; 1162:23-1163:9.)

Defendant prepared a written protocol describing its modified operations in CJ3 in response to the COVID-19 pandemic, and Pratt had direct involvement in preparing these changes. (Tr. 639:25-640:8; Tr. 1164:17-25.) Defendant updated and adjusted CJ3's COVID-19 pandemic protocols in real time as needed in response to the evolving situation and made these protocols publicly available on their website. (Tr. 640:9-22; 637:11-639:1 Tr. 1165:1-12; Tr. 1173:4-1174:11.)

Inmates coming into custody as of December 2020 were required to quarantine in a downtown San Francisco location for two or three weeks before being ho used anywhere else in the jail system and had to quarantine again for another two or three weeks when transferred from downtown San Francisco to CJ3 in San Bruno. (Tr. 297:3-21.) Those who left CJ3 temporarily, such as for a hospital visit, also had to quarantine again on their return. After spending a month at the hospital for a surgery, McAlister went through this quarantine procedure before reentering housing at CJ3. (Tr. 298:5-25.)

CJ3 modified its air handling system to support inmates' health during the COVID-19 pandemic. The fresh air intake for the air handling units was increased to provide 100 percent

United States District Court
Northern District of California

fresh air. (Tr. 1089:3-23; 1090:1-21.)  The air filters in the air handling units were also upgraded. (Tr. 1089:24-25; 1092:10-1093:4.)  Pratt met with CJ3's facility personnel to ensure sufficient air filtration that would not contribute to the transmission of COVID-19 in CJ3, which was confirmed by her investigation. (Tr. 659:14-660:23.)  Pratt confirmed that fresh air was being provided into CJ3 through its HVAC system. (Tr. 726:19-727:2.)

Defendant closed gyms in CJ3 during the early phases of the COVID-19 pandemic.  (Tr. 720: 1-10; 955: 3-24; 965: 13-16.)  At this time, CJ3's policy mirrored the shelter in place policy in the general community.  (Tr. 955:14-17; 1031:1-10.)  The national Center for Disease Control and an order from the Department of Public Health closed down all gyms, so Tilton closed down the gyms in CJ3 in accordance with those public health orders.  (Tr. 1161:25-1162:11.)  The gyms were re-opened as soon as the health orders allowed.  (Tr. 965:17-20.)

Although inmates could not exercise inside the gyms, they did have access to the common rooms inside their pod and were permitted to use those areas as part of a "walk group," and the size of the "walk groups" was limited in order to mitigate transmission. (Tr. 636:4-637:9.)  During these times, the people in a walk group could walk around the common area, and walking is a form of exercise.  (Tr. 732:11-16.)

Inmates also continued to exercise in their cells throughout the COVID-19 pandemic. (Tr. 718:21-719:12.)  Inmates used their bunkbeds, bars, and the floor space. (Tr. 721:13-25.)

During the initial two-month period of the COVID-19 pandemic, inmates in administrative segregation were allowed out of their cells only for two 30-minute time blocks per week.  (Tr. 950 10-23.)  However, after the initial shelter-in-place orders were lifted, CJ3 attempted to provide out of cell time for inmates in administrative segregation on hour a day, for "as many days as possible, at least three, but usually five."  (Tr. 1169:6-12.)

CJ3 also spread out its population because CJ3 was not at its maximum capacity, which allowed inmates more out-of-cell time in their walk groups. For example, although the number of administrative separation inmates could be housed in three pods at CJ3, for social distancing safety measures, they were spread over four pods, with fewer inmates in each pod. (Tr. 1177:9-1178:9.)

During this period of time, there were lengthy lockdowns for inmates in general population, during which time they could not leave their cells at all. (Tr. 1582:24-1583:20.) The longest lockdown was 21 days, and there were other ones that lasted three to seven days and one ten-day lockdown in 2021. (Tr. 1583:15-20.)

The COVID-19 pandemic was the only reason for the changes Defendant put in place during this period. (Tr. 1033:21-1034:4.) Absent another pandemic, Defendant has no plans to re-implement these restrictions. (Tr. 1034:6-13.)

### b. Availability of Vaccination: Mid 2021

About one year into the pandemic, by mid-2021, Defendant was putting a renewed focus on balancing the twin risks of the COVID-19 pandemic:  the risk of death from infection against the risk of mental health issues associated with quarantine and isolation. (Tr. 1031:1-19.) Tilton's goal was to increase out-of-cell time as much as possible. (Tr. 1166:25-1167:14.) During this period, Miyamoto was considering the COVID-19 pandemic every day and speaking with members of his staff and other city partners including the Department of Public Health every week. (Tr. 1031:20-1032:9.) COVID-19 restrictions were constantly evolving as the COVID-19 emergency changed. (Tr. 1163:12-1164:11.) Defendant was able to ease or lift restrictions in CJ3 beginning in February 2021 when vaccines first became available. (Tr. 641:7-20.) Defendant worked to encourage inmates to accept COVID-19 vaccines. (Tr. 1165:13-1166:20; 1168:7-1169:5.) However, inmates retain medical autonomy, and Defendant could not force inmates to receive COVID-19 vaccines. (Tr. 644:5-8.)

Defendant worked to decrease COVID-19 restrictions where inmates chose vaccination. For example, Tilton instructed deputies to increase the amount of out-of-cell time inmates received by increasing the size of walk groups. (Tr. 1174:13-1175:11.) Defendant expanded the numbers of people that would walk together during out-of-cell time in pod with high vaccination rates, so each inmate had longer time out-of-cell. (Tr. 643:1-14.) In this timeframe, Miyamoto also relaxed the COVID-19 restrictions to allow inmates to use the gym inside their pods as soon as the public health orders made it lawful to do so. (Tr. 1037:25-1038:6.)

United States District Court
Northern District of California

In-person visiting resumed in June 2021. (Tr. 1203:4-10.) Librarians were welcomed back to jail by at least July 2021. (Tr. 1176:16-1177:4.) However, these relaxed procedures occasionally coincided with an increase in COVID-19 transmissions at CJ3. CJ3 experienced its first COVID-19 outbreak—defined as three or more related COVID-19 cases—in the summer of 2021. (Tr. 641:21-642:25; 1169:13-1170:2.) The outbreak reemphasized the need for ongoing preventative measures such as masking, social distancing, quarantining, and isolating. (Tr. 644:9-24.)

The COVID-19 pandemic was the only reason for the changes Defendant put in place during this period. (Tr. 1033:21-1034:4.) Absent another pandemic, the SFSO has no plans to re-implement these restrictions. (Tr. 1034:6-13.)

### c. Subsequent Outbreaks: Mid 2021-Summer 2022

During this period Miyamoto was considering the COVID-19 pandemic every day and speaking with members of his staff and other city partners including the Department of Public Health every week. (Tr. 1031:20-1032:9.) In August 2022 there were still COVID-19 protocols in CJ3, as there were still public health orders that applied to congregate living settings, such as distancing, masking, testing, vaccination, isolation, quarantine. (Tr. 645: 3-23; 1214:16-1215:5.) CJ3 remained a high risk setting for COVID-19 pursuant to public health orders. (Tr. 647:6-8.)

By August 2022, CJ3 had relaxed many of its COVID-19 precautions. Group and in-person programming had been reinstated; in-person visiting had resumed; librarians were back working in CJ3; clergy were back visiting inmates, and the pod gyms were open. (Tr. 1056:13-15; 1214:4-15.) The intent of Pratt and Defendant's staff during August 2022 was to provide as much freedom and liberalize restrictions as quickly as possible and as safely as possible. (Tr. 648:13-649:14.)

During this time, inmates in general population received up to three or hours out-of-cell time per day, although it was decreased if there were surges or positive COVID-19 tests in the pod, and inmates in administrative segregation in the worker pod had six to eight hours of out-of-cell time per day. (Tr. 1167:15-1168:6; 1275:23-1276:5.) It is not clear how many hours inmates in administrative segregation had if they were not in the worker pod, but the total amount of out-

of-cell time for inmates in administrative separation did not change much during the COVID-19 pandemic as compared to the out-of-cell time they had prior to the pandemic. (Tr. 192:4-17.) In August 2022, administrative separation inmates had one hour out-of-cell time. (Tr. 1275:15-22.) Although Poot testified that he had only 15 minutes of out-of-cell time every day (Tr. 129: 21-130: 6), it was unclear if this was the schedule he had for the entire time he was incarcerated in administrative segregation.

During this out-of-cell time inmates were allowed out in walk groups and could use the phones, shower, and socialize in the common area. (Tr. 963:21-964:5.) However, walk groups remained limited because CJ3was dealing with not only another surge of COVID-19, just like the community, but an additional risk of another communicable disease, MPOX. (Tr. 645:24-646:23.)

McAlister and Brackens confirmed that, by July 2022, the gyms were open and six to eight inmates were able to use them at a time. (Tr. 242:12-16; 300:1-3.) During this same time frame of July 2022, up to 12 cells (24 inmates) were let out of their cells at a time. (Tr. 300:12-301:2)

Plaintiffs proffered no documentary evidence that supported their claim that any inmate in administrative separation did not receive at least one hour of out-of-cell time every day, or that general population inmates did not receive multiple hours of out-of-cell time every day. (Tr. 1302:14-1303:3.)[4]

Defendant would have implemented these out-of-cell restrictions during the COVID-19 pandemic regardless of its staffing levels because the decisions regarding out-of-cell time during this period were not made as a result of staffing limitations, but because of the state and local health directives in place to manage the public health emergency. (Tr. 1019:11-19.)

[4] Deputies also perform security rounds of each pod. (Tr. 1269:20-1271:7; Exh. 1180.) Defendant documents these rounds on a standard form. (Tr. 1271:8-18; Exh. 1180.) However, these forms are not used to document walk time or walk groups. (Tr. 1271-1272:4.) Plaintiffs attempted to use Exhibit 1192 to identify time periods in which inmates were given out-of-cell time. (Tr. 1243:20-21; 1244:18-23; 1246:6-7.) This attempt was not successful, as Tilton testified that this exhibit was not used to document walk time and that it was not clear if the document, Exhibit 1192, showed when the walk group ended. (Tr. 1249: 22-25.) Plaintiffs did not proffer any walk logs, which are the correct document that would substantiate or negate the testimony regarding the amount of out-of-cell time that Defendant provided inmates in CJ3.

24

Even during this later period where CJ3 was increasing out-of-cell time for inmates, there were new strains of COVID-19 resistant to the initial vaccines, and outbreaks in CJ3that required the SFSO to again change the out-of-cell time policies. CJ3 experienced six to seven outbreaks in 2021 and 2022 to which it was required to respond. (Tr. 1172:11-1173:3.) For example, CJ3 experienced an outbreak of COVID-19 during the summer of 2022. (Tr. 1588:8-10.) McAlister's pod experienced an outbreak in between July 7, 2022 and August 15, 2022 in which eight people contracted COVID-19. (Tr. 302:22-303:3.) Inmates who were transported to Zuckerberg San Francisco General Hospital for unrelated reasons returned and developed COVID-19 shortly after. (Tr. 242:1-7.) After the outbreak in McAlister's pod was managed, out-of-cell time in the pod was gradually increased. (Tr. 303:6-9.)

The COVID-19 pandemic was the only reason for the policy changes CJ3put in place during this period. (Tr. 1033:21-1034:4.) Absent another pandemic, the SFSO has no plans to re-implement the restrictions it put in place during this period. (Tr. 1034:6-13.)

**4. Efforts to Mitigate Harm to Inmates during COVID-19 Pandemic**

To support inmates who were sheltering in place, Defendant implemented a tablet program to connect inmates with their communities and families outside CJ3, and this plan involved partnering with other agencies within San Francisco and installing a WiFi system in CJ3. (Tr. 1032:10-1033:10.) This platform, which cost between $3 to $5 million, was released in June 2020, and it did not exist before the COVID-19 pandemic and. (Tr. 1036:10-16; 1099:17-23; 1171:15-24.) The video visit program, which continues to the time of trial, was initially offered to provide inmates access to their legal counsel and then expanded to family visits and visits from the general public. (Tr. 1033:7-10.) When the program first started, 88 video visits were completed in one month; in February 2021, there were 299 video visits. (Tr. 1200:24-1202:4; Exh. 1131.) These video visits also made it possible for inmates to remotely attend funerals of loved ones who passed away from COVID-19, and without the video visits, the inmates would not be able to attend either before or after the COVID-19 pandemic. (Tr. 245:1-20.) Video visits continued even when in person visiting resumed. (Tr. 1203:11-1204:7.) The video visiting infrastructure is in every pod in CJ3. (Tr. 1204:15-23.)

During the COVID-19 pandemic, Defendant also routed the sound for the television into the cells, whereas previously sound was limited to common areas, so that inmates would have access to programming including the news even when they were not out-of-cell. (Tr. 1098:24-1099:16.)

Even if CJ3 had a secure outdoor space, the SFSO could not have used it during the COVID-19 pandemic to provide outdoor access to inmates given the restrictions regarding social distancing and the number of individuals who could be out together. (Tr. 1010:7-11.)

### 5. Programming During the COVID-19 Pandemic

CJ3's programming opportunities during the COVID-19 pandemic were restricted because of public health concerns. Volunteers were prohibited from entering CJ3 until vaccinations became available to prevent spread of the virus. (Tr. 1059:8-1060:5.) Once vaccinations were available, Defendant prioritized getting vaccinated volunteers, such as those from the library, COVER, Roads to Recovery, and RSVP programs back in CJ3 first. (Tr. 1059:8-1060:5.) This transition to letting vaccinated volunteers back into CJ3 began in May of 2021. (Tr. 1059:17-1060:12.)

Tilton worked with the educational programming staff to have packet materials dropped off and distributed when group programming was not possible. (Tr. 1170:7-1171:14.) To the extent possible, programming returned to CJ3 during the COVID-19 pandemic, as exhibited by McAlister's participation in group programming for three hours a day in approximately July 2021. (Tr. 293:19-24; 294:15-24.)

None of the programming restrictions implemented during the first phase of the COVID-19 pandemic were intended to punish inmates. (Tr. 1060:13-17.) They were instead implemented as a best practice, in consultation with the Department of Public Health, to protect inmates' health and safety during a global pandemic. (Tr. 1060:18-23.)

### J. Plaintiffs

#### 1. Jose Poot

Jose Poot was incarcerated first with Defendant in 2016 and then at CJ3 from 2017 to 2018, and then after spending a year and a half in the jail (now closed) located at 850 Bryant Street

26

in San Francisco, he was transferred back to CJ3, where he remained until the time of trial. (Tr. 128:20-129:16.) He has been in general population and administrative segregation at different times during his incarceration. (Tr. 129:3-5.) He was in administrative segregation for approximately three years. (Tr. 129:24.) Thus, as of the time of trial, Poot had been incarcerated for approximately seven years. Poot waived his right to a speedy trial in connection with the criminal charges that led to his incarceration in CJ3 during the pendency of this litigation. (Exh. 1173 (Request for Admission 3).)

While Poot was in administrative segregation and before the COVID-19 pandemic, Poot was able to go out of his cell for one hour a day. (Tr. 157:4-6.) He could use the gym during that time but also needed that time to use the phone and go to the bathroom. (Tr. 157:7-10.) Poot testified that, after the COVID-19 pandemic, he was allowed out of his cell for 15 minutes, every other day. (Tr. 129:25-130:5.)

He weighed 133 pounds when he first entered jail but now weighs 182 pounds. (Tr. 131: 17-23.)

He testified that he has headaches at a level 8 out of a scale of 1 to 10 every day, "always," but there is no medical record of them because he did not seek treatment. (Tr. 133:1-10; Exh. 9G.)

He has low Vitamin D. (Tr. 133:20-25.) He refused Vitamin D supplements, though. (Tr. 171:25-172:2.)

Poot has felt depressed, nervous and anxious, worried, and tired. (Tr. 134:16-137:15.) Poot experienced stress from causes unrelated to this lawsuit including the seriousness of his underlying criminal charges, the uncertainty around his criminal trial, separation from his family, and concerns about his family's health. (Tr. 165:9-166:17.)

Poot's medical records show no problems with hypertension or any of the other medical or psychological issues which he complains were caused by lack of access to direct sunlight or out-of-cell time. (Exh. 9G.) Regarding his psychological state, his records showed only one report in which he admitted that he had been suicidal when he first was incarcerated but that he no longer felt suicidal, and on another occasion he said that he was sad and linked his sadness to his

United States District Court
Northern District of California

concerns about his case.  (Exh. 9G at CCSF-Norbert 006512; 000078; P 0009-006366.)[5]

Since August 2022, Defendant has offered him outdoor access via a catwalk area, and Poot has refused that opportunity. (Tr. 167:11-168:5.)  The catwalk was covered by a roof but open on the sides with a chain link fence, and Poot testified that it stressed him out to be in an area where he can see the sun but not feel sunlight on his skin other than if he places his hand in a gap in the fence.  (Tr. 178:17-180:18.)

Poot filed a separate lawsuit against San Francisco alleging that the lighting conditions in CJ3, timing of meals, nighttime noise in CJ3 were disturbing his sleep (the "*Poot* lawsuit").[6]  That lawsuit did not concern any allegations about the conditions of confinement at issue in this litigation—outdoor access and out-of-cell time.  (*Id.*)  However, in this lawsuit and in the *Poot* lawsuit, Poot answered sworn interrogatories regarding the alleged injuries he attributed to the conditions of confinement in both cases and identified word-for-word the same injuries, down to the same unusual punctuation. (*Compare* Exh. 1177 *with* Exh. 1178.)

Other than his explanation that he rejected his time on the catwalk because of frustration of limited access to direct sunlight, Poot did not testify at trial or provide any other evidence stating that his lack of access to direct sunlight caused him emotional distress.  He did not personally link his lack of direct sunlight to medical problems.  Poot did not testify at trial or provide any other evidence stating that his lack of out-of-cell time caused him emotional distress.  He did not personally link his lack of out-of-cell time to medical problems.

Poot chose not to attend trial every day, even though the Court reminded him of his right to do so.  (Tr. 370:22-372:19; 436:4-7; 656:4-6; 1273:18-21.)

The Court finds that Poot lacks credibility.  First, he claimed at trial that he was not sure if his memory issues were so bad that he could give truthful answers.  (Tr. 151:17-22.)  Second, Poot claimed that he suffered the same injuries in this case, caused by lack of direct sunlight and

---

[5] Each page in this Exhibit 9G has three different Bates numbers, so the further references will be to the Bates number without the letters before the number.

[6] The Court took judicial notice of the existence and contents but not the truth of the allegations in the Complaint filed in *Poot v. San Francisco Cnty. Sheriff's Dep't*, 4:19-cv-02722 (N.D. Cal. May 5, 2019).

United States District Court
Northern District of California

inadequate time out of his cell, that he suffered in from other issues such the lighting conditions in CJ3, timing of meals, and nighttime noise CJ3in the *Poot* lawsuit that he filed against Defendant. (Tr. 160:8-163:4.)  Specifically, the Court finds that Poot's testimony about the out-of-cell time he had after the COVID-19 pandemic began was vague and not reliable.

### 2.  Montrail Brackens

Montrail Brackens was incarcerated in either the older, closed facility located at 850 Bryant Street, San Francisco, or CJ3 from December 11, 2012 onward and was housed in CJ 3 during August 2022 and at the time of trial.  (Tr. 184:12-19, 192:3-6;  Dkt. No. 448 (Stipulation ¶¶ 8-9).)  He was in administrative segregation for all but approximately two years of that time.  (Tr. 185:2-16.)  When Defendant sought to reclassify Brackens back into general population, he refused the housing assignment, as he preferred to stay in administrative segregation. (Tr. 240:12-241:11.)  There have also been times when Brackens was housed in administrative segregation where he preferred to be housed alone rather than having a cellmate. (Tr. 241:20-23.)  Thus, as of the time of trial, Brackens had been incarcerated for almost 11 years.  Brackens waived his right to a speedy trial in connection with the criminal charges that led to his incarceration in CJ3 during the pendency of this litigation. (Exh. 1173 (Request for Admission 3).)

Starting in December 2014, Brackens' medical records show that his blood pressure readings were "abnormal" or pulse "elevated."  (Exh. 9A at CCSF-NORBERT 000165; 000013-000014; P 0009-000019 (blood pressure reported as 155/101 and listed as "abnormal"),[7] 000015 (BP 138/90), 000031 (noting earlier high blood pressure with decreased results later), 000040 (blood pressure 157/94), 000043-000044 (153/89, and pulse listed as "abnormal"), 000046 (146/81 "abnormal"), 000049 (141/77 "abnormal"), 0050 (nothing), 000051 (blood pressure 113/75 and pulse "abnormal"), 000058 "(also reviewed bp/puls c pt . . . still elevated tho mostly wnr" and blood pressure listed as 130/89); 000059 ("elevated bp/pulse"), 000075 (blood pressure 145/97 "abnormal"), 000076 ("BPi is elevated in clinic"), 000094 ("bp and pulse intermittently elevated"), 000119 (nothing), 000192-000194 ("He has had elevated blood pressure in the past[;]

---

[7] Again, these documents have three Bates numbers, and further references will be to the Bates number without a letter preceding the number.

29

however today in clinic, his blood pressure is 129/89."), 000235-000236 (history of high blood pressure but "BPs appear to have improved recently with current BP 142/95."), 000382 (blood pressure 122/68), 000421 (BP 134/78), 000487-000488 (blood pressure is 142/89).)[8]

Starting in  2015, Brackens' medical records also show regular reporting of digestion and bowel issues, including blood in his stool (melena).  (Exh.9A at 000038, 000039, 000040, 000070, 000075, 000076, 000117, 000118, 000142, 000261, 000266, 000281, 000286, 000479, 000481, 000490, 000492, 000495, 000569, 000595, 000599, 000600, 000603, 000608, 000881.)  Brackens exhibited obesity and weight issues starting in December, 2014, which was two years after incarceration.  (Exh. 9A at 000013-000014, 000019.)

Brackens was diagnosed with chronic Vitamin D deficiency and was offered supplements. (Tr. 200:10-18 and 248:2-10.)

Brackens testified at trial that he had very painful headaches began six to eight  months after incarceration.  (Tr. 199:24-25)  His headaches were reported with a severity of level five out of ten.  (Exh. 9A at 000586-000587.)  There were continued report of chronic headaches throughout 2016 and partly in 2017.  (Exh. 9A at 000597-000598; 000600, 000614; 000618-000619, 000627; 000632-000633; 000663-000664, 000703-000704.)  Brackens testified that, since "last summer," the headaches occur three or four times a week, on a scale of 7 ½ to 8 on a pain scale of 1 to 10.  (Tr. 198:14-20.)

Brackens now wears glasses, and he started wearing them for being near-sighted (myopia) one or two years after he was incarcerated.  (Tr. 200: 1-9.)

Two years after being incarcerated, Brackens also gained weight:  55 pounds as of December 18, 2014.  (Exh. 9A at 000013.)

Brackens was diagnosed with diabetes in 2019.  (Tr. 189:11- 14; Exh. 9A at 000978(8/16/19).)  Brackens was also hospitalized once in April 2022 because he was fasting for Ramadan. (Tr. 227:25-228:10.)

Brackens  felt nervous or anxious every day, felt depressed three or four times a week, and

_____

[8] Each page of this Exhibit has three Bates numbers.  The references here are to the ones in bold on the exhibit without a prefix.

felt hopeless two or three times a week.  (Tr. 209:9-202:8.)  Brackens admitted that he felt depressed because of the limitations on family visits, frequency of phone access, and quality of the food in jail.  (Tr. 243:9-22.)  While incarcerated, Brackens missed important family events, including family funerals which he was able to attend via Zoom but not in person.  (Tr. 245:1-20.)  He also felt both depressed and anxious because of concerns for his physical safety. (Tr. 243:23-244:25.)

Brackens uses CJ3'scommissary and orders items including candy bars, gummy worms, chips, ramen, and powered drinks, (Tr. 228:16-230:4.)

Brackens refused to additional time in the indoor gym on three occasions  in the past few months. (Tr. 236:12-20.)  Also, after August 2022, Defendant has offered Brackens *outdoor* access in the past few months, but he has refused to take advantage of it on multiple occasions. (Tr. 245:21-246:2; 246:18-22.)

Brackens was a named plaintiff in the *Poot* lawsuit. (Tr. 243:2-4.) As noted above, the *Poot* lawsuit did not concern any allegations about the conditions of confinement at issue in this litigation—outdoor access and out-of-cell time.  However, in this lawsuit and in the *Poot* lawsuit Brackens answered sworn interrogatories regarding his alleged injuries in each lawsuit and identified word-for-word the same injuries, down to the same unusual punctuation, in both cases. (*Compare* Exh. 1177 *with* 1178; Tr. 243:5-8.)  Brackens did not testify at trial or provide any other evidence stating that his lack of access to direct sunlight caused him emotional distress.  He did not personally link his lack of direct sunlight to medical problems.  Brackens did not testify at trial or provide any other evidence stating that his lack of out-of-cell time caused him emotional distress.  He did not personally link his lack of out-of-cell time to medical problems.  However, Brackens wrote an poem about being incarcerated, and he read that poem at trial.  His poem follows:

> I got to move. Where can I move? I'm a hamster. Y'all don't even have a wheel. On top it's calm, but underneath my legs are pumping up – my legs are pumping like mad. All this energy with nowhere to go. Secluded. Forcing me to be introverted. Everything gets stuffed inside. No one to talk to, no one to smile at, no one to have a healthy – no one to have – no one to have healthy conversations with or the

31

United States District Court
Northern District of California

> kind of arguments you have with friends, ideas flying, words, jokes, laughter. Nothing.  Silence. Them's the emotions, them is feelings. They're bent and distorted from being in a tight space. Nowhere to turn.  On the ledge and the wind is blowing.  I have to fight everyday not to fall over.  Every day I think I'm so close to the edge.  I can hear people, so close to people, yearning to be with people, but all I have is this little ledge. It would be so easy to fall over, to lay down and just go over the edge. I was a young healthy active 21-year-old.  I had friends.  I had a life.  I had a future.  I had hopes. I had a family, love and people who loved me. Ten years in jail. Ten years in ad seg. I'm 31 now. I'm overweight. I'm depressed, lost and a diabetic. My life revolves around insulin shots and it cost San Francisco a million dollars. What a waste.

(Tr. 226:17-227:16.)

Brackens chose not to attend trial every day, even though the Court reminded him of his right to do so.  (Tr. 370:22-372:19; 436:4-7; 656:4-6; 1273:18-21.)

### 3.   Troy McAlister

Plaintiff Troy McAlister has been in and out of jail since 1995 without memory of any periods during which he was not incarcerated for longer than six months.  (Tr. 292:22- 293: 3.) He was incarcerated in a San Francisco jail during three main periods.  First, he was incarcerated from 2009 to 2010.  (Tr. 267:5-9.)  In 2010 he was transferred to San Quentin State Prison, where he stayed for approximately four years.  (Tr. 267:9-14.)  He was out of custody for approximately a year.  Second, after his release from San Quentin State Prison, he returned to CJ3 from 2015 to 2020 at CJ3.  (Tr. 266:5-24.)  He was released, apparently only for less than a year.  Third, he then returned to CJ3, so that from December 2020 to the time of trial, he had continuously been in custody at CJ3.  (Tr. at 266:5-268:2.)  Thus, at the time of trial, McAlister had been incarcerated almost three years on his latest charges.  McAlister waived his right to a speedy trial in connection with the criminal charges that led to his incarceration in CJ3 during the pendency of this litigation. (Exh. 1173 (Request for Admission 3).)

McAlister has a history of abusing methamphetamines since 2000. (Tr. 286:5-6.)

McAlister gained weight while in CJ3.  In 2009, he weighed between 185 to 200.  (Tr. 267: 15-17.)  In 2010, when he was transferred to San Quentin State Prison, he weight about 240 pounds.  (Tr. 267:18-20.)  During his time in San Quentin State Prison, he was able to exercise

32

outside "basically all day" for many hours, every day, and he lost about 40 pounds. (Tr. 267: 24-268:7; 271:14-272:1.) During his second period of incarceration by Defendant, he gained much of that back. (*Compare* Exh. 9e at 000041 (weight 190 pounds) *with* Exh. 9E at 001540 (weight 221 pounds on 12/8/17).)[9] By July 2019, McAlister had gained 52 pounds. (Exh. 9E at 002356.) During his third period of incarceration, he remained overweight, and at the time of trial, he weighed 251 pounds. (Tr. 268:20-21.)

McAlister testified that he did not have high blood pressure when he first was incarcerated by Defendant. (Tr. 269:11-13.) He developed high blood pressure and was prescribed blood pressure medication in late 2009 or early 2010 during his first phase of incarceration. (Tr. 269:11-270:5).[10] His medical records indicate that, after Defendant discharged him, his blood pressure returned to normal or close to normal. (Exh. 9E at 00000003 (record from readmission into custody in July 2015, indicating blood pressure of 127/79).) McAlister testified that, following his release after his first phase of incarceration and during his time in San Quentin prison, he had ample access to the outdoors and direct sunlight. (Tr. 271:17-272:23.) During that time, his blood pressure remained at 120/80 and that he ceased medication (Tr. 270: 6-16.) However, following McAlister's reincarceration in 2015 in CJ3, he developed hypertension (high blood pressure) within six months of his incarceration. (*Compare* Exh. 9E at 000043 (BP at 138/69 on 8/21/15); *with* Exh. 9E at 000372 (blood pressure 148/96 "abnormal" on 6/16/16).) His blood pressure was treated initially by medication, but McAlister did not want to increase his medication. (Exh. 9E at 001540, 001820, 001919, 001942, 002174, 002334.)

McAlister's weight gain upon returning to CJ3 in his third phase (December 2020 onward) was at least partially related to a leg injury that prevented him from exercising. (Tr. 275:6-15.) McAlister had a gunshot wound to his leg that occurred in August 2020; he could not exercise in jail because of his leg wound; and the injury caused ongoing limitations as of August 2022. (Tr. 286:13-23.)

---

[9] Each page of this Exhibit has three Bates numbers. The references here are to the ones in bold on the exhibit without a prefix.

[10] Medical records from this time period corroborating this testimony were not in evidence.

33

McAlister claimed he gained weight from eating jail food. (Tr. 267:15-23; 268:3-21.) McAlister purchased food from the commissary, including purchasing 10 to 20 items ramen and chips every couple of weeks. (Tr. 303:21-304:17.) McAlister purchased these items for himself. (Tr. 315:7-16.)

McAlister also had some digestive issues. (Exh. 9E at 255-256.)

McAlister's weight and blood pressure in CJ3 did not improve even though he went outside once or twice a week for two semesters as part of the aquaponics program at CJ3 in 2015. (Tr. 273:2-6; 273:17-23; 274:2-7; 274:18-22.) The aquaponics program was one in which inmates worked outside. (Tr. 98:21-99:1.)

McAlister had headaches only "now and then," as he explained that everybody gets headaches every now and then and his were limited to that also. (Tr. 312:21-24.)

McAlister felt tired because he woke up throughout the night. (Tr. 211:9-24.) But he woke up due a swollen prostate for which no medical physician testified was specifically caused by any conditions of confinement. (Tr. 279:9-13.) McAlister was refreshed by daily 30- to 60-minute naps, did not suffer from sleep attacks, did not fall asleep while sitting in a chair or taking a class. (Tr. 279:19-280:17.) His tiredness and sleep habits are not caused by out-of-cell time or access to sunlight. (Tr. 286:24-287:2.)

McAlister had no behavioral health treatment in jail from 2015 to 2020. (Tr. 291:13-16.) McAlister had behavioral health treatment when he returned to jail in December 2020, but that treatment was not related to the conditions in jail; rather, it concerned a death or loss about which he asserted his Fifth Amendment right and refused to testify. (Tr. 291:17-292:11.) It is hard for McAlister to be away from his family. (Tr. 293:4-5.) It is stressful for McAlister to have uncertainty regarding his criminal case. (Tr. 293:6-8.) McAlister is worried that his mother will die while he is incarcerated. (Tr. 293:9-11.)

McAlister did not testify at trial or provide any other evidence stating that his lack of access to direct sunlight caused him emotional distress. He did not personally link his lack of direct sunlight to medical problems. McAlister did not testify at trial or provide any other evidence stating that his lack of out-of-cell time caused him emotional distress. He did not

United States District Court
Northern District of California

personally link his lack of out-of-cell time to medical problems.

McAlister chose not to attend trial every day, even though the Court reminded him of his right to do so.  (370:22-372:19; 436:4-7; 656:4-6; 1273:18-21.)

### K. Testimony of Expert Witness Ross Mirkarimi

Ross Mirkarimi is the former Sheriff for San Francisco and testified as an expert witness on behalf of Plaintiffs regarding the operations of the San Francisco Sheriff and physical plant of CJ3.  (Tr. 19: 14-21.)  Mirkarimi served as elected Sheriff of San Francisco from January of 2012 through January of 2016.  (Tr. 14:10-11.)  After graduating from the San Francisco Police Academy as a POST-certified law enforcement officer but before he became Sheriff, Mirkarimi was employed as an investigator in the San Francisco District Attorney's Office for nine years and was subsequently elected twice to the San Francisco Board of Supervisors.  (Tr. 14:14-25, 15:1-11.)

Mirkarimi testified about the physical layout of CJ3, the outdoor yard that previously existed, the fact that there was no reason CJ3 could not have an outdoor yard, that Defendant is understaffed in the Sheriff's Office, the manner in which understaffing can create a lockdown or increase in inmates placed in administrative segregation, and the effects of a lockdown on inmates and Sheriff's deputies.  (Tr. at 19-55.)  He specifically opined about the current practices for administrative separation at CJ3:

> it sounds like a blanket practice that has now been put into action in order to justify the absence of staff in San Bruno so that then the measures of security and safety would be enhanced by putting people, who maybe under my administration wouldn't have been in administrative segregation as a default, to not have to provide programming because of the lack of deputy staff that would typically be assigned.

(Tr. 55:14-22.)[11]

---

[11]   In contrast, Tilton explained that the reason the number of inmates in administrative segregation in CJ3 increased was that another jail, located at 850 Bryant Street, in San Francisco, closed, and those inmates from administrative segregation then were transferred  to CJ3.  (Tr. 1255:16-24.)

United States District Court
Northern District of California

As the trier of fact, the Court finds his testimony on key areas regarding jail operations not credible. Ironically, despite the fact that he was the Sheriff for San Francisco, Mirkarimi has little experience in the areas for which he served as an expert witness. Before he was elected to the position as Sheriff, Mirkarimi held no other position with the Sheriff's Office; he was never a deputy, senior deputy, lieutenant, captain, chief, assistant chief, or undersheriff. (Tr. 57:24-58:16.) Mirkarimi has never actually worked in a county jail. (Tr. 57:24-58:1.) Mirkarimi served as Sheriff for four years, but was suspended for 7 months during that period of time, so he actually worked as Sheriff for fewer than four years. (Tr. 57:14-18.) There was no evidence that, after Mirkarimi left his position as Sheriff, that he worked in any other incarcerated setting or in law enforcement.

Mirkarimi gave testimony regarding the mental health impacts of conditions of confinement on incarcerated persons even though he has no expertise in any related field including as a doctor, nurse, psychiatrist, or social worker. (Tr. 58:17-59:11.)

Mirkarimi's work in this matter was minimal and limited. He was paid a flat fee of $10,000 to write a report based on 194 pages of materials that he received within two days of the date his report was due. (Tr. 59:23-60:14.)

Mirkarimi failed to explain adequately how he formed his opinion. For example, Mirkarimi's report included a list of documents that he purportedly reviewed, although he did not prepare that list, and it included documents he in fact had never seen. (Tr. 60:20-25.) At trial, Mirkarimi was impeached multiple times. Although he testified at trial that he had reviewed certain documents, he stated under oath in his deposition that he had not reviewed them. (Tr. 61:19-69:12.) And of the documents that he did review, Mirkarimi could not identify the significance they held to his opinions. (Tr. 65:9-66:12; 69:14-70:3.) These factors raise concerns that Mirkarimi did not form independent opinions but instead relied upon Plaintiffs' counsel to form his opinions.

Mirkarimi also formed opinions without reviewing or relying on key materials including: Plaintiffs' depositions or the depositions of any of Defendant's employees. The documents Mirkarimi did not review include the following: depositions of Chief Kevin McConnell, Ramirez,

36

Tilton, Pratt, Miyamoto; any document produced by Defendant during discovery; any inmates' grievances; any inmates' disciplinary records; any classification records; and medical records. (Tr. 70:16-80:7; 82:8-86:8.) Although Mirkarimi testified at trial that he had reviewed some of these documents to form his opinion, he was impeached by testimony from his deposition in which he admitted that he had not reviewed them. (*Id*.)

Mirkarimi was not reliable in explaining what he had been told; for example, he opined that Defendant was moving away from a direct supervision model and stated this opinion was based on a discussion with Kenneth Lomba.[12] (Tr. 87:4-20; 88:8-11.) However, Lomba confirmed that he told Mirkarimi that the direct supervision model will "always carry on." (Tr. 592:19-593:1.)

Mirkarimi opined that outdoor access should be provided at CJ3 even though he never advocated for outdoor access and "orchestrated and assembled" a team of employees to prepare a formal proposal of 139 pages to build a new jail facility in San Francisco that did not have any outdoor access. (Tr. 102:6-12; 104: 3-14; 105: 3-9.) In fact, although Mirkarimi stated he believed incarcerated persons should have outdoor access, during the entirety of his tenure as Sheriff, he was never able to offer outdoor access to more than four lower level security inmates. (Tr. 98:21-99:1; 99:5-13; 100:13-15.)

In addition, Mirkarimi was suspended as Sheriff without pay after pleading guilty to misdemeanor false imprisonment and after the San Francisco Ethics Commission found in a vote of four to one that he committed official misconduct. (Tr. 56:25-57:23.) The City Attorney's Office, the same office defending Defendant in this matter, represented Defendant in the effort to remove Mirkarimi permanently from office. (Tr. 56:25-57:23.) Although he denied being biased against Defendant, the Court finds that Mirkarimi was biased against Defendant, partially based on Defendant's actions against him. The Court does not find that Mirkarimi intentionally lied, but his bias was to criticize his successor.

_____

[12] Lomba is a deputy sheriff "detailed to the union" (the Deputy Sheriffs' Association) and he is president of the union. (Tr. 509:21-24.)

37

These factors together undermine Mirkarimi's credibility with respect to his critiques of Defendant's policies and practices.  The Court finds that Mirkarimi was not a credible witness and does not accept his opinions.

**L.  Testimony of Expert Witness Jamie Zeitzer, Ph.D.**

Jamie Zeitzer, Ph.D., submitted a declaration in support of Plaintiffs' motion for a preliminary injunction and testified before the Court at the evidentiary hearing held on October 23, 2019.  Zeitzer received his Ph.D. in neurobiology from Harvard University and has spent almost 30 years studying circadian rhythms and light.  (Tr. 424:1-4.) He is currently a professor in psychiatry and behavior sciences at Stanford University and co-directs the sleep and circadian sciences center there.  (Tr. 424:3-7.)  He has also worked as an expert in two cases related to conditions at the Santa Rita Jail.  (Tr. 487:20-22.)

The Court considered both  Zeitzer's testimony from the evidentiary hearing for the preliminary injunction and his testimony at trial, as his testimony remained consistent throughout both.  Zeitzer provided slightly more background during the hearing for the preliminary injunction, (Dkt. No. 110 at 18-19) and at trial provided specific details about light readings at CJ3.

In summary, Zeitzer explained at both the evidentiary hearing and at trial that a person needs variation between light and dark to maintain the Circadian clock or Circadian rhythm, and failure to maintain that Circadian clock can cause medical problems.  (Dkt. No. 110 at 18-19.) Disruptions to the Circadian clock can cause many short-term problems, including changes in appetite and hormones, reduced memory, problems with cognition, and an impaired immune function.  (Tr. 502:9-11; Dkt. No. 110 at 18-19.)  Longer-term problems include depression, anxiety, the development or worsening of diabetes, dementia-like symptoms, and increased incidence or recurrence of breast or colon cancer.  (Tr. 501: 24-502: 16; Dkt. No. 110 at 18-19.) The key to maintaining the Circadian clock is a differential between light during the day and dark at night.  (Tr. 477:11-19.)  As the Court previously summarized Zeitzer's previous writings and testimony at the hearing:

> "A properly timed and functioning Circadian clock is dependent on exposure to regular light-dark cycle." . . . . "Exposure to sunlight is

38

> an important component in the setting and regulation of the human Circadian rhythm." . . . . This is true because "[t]he more robust the difference between the brightness of light during the day and night, the stronger the signal to the Circadian clock."

(Dkt. No. 110 at 18-19.)

The most important issue for the Circadian clock is to "create a difference between the daytime lighting and the nighttime lighting." (Dkt. No. 110 at 18-19.) Zeitzer testified earlier that if a person "were to sleep in absolute hundred percent darkness," [daylight between 50 to 200 lux would be adequate. (Dkt. No. 110 at 18-19 (internal citation omitted).)

There is no conclusive evidence that lack of exposure to direct sunlight, as opposed to sufficiently bright light, causes medical problems, because generally the type of light does not matter in regulating the Circadian clock. (Dkt. No. 110 at 18-19; Tr. 506:23-507:11.) There is no agreed-upon published standard for what the delta between daytime light and nighttime light should be to regulate one's Circadian clock. (Tr. 477:20-24.) However, a person who sleeps in total darkness needs exposure only to 50 to 100 lux during the daytime to regulate his Circadian clock. (Tr. 479:17-20.) If a person has some light exposure at night, he needs approximately 200 to 300 lux during the daytime to regulate his circadian rhythm. (Tr. 479:21-480:20.) Zeitzer's light readings show this difference in the appropriate amount of light between the day and nighttime light levels in CJ3. (Exhs. 32-33.) A person can regulate his Circadian clock by artificial light or access to light through a window as opposed to going outside. (Tr. 475:20-476:1.) The "type of light – whether sunlight or artificial light – is not significant" as an isolated factor in determining physical health risk to individuals based on the failure to regulate the Circadian clock. (Dkt. No. 110 at 20; Tr. 506:23-507:11.) Having light filter through plastic or Lexan glass does not matter for purposes of the Circadian clock. (Tr. 479:8-10.) So, for example, the presence or absence of UV spectrum light within light does not have much impact, if any, on the ability of a person to regulate his Circadian clock. (Tr. 506:23-507:11.) In terms of regulating a person's Circadian clock, the exposure to light that matters is the light received through a person's eyes rather than whether or not she or he receives any exposure to light directly on skin. (Tr. 477:9.) To regulate one's Circadian clock, exercising outdoors does not make a difference. (Tr. 416:19-417:5.)

United States District Court
Northern District of California

United States District Court
Northern District of California

Zeitzer also explained the measurement system for light. As the Court previously summarized:

> Zeitzer explained during the evidentiary hearing that it is possible to measure ambient light levels using a light detector unit ("LDU") calibrated by the National Institute of Standards and Technology. (Dkt. 75 (Zeitzer Hearing FTR at 9:41).).… Zeitzer explained that the LDU takes in light readings and normalizes them to a unit of measure referred to as "lux," which corresponds to the amount of light taken in by the human eye and consciously seen by the human brain. (Dkt. 75 (Zeitzer Hearing FTR at 9:42; Zeitzer Hearing Transcript at 12:3-9).) Zeitzer clarified that the further a person is from a light source, the lower the intensity of the light the person receives, with the normal calculation being 1 divided by the square root of the distance from the light. (Dkt. 75 (Zeitzer Hearing FTR at 9:43).)

Zeitzer also explained the context of lux readings – measuring the amount of light.

> According to Zeitzer, "anything under 10 lux" represents "very dim lighting." (Dkt. 75 (Zeitzer Hearing Transcript at 12:11).) In the United States, indoor lighting in a typical home varies between 100 lux during the day and 50 lux in the evening. (*Id.* at 12:11-14.) In contrast, "a well-lit office" might be 200 to 300 lux, and the light outside on a nice day would be anywhere from 10,000 to 100,000 lux. (*Id.* at 12:15-17.) . . . A person can receive the proper differential between light during the day and light during the night from access to natural light from a window instead of being outside. [(*Id.* at 23:8-11.)] And that differential can also be established from [artificial light boxes at 10,000 lux as opposed to natural light. (*Id.* at 23:14-22.)]…
>
> Zeitzer further hypothesized that some exposure to high intensity sunlight one to two times a week might also be sufficient to ameliorate Circadian problems in people who generally are exposed to poor lighting conditions. (Dkt. 75 (Zeitzer Hearing Transcript at 28:10-19.)

Zeitzer took approximately one week of light measurements from inside two types of cells inside CJ3—those that still have fluorescent bulbs and those that have transitioned to more modern LED lights, which are recorded in Exhibits 33 (fluorescent) and 32 (LED). (Tr. 442:10-18; 481:7-10.) His light readings are measured in lux—with one lux giving off about as much light as a single candle from a few feet away. (Tr. 441:2-442:1.) For example, inside the courtroom, the lux levels would vary between 50 or 60 if a person were looking into a dark area to approximately 150 lux if a person were looking more directly at the light. (Tr. 441:2-442:1.) A bedroom typically has between 50 and 80 lux; a well-lit bathroom or doctor's office typically has up to 500 lux; and

at sunrise, the lux outside will likely reach 10,000 lux on cloudy days or even higher. (Tr. 441:2-442:1; 461:14-16; 461:22-24.)

Zeitzer's light measurements ranged from basically zero at night in CJ3's cells to the level of a well-lit doctor's office during the day in the cell.  (Tr. 481:14-17; 482:24-483:5; 499:22-25.) That light is as bright as any indoor location would be. (Tr. 481:18-482:22.)  Zeitzer's measurements do not distinguish between the source of the light. (Tr. 484:24-485:3.)  In other words, the light meter readings do not distinguish between light from the overhead artificial lighting and sunlight coming through the window.  (Tr. 484:24-485:3.)  Increasing the level of light during the day does not compensate for night at light because, even with closed eyelids, all people spontaneously wake up at night, multiple times, open their eyes, and look around, and even 50 lux of light at night has a greater chance of disrupting sleep.  (Tr. at 497:4-498:13.)  To establish a proper day/night cycle, if daytime lighting is 250-300 lux, night time lighting must be between zero and five lux.  (Tr. at 497:21-24.)  From the light reading measurements Zeitzer took he confirmed there was a day-night light cycle inside CJ3's cells.  (Tr. 446:16-21.)

If a person closes his eyes, that reduces the amount of lux he receives into his eye by 90 percent. (Tr. 483:6-12; 483:18-22.)  None of Zeitzer's light reading measurements accounted for the reduction in light levels an inmate, when sleeping, would experience. (Tr. 483:13-17.)  Inmates in CJ3 also have access to eye masks. (Tr. 1211:10-1212:10.)  Wearing an eye mask further decreases the amount of lux a person experiences at night.  (Tr. 406:2-4; 3 503:22-25.)  None of Zeitzer's calculations accounted for the effect of an eye mask.  (Tr. 504:4-7.)

Zeitzer did not opine in any way about the effect of the differential between light in the day and light at the night in CJ3 for the inmates' Circadian clocks.  In other words,  Zeitzer did not offer any opinions about whether any class member was experiencing injuries or harm as a result of a disruption to his Circadian clock caused by their conditions of confinement.  (Tr. 494:2-10.) The Court found Zeitzer to be credible.

**M. Testimony of Expert Witness Charles Czeisler, M.D., Ph.D.**

Charles Czeisler, M.D., Ph.D., testified as an expert in the field of sleep medicine, circadian rhythm, and the effect of sunlight and light on human physiology.  (Tr. 331: 6-8.)

Czeisler received his Ph.D. in neurological and biobehavioral sciences and his M.D. from the Stanford University School of Medicine, after which he served as a senior fellow in health policy at the John F. Kennedy School of Government at Harvard University. (Tr. 317:6-15.) He currently serves as a professor of medicine and the Frank Baldino, Jr. Professor of Sleep Medicine at Harvard Medical School, the director of the Division of Sleep Medicine at Harvard Medical School, an associate professor in the department of molecular and cellular biology at Harvard University, and as a senior faculty member in Harvard's College of Arts and Sciences. (Tr. 317:16-25, 318:1-5, 319:22-23.) He is also a senior physician in the Department of Medicine at Brigham and Women's Hospital in Boston, Massachusetts, where he was the Division Chief of the Division of Sleep and Circadian Disorders from 2001 until 2014 and became the Division Chief of its Departments of Medicine and Neurology beginning in 2014. (Tr. 318:6-25, 319:1-18.) He has served in positions of leadership for national organizations. (Tr. 322:24-25, 323:1-2; 323:17-19; 324:9-14.) He has received many national awards. (Tr. 324:18-21; . 325:2-4; 325:5-10; 325:17-20, 24-25, 326:1; 325:21-23; 326:2-4; 326:5-12; 327:1-6.) He has also received awards from Harvard and Stanford. (Tr. 327:7-9; 327:10-12.) He has also published over 300 papers. (Tr. 327:18.) For the last 38 years, he has done work as an expert witness, working on between 60 and 80 cases. (Tr. 411:24-25, 412:1-22.) Although he has a medical degree, he never treated patients. (Tr. 400:25-401:6.)

Czeisler opined that insufficient exposure to direct sunlight can lead to high blood pressure, because "the sun very rapidly converts nitric oxide derivatives into nitric oxide, which causes the blood vessels to relax and lowers blood pressure." (Tr. 357:20-22, 365:6-12.) This "effect persists for 24 hours." (Tr. 357:23.) "[T]his is one of the major mechanisms by which all-cause mortality is increased in individuals who get insufficient sunlight." (Tr. 358:1-3.) These effects are "estimated to be equivalent to the impact of smoking." (Tr. 358:4-5.) Czeisler testified that insufficient exposure to sunlight leads to a "greatly increased risk of all-cause mortality.". (Tr. 358:11-12.)

Insufficient exposure to sunlight also can lead to "increased risk of colorectal cancer, breast cancer, ulcerative colitis, and bowel problems." (Tr. 358:11-14.) It is not clear how lack of

42

exposure to sunlight leads to these increased risks, though. (Tr. 358:15-23.) Insufficient exposure to sunlight also increases the risk of diabetes. (Tr. 360:13-18.) Insufficient exposure to sunlight also increases the risk of myopia (nearsightedness), even though the mechanism is not understood. (Tr. 358:21-23.) Insufficient exposure to sunlight also increases inflammation in the body, which leads not only to an increase in blood pressure but also can adversely affect the immune system and lead to increased risk of Alzheimer's disease, autism, and memory loss. (Tr. 361:6-20.) Again, direct sunlight is necessary to avoid these illnesses. (Tr. 375:23-376:10.)

The spectrum of light from sunlight necessary to prevent the myriad of illnesses described above is ultraviolet light, and a person cannot get that ultraviolet light through glass or plastic and must get sunlight directly without any intervening material to get that ultraviolet light. (Tr. 375:23-376:10, 376:21-377: 1.)

Treatment with Vitamin D does not solve those problems, as lack of Vitamin D is a marker showing lack of exposure to sunlight but not necessarily a cure for the ills caused by lack of sunlight, and epidemiological studies show that treatment with Vitamin D did not resolve adverse health effects. (Tr. 359:15-360:7.) Specifically, supplementation with Vitamin D cannot resolve the problems with "all-cause mortality and the blood pressure issues." (Tr. 361:21-362:4.) In other words, lack of Vitamin D shows lack of access to sunlight, but providing Vitamin D does not necessarily solve the problems caused by lack of access to sunlight.

Czeisler opined that, after reviewing Plaintiffs' medical records, the deprivation of direct sunlight is a "causal factor" in causing illnesses that Plaintiffs allege in the Complaint or are a "contributing factor" or exacerbated illnesses that Plaintiffs already had. (Tr. 390:19-25.) Specifically, Czeisler pointed to gaining weight, high blood pressure, diabetes, myopia, and migraine headaches as the result of lack of access to direct sunlight. (Tr. 390:7-25.)

Czeisler opined that people need to get direct sunlight every day. (Tr. 419:10-13.) However, there was no admissible evidence about the amount of time each day that a person must be in direct sunlight.

Access to direct sunlight need not be coupled with exercise to avoid the negative health effects caused by lack of direct sunlight. (Tr. 416:19-24.)

43

The Court found Czeisler to be credible.

**N.  Testimony of Expert Witness Lawrence Stephen Mayer, M.D., Ph.D.**

Lawrence Stephen Mayer, M.D., Ph.D., testified as an  expert in the fields of epidemiology, biostatistics, and public health.  (Tr. 1336:3-5.)  Defendant proffered him as an expert both for his affirmative opinions and as rebuttal to Czeisler.  (Tr. 1337:20-24.)  Mayer has been a tenured professor at a number of universities over the past 50 years and authored hundreds of articles in scientific journals. (Tr. 1432:3-1433:2; 1433:12-17.)  Mayer has also testified as an expert hundreds of times. (Tr. 1335:12-18.)  Mayer opined that there was not sufficient evidence from an epidemiological perspective to show a link between the conditions of confinement of Plaintiffs and the injuries that they alleged.  (Tr. 1338:4-1339:12.)  In making this assessment, Mayer explained that "epidemiology is about the estimate in populations of disease frequencies and then the comparisons of populations with regard to the outcomes of interest."  (Tr. 1339:9-12.) An epidemiologist "looks over sets of patients or sets – whatever set we're talking about – inmates, and assesses whether the rates are significantly increased in one group versus another to make the conclusion that one group is at higher risk than the other for whatever the outcome is." (Tr. 1340:4-8.)  Mayer explained:  "Epidemiology is strongest in ruling out causation, not ruling in causation."  (Tr. 1344:10-11.)

Mayer testified that he searched the literature "to answer the question of whether there are any studies that support or refute the allegations by plaintiffs regarding the effects of the conditions of confinement on plaintiffs in this case."  (Tr. at 1395:8-13.)  Mayer was looking "for papers that looked at the conditions of confinement -- around the conditions of confinement here to see if anyone had studied the effects of minor changes in those conditions on, let's say, vitamin D deficiency."  (Tr. at 1399:9-22.)  But Mayer failed to include in his expert report the names of the databases he searched, did not record the "exact terms" or the "search strings" he used, and took no notes.  (Tr. at 1395:14-1396:16, 1386:19, 1397:24-1398:1-3.)  Mayer's failure to record the terms he used to search prevents someone else from being able to test his search for relevant literature and therefore his conclusions regarding the scope of literature available.  (Tr. at 1387:16-19.)  Mayer is not an expert on circadian rhythm or the impact on human physiology of the

44

deprivation of sunlight. (Tr. at 1380:2-12.) Mayer did not seek the assistance of anyone with such expertise in determining what search terms would be appropriate for a literature search in a field in which he lacked expertise. (Tr. at 1392:7-16.)

Given Mayer's inability to explain how he conducted his search, which showed a lack of literature to support the causation between conditions of confinement and Plaintiffs' injuries, the Court does not find Mayer's opinion on this issue of lack of scientific evidence to support Czeisler's opinions to be credible.

Mayer also opined that Czeisler did not conduct any epidemiological analysis in making his opinion. (Tr. 1347:1-9.) Mayer explained that there are some times when the "pathophysiology is so strong" that only one example was needed to show causal effect, and he gave an example of a person who ingested H pylori, the bacteria that causes ulcers, and he immediately became ill. (Tr. 1332:21-1333:1.) But unless one knows the pathophysiology, one must then turn to epidemiology to see if the "relationship is strong enough that it will show up in the population." (Tr. 1344:2-5.) If that does show up in the population, then one looks at "specific causation," i.e., whether a specific person is affected. (Tr. 1344:2-9.)

Mayer opined that there was "no relationship" between the conditions of confinement and Plaintiffs' injuries in any of" the literature Czeisler cited in his expert report "between the kind of variables looking in those outcomes." (Tr. at 1349:4-9.) Mayer did not point to any study cited by Czeisler to refute the findings, and Mayer did not explain why the studies Czeisler cited were flawed. For this reason, the Court finds Mayer's testimony on this opinion not to be credible, as it is simply too vague to contradict Czeisler's opinions.

**O. Testimony of Expert Witness Michael Rogers, M.D.**

Michael Rogers, M.D., testified as an expert in psychiatry. He reviewed thousands of pages of medical records from the named Plaintiffs and other class members and determined that their symptoms had causes separate and apart from the challenged conditions of confinement. (Tr. 1477:5-14.) Rogers is a physician who is board certified in psychiatry, forensic psychiatry, and addiction medicine. (Tr. 1447:17-18.) He currently serves as a senior psychiatrist specialist for the State of California's Department of State Hospitals and works at the state facility in Coalinga.

(Tr. 1447:20-22.)  He has been treating patients as a psychiatrist since 2011.  (Tr. 1450:16.)  After being educated in Ireland and obtaining a post-Baccalaureate in premedical science in the United States, he attended and graduated from the medical school at the University of California, San Diego in 2011, and worked at the post-doctorate residency training program there until 2015.  (Tr. 1448:2-10.)  He spent one year as a resident physician at the California Pacific Medical Center working in medicine and neurology, and then three specializing in psychiatric medicine.  (Tr. 1449:6-9.)  He has been licensed to practice as a physician and surgeon in California beginning in 2012.  (Tr. 1448:22-23.)  Following his independent licensure, he moonlighted at the Bay Psychiatric Hospital and Herrick Hospital in Berkeley treating adolescents, adults, and geriatric patients until 2019, and for two years as an in-patient psychiatrist and the Contra Costa Regional Medical Center in Martinez beginning in 2015.  (Tr. 1449:11-17, 22.)  From 2015 through 2019, he worked as an emergency psychiatric physician at the Contra Costa Regional Medical Center.  (Tr. 1449:18-21.)  In 2017, he began studying forensic psychiatry as a fellow at the University of California, San Francisco, and graduated from the program in 2018.  (Tr. 1448:11-13.)  Beginning in 2018, he began working for the California Department of Correction and Rehabilitation at San Quentin as an in-patient psychiatrist for the death row hospital and as an outpatient psychiatrist with non-condemned inmates.  (Tr. 1450:2-8.)  Beginning in 2023, he was promoted to his current position at the Department of State Hospitals.  During his time as chief resident, he taught junior residents, and subsequently gave several teaching seminars and grand rounds as a graduate.  (Tr. 1452:14-17.)  He has also published several peer-reviewed articles.  (Tr. 1453:3.)  In private practice since 2018, he does forensic work for criminal and civil litigation, which constitutes about 10% of his time working.  (Tr. 1455:21-25, 1456:1-5, 13-14.)

Rogers testified that, generally, people can suffer emotional distress if confined in a cell for more than 22 hours a day for weeks on end:

> Q.     Okay.  And you would agree with me that being locked in a cell for 22 or more hours per day for days and weeks at a time can cause emotional distress?
> A.     Correct.

(Tr. 1564:24-1565:20.)  Rogers also testified that many people would experience emotional

46

distress if confined to a cell for more than 20 or more hours per day and separated from the general population would experience emotional distress but that some people would not. (Tr. 1569:19-1570:16.)

However, he then analyzed the medical records of each of the Plaintiffs.

Rogers analyzed the specific medical history of inmate and former plaintiff Kenyon Norbert found his complaints were not related to out-of-cell time or outdoor access. (Tr. 1478:23-1481:21.) Norbert's medical records showed he reported a variety of complaints to medical professionals regarding emotional distress that were the result of external circumstances such as a death in the family and going to court. (Tr. 1482:20-1483:4.) There was no evidence Norbert reported to any medical professionals that his issues were caused by the challenged conditions of confinement. Rogers confirmed Norbert had several diagnoses including substance abuse and transient adjustment disorder which are alternative causes for the symptoms he described. (Tr. 1483:18-1484:10.)

Rogers reached similar conclusions after reviewing the medical records of the three named class representatives. Rogers reviewed McAlister's medical records in excess of 2,800 pages dating back to 2014 and his deposition transcripts. (Tr. 1487:3-8.) Rogers found that there was no evidence of psychiatric symptomology relevant to McAlister as a result of his conditions of confinement. (Tr. 1487:10-23.) In supporting this opinion, Rogers confirmed McAlister's medical records were devoid of involvement with CJ3's behavioral health providers. (Tr. 1487:1-23.) Rather, McAlister's reported anxiety came up in the context of his use of methamphetamines. (Tr. 1488:7-13.) McAlister's sleep difficulties were not attributed to conditions of confinement but were pre-existing. (Tr. 1488:14-21.) Rogers opined that the appropriate psychiatric diagnosis for McAlister is substance use disorder, which was not caused by the inability to outside at CJ3 or out-of-cell time at CJ3. (Tr. 1489:2-17.)

Rogers reviewed the medical records and deposition of Brackens. (Tr. 1491:11-12.) He found that Brackens was prescribed Elavil in jail for pain and headaches that pre-dated his incarcerated. (Tr. 1491:14-1493:11.) Rogers opined Brackens' reported symptoms of depression and headaches were not caused by an insufficient amount of out-of-cell time because there were

47

no contemporaneous complaints; rather his medical history showed obesity, use of opioids while in jail, and withdrawal from opioids which were the probable causes for Brackens' feelings. (Tr. 1493:12-1495:13.) Rogers opined that there is no appropriate psychiatric diagnosis for Brackens that can be attributed to inability to go outside while in CJ3. (Tr. 1495:17-20.) Rather, Brackens' appropriate diagnosis is substance use disorder with possible mood symptoms caused by withdrawal from substance abuse; withdrawal is known to cause the complaints that Plaintiff alleges. (Tr. 1495:21-1499:21.) Rogers also confirmed Brackens' difficulty sleeping was caused by his preexisting back pain and his weight gain could not be attributed to out-of-cell time or outdoor recreation because Brackens came to jail obese. (Tr. 1500:17-21; 1505:15-23; 1507:1-23.)

Rogers reviewed the medical records of Poot from 2016 through May 2021, and his deposition. (Tr. 1507:25-1508:8.) Rogers opined that the only appropriate diagnosis for Poot is a history of alcohol use disorder, as Poot's condition actually improved in jail from the time he was first admitted and followed closely by jail behavioral health. (Tr. 1508:9-1509:15.) Rogers found no evidence Poot's self-reported any depression caused by a lack of out-of-cell time or an inability to go outside. (Tr. 1509:16-19.) Poot did not seek behavioral health treatment from 2016 to 2019 until the filing of this lawsuit. (Tr. 1510:23-1511:11; Dkt. No. 1.) When Poot presented for treatment in August 2019, investigation of his complaints of feeling sleepy and depressed revealed that his mother had a heart attack, which was the source of his concern. (Tr. 1512:12-1513: 3.) Rogers opined Poot's sleeping difficulty was not related to the inability to go outside while housed at CJ3. (Tr. 1513:5-7.) Rather, the actual treatment records noted that trouble sleeping in 2016 was attributable to a tooth ache. (Tr. 1513: 16-1514:12.) There were no treatment records showing Poot ever complained he did not have sufficient out-of-cell time or that he could not go outside. (Tr. 1514:5-15.) Rogers found no evidence in Poot's records that he had headaches, mood changes, poor communications, mental focus, memory loss or cognitive function issues caused by the conditions of confinement. (Tr. 1514:16-1515:19.) The only diagnoses attributable to Poot is alcohol use disorder and substance use disorder; neither of which are attributable to lack of out-of-cell time or lack of outdoor access. (Tr. 1515:20-1516:8.)

United States District Court
Northern District of California

48

The Court finds Rogers to be credible on the issue of psychiatric issues. Rogers did not attempt to opine on the effects of deprivation of sunlight on medical issues (the diseases Czeisler noted). Rogers' experience and credentials are all in the area of psychiatry and do not necessarily overlap with Czeisler's expertise.

**P. Definition of Class**

On July 25, 2022, the parties submitted a stipulation for class certification, and on July 27, 2022, the Court certified a class of plaintiffs as follows:

> (a) Class 1 ("Outdoor Class"): All inmates who are pretrial detainees and have been incarcerated in San Francisco County Jail 3 . . . located in San Bruno, California, at any point during the time period May 20, 2017 to the present, and who do not have outdoor access as part of their incarceration at San Francisco County Jail 3.
>
> (b) Class 2 ("Confinement Class"): All inmates who are pretrial detainees and have been incarcerated in County Jail 3 . . . at any point during the time period from May 20, 2017 to the present, and who have fewer than one (1) hour per 24 hour period of time out of their cells as part of their incarceration at San Francisco County Jail 3.
>
> > (1) Subclass 1 ("Confinement Subclass 1"): All inmates in the Confinement Class who are classified by the San Francisco County Sheriff's Office in general population housing.
> >
> > (2) Subclass 2 ("Confinement Subclass 2"): All inmates in the Confinement Class who are classified by the San Francisco County Sheriff's Office in administrative segregation housing.

(Dkt. No. 238.)

**Q. Relief Requested**

Plaintiffs requested the following injunctive relief:

(1) A prohibition against "locking any in a cell, in excess of 20 hours per day;

(2) An order requiring Defendant to provide "every inmate with no less than one hour per day of outdoor recreation, daily";

(3) An order requiring Defendant to provide "every inmate, who requests, a physical examination including [a] test necessary to determine each inmate's level of Vitamin D

49

and where needed, Vitamin D supplements"; and

(4) An order requiring Defendant to provide "every inmate who requests it, the necessary physical and mental health care[.]"[13]

(Dkt. No. 1 (Complaint at 24).)

**CONCLUSIONS OF LAW**

**A.      Mootness**

There is some evidence in the record that Defendant has started offering outdoor access to direct sunlight to Plaintiffs after this litigation began, and there is evidence that Defendant has increased and decreased the amount of time inmates spend out of their cells.  It is not clear if that access satisfies the Fourteenth Amendment and California Constitution.  But even if current conditions in CJ3 satisfy the Fourteenth Amendment and California Constitution, Plaintiffs' plea for injunctive relief is not moot.  Generally, "[a] request for injunctive relief remains live only so long as there is some present harm left to enjoin." *Bayer v. Neiman Marcus Grp.*, 861 F.3d 853, 864 (9th Cir. 2017) (quoting *Taylor v. Resol. Trust Corp.*, 56 F.3d 1497, 1502 (D.C. Cir. 1995)). Given this, "a claim for injunctive relief becomes moot once subsequent events have made clear the conduct alleged as the basis for the requested relief 'could not reasonably be expected to recur'" based on "a reasonably certain basis." *Wise v. City of Portland*, 539 F. Supp. 3d 1132, 1145-1147 (D. Or. 2021).  Voluntary cessation does not moot a case.  A defendant "cannot automatically moot a case simply by ending its unlawful conduct once sued." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 190, (2000).  Thus, Defendant in this case could moot this case simply by increasing out-of-cell time for inmates after the lawsuit was filed.

Additionally, a claim does not become moot where it is capable of repetition yet evades review.  For this exception to apply, "(1) the duration of the challenged action or injury must be too short to be fully litigated; and (2) there must be a reasonable likelihood that the same party

---

[13] The Court ruled on this issue and found that Plaintiffs cannot seek this relief in this case. (Dkt. No. 339.)

50

United States District Court
Northern District of California

will be subject to the action again." *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1287 (9th Cir. 2013) (internal citation omitted).  "[T]he capable-of-repetition doctrine applies only in exceptional situations, and generally only where the named plaintiff can make a reasonable showing that he will again be subjected to the alleged illegality." *City of Los Angeles v. Lyons*, 461 U.S. 95, 109-10 (1983) (holding that the plaintiff did not face a real and immediate threat of again being illegally choked because he could not prove that it was likely he would again "be chocked without any provocation or legal excuse.")  To show a likelihood of future harm, "plaintiff must show two things: first, that the defendant will repeat his conduct and thereby violate similar rights, and second, that the plaintiff will himself suffer that violation of rights." *Hernandez v. City of San Jose*, 16-CV-03957-LHK, 2019 WL 4450930, at *20 (N.D. Cal. Sept. 17, 2019).

This case is distinguished from *Brach v. Newsom*, 38 F.4th 6 (9th Cir. 2022), where the Ninth Circuit held that a question regarding school closures during the COVID-19 pandemic was moot because the schools were back to in person and thus it would be improper to issue an injunction that California schools could "never ever close" its schools.  The doctrine of voluntary cessation  did not apply there because the State started to open schools before litigation began.  *Id*. at 14-15.  The Ninth Circuit  explained:

> The State did not abandon its policy after suit was filed in July 2020. Rather, the 2020-21 Reopening Framework, which was adopted before the litigation, automatically permitted schools to reopen permanently once their local areas achieved certain COVID-19 benchmarks.  The State did not rescind its school closure orders in response to the litigation—the orders "expired by their own terms" after COVID-19 transmission rates declined and stabilized.

*Id*. at 12.

Here, the amount of out-of-cell time that an inmate can obtain can change constantly.  As outlined above, during resurgences of COVID-19, CJ3 implemented heavier lockdowns, reducing inmates' access to the gym and to out-of-cell time.  In some of these lockdowns, as noted above, inmates have completely lost access to the gym and have been confined to their cells.  Defendant has also taken the position that COVID-19 continues to be a threat to CJ3 and remains an

emergency.  (Dkt. No. 259 at 9.)  Thus, this case is capable of repetition yet can evade review.  Until and unless COVID-19 ceases to be a threat, Plaintiffs maintain the right to seek injunctive relief because the problem is capable of repetition and yet can evade review.  And with respect to outdoor access, Defendant can also change its policy, especially since its official position for this litigation is that it could not offer outdoor access because there is no outdoor exercise yard.  Thus, the issues here are not moot.

**B.      Analysis of Claims under Fourteenth Amendment and California Constitution for Lack of Access to Direct Sunlight**

Plaintiffs allege that Defendant violated their Fourteenth Amendment rights and rights under Article I, Section 7 of the California Constitution because Defendant deprived them of exposure to direct sunlight.[14]  (Dkt. No. 259 at 18.)  Article I, Section 7 of the California Constitution mirrors the Fourteenth Amendment.  U.S. Const. Amend. XIV ("nor shall any State deprive any person of life, liberty, or property, without due process of law"); Cal. Const. Article I, § 7 ("A person may not be deprived of life, liberty, or property without due process of law[.]").  "In light of the virtually identical language of the federal and state guarantees, we have looked to the United States Supreme Court's precedents for guidance in interpreting the contours of our own due process clause and have treated the state clause's prescriptions as substantially overlapping those of the federal Constitution." *Today's Fresh Start, Inc. v. Los Angeles Cty. Office of Educ.*, 57 Cal.4th197, 212 (2013).[15]

---

[14] The remaining Plaintiffs are pretrial detainees and thus assert only a Fourteenth Amendment right and corresponding right under the California Constitution.  Plaintiffs originally asserted a claim for violation of Article I, Section 17 of the California Constitution, which  mirrors the Eighth Amendment.  (Dkt. No. 1.)  However, Plaintiffs did not oppose Defendant's motion for summary adjudication as to this claim and that claim was thus eliminated.  Because there are no longer any Plaintiffs who are convicted among the class representatives, none of the current class Plaintiffs can represent any inmate who has been convicted of a crime but awaiting sentencing and transfer to a state prison.  This Court has already found that the Eighth Amendment does not apply in this case because of that issue.  (Dkt. No. 110 at 50.)  For the same reason, Article I, Section 17 of the California Constitution also does not apply to this case.

[15]  There are minor differences which are not relevant here. *See*, *e.g.*, *Ryan v. Cal. Interscholastic Fed'n-San Diego Section,* 94 Cal. App. 4th 1048, 1069 (2001) (citation omitted) (procedural due process requirements under California Constitution closely follow Fourteenth Amendment except California Constitution does not require the plaintiff to "establish a property or

The evaluation of a pretrial detainee's conditions of confinement arises out of the Fourteenth Amendment because the U.S. Constitution bars deprivation of liberty without due process. *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). Thus, the question is whether detention equals punishment, because a pretrial detainee cannot be punished without being adjudged guilty of a crime. *Wolfish*, 441 U.S. at 535; *see also Norbert v. City and Cnty. of San Francisco*, 10 F.4th 918, 928 (9th Cir. 2021).[16] The Fourteenth Amendment bars "punishment" of pretrial detainees. What amounts to punishment is something that causes a "harm or disability" and where the "purpose of the governmental action" was to punish the detainee. *Norbert*, 10 F.4th at 928 (quoting *Demery v. Arpaio*, 378 F.3d 1020, 1029 (9th Cir. 2004).) However, showing that the purpose of the government's action is to punish does not require showing intentional harm by the government but only reckless indifference by the government. *Id.* If there is no "expressed intent to punish," the analysis of reckless indifference "generally will turn on 'whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it].'" *Wolfish*, 441 U.S. at 525 (citing *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-69 (1963) (brackets in original).) The government's action must be "rationally related to a legitimate nonpunitive governmental purpose and [not] appear excessive in relation to that purpose." *Pierce v. Cnty. of Orange,* 526 F.3d 1190, 1213 (9th Cir. 2008).

And although the Fourteenth Amendment governs the rights of a pretrial detainee, the Eighth Amendment provides a "minimum standard of care." *Jones v. Johnson*, 782 F.2d 769, 771 (9th Cir. 1986). Thus, the Ninth Circuit has held that "pretrial detainees' rights under the Fourteenth Amendment are comparable to prisoners' rights under the Eighth Amendment" and

---

liberty interest as a prerequisite to invoking due process protection."); *Toussaint v. McCarthy,* 801 F.2d 1080, 1097 (9th Cir. 1986) (same); *Taking Offense v. State*, 66 Cal. App. 5th 696, 722 (2021) (equal protection under U.S. Constitution and California Constitution are identical, except with respect to gender). These differences are not relevant to the case at bar. Thus, the discussion regarding the Fourteenth Amendment applies equally to the California Constitutional claim.

[16] This was originally titled under the name of the plaintiff Norbert, who is no longer a defendant.

53

therefore applied the "same standards" to analyzing the rights of pretrial detainees. *Frost v. Agnos*, 152 F.3d 1124, 1128 (9th Cir. 1998) (citing *Redman v. Cty. of San Diego*, 942 F.2d 1435, 1441 (9th Cir. 1991).) In *Demery v. Arpaio*, the Ninth Circuit explained the difference between the analysis under the Eighth Amendment and Fourteenth Amendment: "Both distinctions are critical because the Fourteenth Amendment prohibits all punishment of pretrial detainees, while the Eighth Amendment only prevents the imposition of cruel and unusual punishment." 378 F.3d at 1029. An independent constitutional violation is not required to find that punishment exists. *Id*. at 1030. But, based on this analysis, if a governmental action constitutes a violation of the Eighth Amendment, it also constitutes a violation of the Fourteenth Amendment.

### 1. Harm to Plaintiffs from Lack of Exposure to Direct Sunlight

Plaintiffs must show that lack of direct access to sunlight is punishment (either by showing intent to punish or reckless indifference) to prove a violation of the Fourteenth Amendment. *Norbert*, 10 F.4th at 928. Specifically, the Ninth Circuit disavowed the statement by the undersigned that lack of access to direct sunlight *per se* constitutes punishment and held that Plaintiffs must show harm: "Under the Fourteenth Amendment (and contrary to the district court's apparent suggestion otherwise) to show improper 'punishment' plaintiffs must again demonstrate that the challenge conditions produce a 'harm or disability.'" *Norbert*, 10 F.4th at 934-35.To prevail, Defendant must show that its policy is "rationally related to a legitimate nonpunitive governmental purpose and [not] appear excessive in relation to that purpose." *Pierce*, 526 F.3d at 1213.

There is no case law addressing whether the lack of access to direct sunlight is a violation of the Fourteenth Amendment to the Constitution or Article I, Section 7 of the California Constitution. The Ninth Circuit recognizes that there is no *per se* requirement of *outdoor* exercise. *Norbert,* 10 F.4th at 930. The Ninth Circuit in this case addressed the issue of "outdoor exercise" and found that outdoor exercise can be required when there is no "otherwise meaningful recreation" available. *Norbert*, 10 F.4th at 929. The Ninth Circuit specifically ruled that the circumstances of the case control whether there is a need for outdoor exercise. *Norbert*, 10 F.4th at 930.

54

The evidence discussed above shows that failure to provide access to direct sunlight for a period of several years has caused harm to Plaintiffs. In response, Defendant argues that there is a valid purpose of restraining inmates securely before trial. Defendant is correct that there is a valid governmental purpose to restrain inmates before trial, but there is no valid governmental interest in a complete denial of direct sunlight to Plaintiffs.

### a. All-Cause Mortality

Czeisler testified that the lack of access to direct sunlight is a leading cause of "all cause" mortality. He also opined that lack of access to direct sunlight led to the specific complaints that Plaintiffs made in the Complaint. In the Complaint, Plaintiffs alleged that the conditions of confinement caused cardiovascular disease, hypertension, negative impacts on blood sugar including adult onset diabetes and lowered insulin sensitivity, headaches, migraines, anxiety and depression, weight increase and obesity." (Dkt. No. 1 at ¶ 52.) Additionally, Plaintiffs alleged that they were deficient in Vitamin D and thus suffer from a "variety of health issues resulting from Vitamin D deficiency, including soft bones, muscle weakness, bone pain, cardiovascular disease and cognitive impairment (inability to think clearly and analyze logically). (*Id*. at ¶ 53.) As noted above, all three Plaintiffs (Brackens, McAlister, and Poot) gained a substantial amount of weight while incarcerated. Also, two of the three (Brackens and McAlister) developed high blood pressure while incarcerated. McAlister's blood pressure went down when he was incarcerated at San Quentin, where he had access to an outside exercise yard. Brackens developed diabetes, and he also became nearsighted while incarcerated. Two of the three (Brackens and Poot) developed significant headaches while incarcerated, but the Court finds Poot not to be credible on this issue because he never sought medical treatment for headaches and because he has general problems with credibility, as noted above.

Czeisler explained the specific mechanism in which lack of exposure to ultraviolet light, which cannot pass through glass or plastic, creates a physical problem; thus, he explained the pathophysiology which Mayer states is necessary to establish causation. Czeisler specifically pointed to epidemiological studies about lack of exposure to sunlight. Although Mayer claimed that there were no studies showing the links that Czeisler claimed, he did not refute any specific

United States District Court
Northern District of California

study that Czeisler cited.  For these reasons, the Court accepts Czeisler's opinions on this issue and finds that the lack of direct sunlight was a causal factor in high blood pressure, diabetes, myopia, and weight gain in Plaintiffs.

### b.     Psychological Harm

In contrast,  the evidence shows that the psychological harm that Plaintiffs claim is not caused by lack of access to direct sunlight.  First, Rogers' testimony that other factors caused Plaintiffs' psychological harm is credible and well-founded.  No other expert contradicted his specific opinions on the issue of psychological harm.  Even Czeisler's testimony about the importance of ultraviolet light on skin did not link to psychological harm specifically, as he did not mention psychological harm in his testimony.  Czeisler is not a psychiatrist or practicing medical doctor, so the Court finds the testimony from Rogers, a practicing psychiatrist, on this issue to be persuasive.

Even without evidence from a medical expert, Plaintiffs may allege "garden variety" emotional distress and prove that harm through their own testimony, and the Court considered a claim by Plaintiffs for garden variety emotional distress.[17]  Garden variety emotional distress is "ordinary or common place emotional distress that is 'simple or usual.'" *Fitzgerald v. Cassil*, 216 F.R.D. 632, 637 (N.D. Cal. 2003).  Garden variety emotional distress has been described

> the distress that any healthy, well-adjusted person would likely feel as a result of being victimized; "the generalized insult, hurt feelings and lingering resentment which anyone could be expected to feel given the defendant's conduct;" and general pain and suffering that is not serious enough to require psychological treatment or disrupt of affect the claimant's life activities.

*Curry v. United States*, 2018 WL 347661, at *2 (E.D. Cal. Jan. 9, 2018) (citing *Flowers v. Owens*, 274 F.R.D. 218, 225-26 (N.D. Ill. 2011) (internal citation and quotations omitted).)  To show garden variety emotional distress, Plaintiff need not show any medical records or medical expert testimony.  *Wilson v. Decibels of Oregon, Inc.*, No. 1:16-CV-00855-CL, 2017 WL 393602, at *1 (D. Or. Jan. 26, 2017).  Emotional distress can be "harm" under the Fourteenth Amendment

---

[17] The Court specifically noted in the Order regarding summary judgment that Plaintiffs could make this argument and present this evidence.  (Dkt. No. 325.)

United States District Court
Northern District of California

without any reference to medical records or medical expert testimony. *Vazquez v. County of Kern*, 949 F.3d 1153, 1163 (9th Cir. 2020). None of the Plaintiffs testified that they suffered emotional distress from lack of direct sunlight, and the medical records do not indicate any complaints by Plaintiffs that they suffered emotional distress because of lack of direct sunlight. Although Plaintiffs testified about their emotional distress in general, they never linked that emotional distress to the failure to access direct sunlight. This failure to link the two is critical in this context because it is understandable that inmates incarcerated for many years before trial feel depressed and anxious. The testimony of the Plaintiffs links their emotional distress to factors understandably associated with incarceration: the inability to spend time with loved ones in times of crisis and worry about their criminal cases. Brackens' poem echoed their testimony about the cause of emotional distress for them, which are the inherent conditions of incarceration. That type of harm is inherent in the conditions of confinement and thus cannot rise to the level of punishment. And two of the Plaintiffs (Poot and Brackens) actually refused outdoor exercise when offered it, which shows that they did not find the need for direct sunlight necessary for emotional health. One, Poot, testified that he refused because it was too frustrating for him to be close to the sun but not feel it in any part of his body, but the Court does not find his testimony to be credible.

<strong>c.     Lack of Harm to Circadian Clock</strong>

The Court does not find that the lack of direct sunlight caused a change to the Circadian clocks of the Plaintiffs. Given the light readings, given Zeitzer's testimony, and given that inmates at CJ3 can use sleep masks to block out light while sleeping, even Zeitzer's testimony supports a finding that there is a sufficient differential between the brightest light during the day and the amount of light at night with eyes closed or with a sleep mask. As Zeitzer explained, for purposes of the Circadian clock, the only difference that matters is the variable from day to night, and the source of light does not matter. Finally, Zeitzer did *not* opine that the differential between light at night and day at CJ3 disrupted the inmates' Circadian clock.

**2. Intent to Punish or Reckless Indifference**

Because the denial of access to direct sunlight is harmful to Plaintiffs, the next step is to

57

determine whether Defendant acted intentionally or was recklessly indifferent to Plaintiffs' needs. That analysis turns on the purported reason for the action (or here, the denial) and whether the action is "excessive in relation to the alternative purpose" assigned to the action. *Wolfish*, 441 U.S. at 538 (internal citation omitted). Here, there is no evidence to show that Defendant intended to punish Plaintiffs in denying them access to direct sunlight. However, there is evidence to show that Defendant was recklessly indifferent to Plaintiffs' needs in denying them access to direct sunlight.

Defendant attempts to justify its denial of outdoor exercise by arguing, with no evidence, that there is no way that Defendant can securely provide exercise to Plaintiffs and other inmates because there is no outdoor exercise yard. Defendant is correct that security is a valid governmental purpose in a jail. See, e.g., *Wolfish,* 441 U.S. at 540 ("Restraints that are reasonably necessary to the institution's interest in maintaining jail security do not, without more, constitute unconstitutional punishment.") In *Wolfish*, the Supreme Court considered the practice of "double bunking" and held that "prison officials must be free to take appropriate action to ensure the safety of inmates and corrections personnel and to prevent escape or unauthorized entry." *Id*. at 536-47. Although the government can take measures to ensure the safety and security of inmates and to prevent escape, budgeting concerns, inconvenience, and even some safety concerns generally do not serve as legitimate government objectives. *Spain v. Procunier*, 600 F.2d 189, 200 (9th Cir. 1979) ("The cost or inconvenience of providing adequate facilities is not a defense to the imposition of a cruel punishment [here, the denial of exercise].") Further, even where the government provides an interest in safety, this still may not serve as enough of a legitimate government interest if it would mean there would be "no meaningful vindication of the constitutional right to exercise for this entire category of detainees." *Pierce*, 526 F.3d at 1212 (holding that institutional security concerns do not serve as a legitimate government interest for curtailing inmates' exercise to 90 minutes per week); *Lopez v. Smith*, 203 F.3d 1122, 1133 (9th Cir. 2000) (upholding summary judgment where defendant was deliberately indifferent for barring outdoor exercise for an inmate's "own protection" while he recovered from an injury); *Allen v. Sakai*, 48 F.3d 1082, 1088 (9th Cir. 1994) (holding that logistical concerns regarding ensuring a

United States District Court
Northern District of California

guard was available to monitor inmates during exercise did not serve as a legitimate government objective greater than their need for exercise.)

Despite these rulings, Defendant provides no real reason why it cannot build an exercise yard for outdoor exercise that would allow inmates access to direct sunlight.  Defendant relies upon tautological reasoning:  it created the problem by building a jail without a secured outdoor exercise yard and then relies upon that problem to claim that it cannot provide a secure way for inmates to have access to direct sunlight.  This type of tautological reasoning does not show a rational reason for failing to provide outdoor access.  Other jails and prisons in the same geographical area, such as San Quentin State Prison and other counties' jails, are able to  provide outdoor exercise yards for their inmates.  Defendant's arguments are similar to the ones made by the jails and prisons in *Pierce*, *Lopez v. Smith*, and *Allen v. Sakai* above.  Defendants created a situation in which they cannot securely allow inmates to go outside, and they cannot hide behind that reason when the denial creates harm.

Furthermore, standards in the community show that Defendant's actions are not rational and not reasonably related to a valid penological purposes.  First, the California Board of State and Community Corrections ("BSCC") sets minimum standards for the physical structure within which detainees can be housed.  The BSCC promulgates regulations governing these minimum standards, which are found in Title 24 of the California Code of Regulations, which is the State Building Code.[18]  BSCC's Building Code regulations require outdoor exercise areas for all Type II facilities. The regulation states in relevant part:

> An outdoor exercise area or areas must be provided in every Type II and Type III facility. The minimum clear height must be 15 feet (4572 mm) and the minimum number of square feet of surface area will be computed by multiplying 80 percent of maximum rated population by 50 square feet (4.7 m2) and dividing the result by the number of one-hour exercise periods per day.

24 Cal. Code Regs. § 1231.2.10.

---

[18] In 1978, California mandated that building standards be unified in a single code designated as Title 24, the California Building Standards Code. (SB 331, Robbins - https://www.dgs.ca.gov/BSC) *see* California's Health and Safety Code §18938(b) (Uniform Building Codes "shall" apply to all occupancies throughout the state), §18941.5 (localities may adopt more restrictive building standards).

59

United States District Court
Northern District of California

Other sources also state the need for exercise outdoors. The fifth edition of Performance-Based Standards and Expected Practices for Correctional Institutions published in March 2021 by the American Correctional Association ("ACA"), a national association that sets forth standards used by correctional institutions across the United States, recommends: "Both outdoor and covered/enclosed exercise areas for general population inmates are provided in sufficient number to ensure that each inmate is offered at least one hour of access daily. Use of outdoor areas is preferred, but covered/enclosed areas must be available for use in inclement weather." (Dkt. No. 449-4 at 23.)[19]  The ACA also states: "Exercise/recreation spaces are not the same as dayrooms." (*Id.*)  The fourth edition also contained a similar provision (Dkt. No. 449-1 at 2, 55), which the U.S. Marshals Service has adopted in its handbook.

Foreign countries have also adopted a similar position. *See*, *e.g.*, The Thirtieth Annual Report of the European Committee for the Prevention of Torture and Inhumane or Degrading Treatment or Punishment. That report states: "The [European Committee for the Prevention of Torture and Inhumane or Degrading Treatment or Punishment] has repeatedly emphasised [sic] that all prisoners must benefit from a minimum of access to one hour's daily outdoor exercise and/or time in the open air, and two hours in the case of juvenile inmates. This remains a fundamental right for all prisoners, including during the Covid-19 pandemic." (Dkt. No. 449-2 at 40.) Even as far back as 1992, the European Committee for the Prevention of Torture and Inhumane or Degrading Treatment or Punishment wrote in its Second Annual Report:

> Specific mention should be made of outdoor exercise. The requirement that prisoners be allowed at least one hour of exercise in the open air every day is widely accepted as a basic safeguard (preferably it should form part of a broader programme [sic] of activities). The CPT wishes to emphasise [sic] that **all prisoners without exception** (including those undergoing cellular confinement as a punishment) should be offered the possibility to take outdoor exercise daily. It is also axiomatic that outdoor exercise facilities should be reasonably spacious and whenever possible offer shelter from inclement weather.

---

[19] The Court takes judicial notice of this document and GRANTS the motion by Plaintiffs for judicial notice. (Dkt. No. 449.)

(Dkt. No. 449-3 at 2-3 (emphasis in original).)

These community standards can be evidence to show that an entity is deliberately indifferent to the suffering of inmates. *See*, *e.g.*, *Roper v. Simmons*, 543 U.S. 551, 575, (2005) (citation omitted) (plurality opinion) ("Yet at least from the time of the Court's decision in *Trop*, the Court has referred to the laws of other countries and to international authorities as instructive for its interpretation of the Eighth Amendment's prohibition of 'cruel and unusual punishments.'"); *Castro v. City of Los Angeles*, 833. F.3d 1060, 1076-1077 (9th Cir. 2016) (holding that Los Angeles's adoption of the California Building Code, which contained certain requirements for "sobering cells" which did not exist in the Los Angeles jail, was "substantial evidence" supporting a finding "that the County knew that its cell design might lead to a constitutional violation among its inhabitants).

Based on the physical harm caused by lack of access to direct sunlight and lack of rational reason for Defendant's denial of that access, Plaintiffs prevail on their claim that complete denial of exposure to direct sunlight is a violation of the Fourteenth Amendment and Article I, Section 7 of the California Constitution.

### 3. Remedy

The question is then one of the appropriate remedy. The Prison Litigation Reform Act ("PLRA") controls "to restrict the equity jurisdiction of federal courts" and "creates a more exacting standard for federal courts to follow." *Gilmore v. California*, 220 F.3d 987, 999, 1007 (9th Cir. 2000). If a court grants injunctive relief, "such relief [must] be supported by findings and precisely tailored to what is needed to remedy the violation of a federal right." *Miller v. French*, 530 U.S. 327, 347 (2000) (citations omitted). The relief must be "narrowly drawn, extends no further than necessary to correct the violation of the Federal Right, and is the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. § 3626(a)(1)(A).

As noted above, with respect to the harms caused by lack of access to direct sunlight, Plaintiffs seek an order requiring Defendant to provide "every inmate with no less than one hour per day of outdoor recreation, daily[.]" Here, the evidence from Czeisler was that each person must have access to direct sunlight every day, but there was no admissible evidence about the

amount of time each person should have. Also, it was not clear from his testimony how long a person could go without access to direct sunlight before medical harm occurred. In other words, he did not explain whether a person can live one day without access to direct sunlight and increase the risk of harm or whether a person live for one year without access to direct sunlight before medical harm occurs. Czeisler also opined that it was not necessary for exercise and access to direct sunlight to be coupled, so his testimony does not support Plaintiffs' request that every inmate be given one hour of outdoor *exercise* every day. The evidence shows that Plaintiffs began suffering medical problems approximately a year after they were incarcerated with no access to direct sunlight.

Given the need for daily access to direct sunlight, the fact that Plaintiffs began suffering from medical problems approximately a year after they were incarcerated, and the failure to identify the amount of time for daily exposure, the Court rules that Defendant must offer to each inmate who has been incarcerated for longer than a year the following: daily access to direct sunlight, weather permitting and in the absence of an emergency (including but not limited to a global pandemic or prison riot) for at least 15 minutes. The amount of time – 15 minutes – is more than *de minimis* but less intrusive on the Defendant.

Plaintiffs also seek testing for lack of vitamin D and treatment with Vitamin D, but Plaintiffs' testimony shows that they were tested for low Vitamin D and offered Vitamin D supplements. Therefore, injunctive relief is not necessary because Defendant is already taking action. And Plaintiffs' own expert opined that providing vitamin D did not necessarily solve the problem. Finally, given that the Court orders that each inmate have direct access to sunlight every day, monitoring and treatment are no longer necessary.

### C. Analysis of Claims under Fourteenth Amendment and California Constitution for Lack of Out-of-Cell Exercise During COVID-19 Pandemic

Separate from the claim based on lack of access to direct sunlight, Plaintiffs also allege that Defendant violated their Fourteenth Amendment rights and under Article I, Section 7 of the California Constitution because Defendant did not provide them with sufficient time out of their cells, and Plaintiffs seek an order requiring that each inmate get at least four hours of out-of-cell

62

time per day. As noted above, before the COVID-19 pandemic, inmates in general population were out-of-cell for many hours, including time in the indoor gyms, but during the COVID-19 pandemic, the amount of time inmates in general population spent out-of-cell was curtailed significantly but varied over time. Inmates in administrative segregation, before the COVID-19 pandemic, had one hour of out-of-cell time every day. During the COVID-19 pandemic, inmates in administrative segregation received even less time out-of-cell at many times, and again that time varied over time. The amount of time that inmates in both groups spent out of cell before the COVID-19 pandemic satisfies the basic Constitutional standard.

The Ninth Circuit has already held that the Eighth Amendment prohibition against cruel and unusual punishment, the minimum standard, requires that inmates must be allowed at least one hour of time out of cell at least five days a week, absent other emergencies. *See*, *e.g.*, *Spain,* 600 F.2d at 199-200 (affirming district court's order that all inmates who had been confined in the adjustment center for over four years to be allowed to exercise one hour a day, five days a week); *Toussaint v. Yockey*, 722 F.2d 1490 (9th Cir. 1984) (upholding a preliminary injunction requiring outdoor exercise for inmates because they were confined to their cells for 23 ½ hours per day while in administrative segregation for over a year); *Allen v. Sakai*, 48 F.3d 1082, 1087 (9th Cir. 1994) (reaffirming that it is clearly established law that confining inmate for almost 24 hours a day is a violation of Eighth Amendment). Because the minimum standard is established, there is no discussion of the harm to Plaintiffs caused by failure to provide sufficient out-of-cell time.

During the COVID-19 pandemic, inmates in CJ3 received far less than one hour of out-of-cell time for large periods of time. Although there was no clear record of exactly how much time they were allowed out of cell at every point in time between March 2020 and August 2022, it is undisputed that there were periods of time during which they were confined to their cells for more than 23 hours a day. Defendant's actions in confining inmates to their cells for long periods of time, though, were balanced against the threat of death caused by the COVID-19 pandemic. "Genuine emergency" can serve as a rational basis for complete lockdown and deprivation of right to exercise. *Hayward v. Procunier*, 629 F.2d 599, 603 (9th Cir. 1980). There are situations in which emergencies can serve as a rational basis for a limited term of lockdown in cells, such that

63

there was no violation of Constitutional rights. *Id.* (describing a six-month lockdown, where outdoor exercise was allowed within one month of lockdown); *Labatt v. Twoomey*, 513 F.2d 641 (7th Cir. 1975) (involving a nine-day lockdown in response to an emergency); *Hoitt v. Vitek*, 497 F.2d 598 (1st Cir. 1974) (finding rational basis for a three- to eight-week lockdown but holding that injunctive relief could be granted if an emergency time span was open-ended or unlimited).

The COVID-19 pandemic was an extraordinary event that one can only hope will take place once in a century. Given the evidence that Defendant proffered about the serious manner in which Defendant sought to protect the lives of inmates and the continuing changes as the medical advice changed as the pandemic waxed and waned, balanced against the total lack of evidence from Plaintiffs that there was some alternative method of providing more out-of-cell access during the COVID-19 pandemic, the Court finds that Defendant did not violate the Fourteenth Amendment or Article I, Section 7 of the California Constitution in failing to provide sufficient out-of-cell access to inmates in the general population and administrative segregation. Defendant succeeded in its goal, as no inmate while incarcerated in CJ3 died of COVID-19.

Here, Plaintiffs attack Defendant's actions but point to no specific manner in which Defendant could have provided more out of cell time. Plaintiffs argue that staffing shortages caused inmates in CJ3 to be locked in their cells during the COVID-19 pandemic and point to both the staffing shortages that existed during that period of time and the number of lockdowns caused by staffing shortages that occurred during that period of time. There are several gaps in Plaintiffs' evidence of the number and length of lockdowns. Plaintiffs cannot identify how many lockdowns occurred during the relevant time period and cannot identify how long they lasted. The evidence was that some lockdowns were for a very short duration of time, and some were longer. Even to the extent that Plaintiffs show that lockdowns caused by staffing shortages occurred frequently, Plaintiffs do not connect the lockdowns caused by staffing shortages to the failure to provide sufficient out-of-cell time. In other words, Plaintiffs point to staffing shortages and lockdowns but do not show whether the staffing shortages caused each lockdown, and there is evidence showing that at least some of the lockdowns were caused by issues unrelated to staffing, such as a need to search cells when a large group of inmates arrived CJ3.

64

Plaintiffs also do not show that, had staffing been at 100% levels, Defendant would have been able to provide more out-of-cell time even during the COVID-19 pandemic.  Plaintiffs do not even articulate the total number of staff they believe would have been adequate to allow inmates out of their cells more frequently.  Although it is obvious that lack of staffing might decrease the ability to provide out-of-cell access to inmates, Plaintiffs do not explain whether, if CJ3 had been staffed fully, CJ3 then would have been able to provide more out-of-cell access to inmates during the COVID-19 pandemic.

Plaintiffs also argue that, had there been an outdoor exercise yard, inmates could have exercised there and thus obtained valuable out-of-cell time, even during the COVID-19 pandemic.  Again, Plaintiffs point to no evidence to support this position.  The evidence shows that many of the limits on providing out-of-cell access to inmates were created by the guidelines about social distancing and that moving inmates created problems with social distancing.  Thus, even if there had been an outdoor exercise yard, moving inmates from their cells to such a space might not have been a possibility.  Plaintiffs do not show that, during the COVID-19 pandemic, that was a realistic possibility.  Given the failure to show that more staffing would have created the opportunity for more inmates to spend time out of cell, the Court cannot find that Defendant was reckless in failing to allow inmates more out-of-cell time during the COVID-19 pandemic.  Defendant had a rational reason for restricting inmates to their cells for lengthy periods of time during the COVID-19 pandemic.

D.      **Analysis of Claims under Fourteenth Amendment and California Constitution for General Failure to Provide Four Hours of Out-of-Cell Time**

In addition to challenging the conditions during the COVID-19 pandemic, Plaintiffs challenge in general the practice of allowing inmates in administrative segregation only one hour of out-of-cell time, the Constitutional minimum, and seek an injunction for Defendant to offer four hours per day of out-of-cell time for inmates in administrative segregation.  Here, though, Plaintiffs do not provide evidence to show that there was any harm that exceeds the inherent discomfort of jail and that was caused by Defendant's failure to provide four hours of out-of-cell each day for inmates. There was no evidence or testimony directed to medical harm caused by failure to provide four hours of out-of-cell time; the only evidence Plaintiffs proffered was about

65

the medical harm caused by lack of direct sunlight.[20]

With regard to psychological harm from failing to provide four hours of out-of-cell access each day, the only evidence, from Rogers, was that lack of out-of-cell access did *not* cause the psychological harm that Plaintiffs claimed. Plaintiffs provided no medical testimony and tellingly, none of the Plaintiffs or witness testified that being confined to their cells for more than 22 hours a day caused them distress. Thus, they fail to show even garden variety emotional distress caused by lack of out-of-cell access, and Plaintiffs' rejection of the chance to get out of their cells on different occasions or choice to remain in administrative segregation show that they do not value out-of-cell time.

**CONCLUSION**

For these reasons, the Court finds that Defendant did not violate Plaintiffs' rights under the Fourteenth Amendment of the U.S. Constitution and Article I Section 7 of the California Constitution by restricting them to their cells in the manner that occurred during the COVID-19 pandemic from March 2020 to August 2022. The Court also finds that Defendant did not violate Plaintiffs' rights under the Fourteenth Amendment of the U.S. Constitution and Article I Section 7 of the California Constitution by failing to allow inmates in administrative segregation to spend four hours a day out of their cells.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

---

[20] Plaintiffs cite to testimony by Rogers about inmates held in solitary confinement in San Quentin (Tr. 1563: 22 -1564: 23), but that is a completely different institution, and there is no evidence that solitary confinement in San Quentin is the same as administrative segregation in CJ3. Plaintiffs also point to testimony that some inmates might suffer psychological harm, discussed above, but, given that Rogers founds that Plaintiffs did not suffer psychological harm caused by lack of out-of-cell time, that generalized statement is also insufficient to show that inmates must have four hours per day out of their cells.

66

The Court finds that Defendant violated Plaintiffs' rights under the Fourteenth Amendment of the U.S. Constitution and Article I Section 7 of the California Constitution by failing to provide any access to direct sunlight, defined as access to sunlight without any mediation through glass or plastic or other solid substance that blocks ultraviolet light, and thus orders the injunctive relief noted above.

**IT IS SO ORDERED**.

Dated: October 16, 2023



_____

SALLIE KIM
United States Magistrate Judge

United States District Court
Northern District of California