**LAW OFFICE OF YOLANDA HUANG**
Yolanda Huang, SBN 104543
2748 Adeline Street, Suite A
Berkeley, CA 94703
Telephone: (510) 329-2140
Facsimile: (510) 580-9410
Email: yhuang.law@gmail.com

Rachel S. Doughty (Cal. Bar No. 255904)
GREENFIRE LAW, PC
2478 Adeline Street, Suite A
Berkeley, CA 94703
Ph/Fax: (510) 900-9502
Email: rdoughty@greenfirelaw.com

Attorney for Plaintiffs

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO/OAKLAND DIVISION**

| | |
|---|---|
| LACARLA CARR, ALEXCIS HERRERA, THEA HOPKINS, SILVIA MONTOYA, DAMENA PAGE, GIOVANNA RAMIREZ-HERNANDEZ, MARILYN SAHAGUN-LOPEZ, KIMBERLY BOYD, and KATELYN WILLIAMS,<br><br>Plaintiffs,<br><br>vs.<br><br>CITY AND COUNTY OF SAN FRANCISCO, et al.,<br><br>Defendant. | CASE NO.: 3:26-CV-5508 CRB<br><br>**REDLINED VERSION OF PLAINTIFFS' FIRST AMENDED COMPLAINT**<br><br>Hon. Charles R. Breyer, Presiding<br><br>**Trial Date: None Set** |

Pursuant to this Court's General Standing for Civil Cases. Plaintiffs file the attached redline version of their First Amended Complaint.

Respectfully Submitted by:

Dated: October 30, 2026

LAW OFFICE OF YOLANDA HUANG

By: */s/ Yolanda Huang*

Yolanda Huang
ATTORNEY FOR PLAINTIFFS

Yolanda Huang (Cal. Bar No. 104543)
LAW OFFICES OF YOLANDA HUANG
P.O. Box 5475
Berkeley, CA 94705
Ph/Fax: (510) 329-2140
Email: yhuang.law@gmail.com

Rachel S. Doughty (Cal. Bar No. 255904)
GREENFIRE LAW, PC
2478 Adeline Street, Suite A
Berkeley, CA 94703
Ph/Fax: (510) 900-9502
Email: rdoughty@greenfirelaw.com

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO / OAKLAND DIVISION**

| | |
|---|---|
| LACARLA CARR, SILVIA MONTOYA, GIOVANNA RAMIREZ-HERNANDEZ, MARILYN SAHAGUN-LOPEZ, KATELYN WILLIAMS, MEREDITH DECHERT, MELODY WINDOM and DOEs 1-50,<br><br>Plaintiffs,<br><br>vs.<br><br>CITY AND COUNTY OF SAN FRANCISCO, SAN FRANCISCO SHERIFF'S OFFICE, SAN FRANCISCO DEPARTMENT OF PUBLIC HEALTH, SHERIFF PAUL MIYAMOTO, in his individual capacity; JENNIFER COLLINS, Chief of Custody for the San Francisco Sheriff's Office, in her individual capacity; LISA PRATT, M.D., in her individual capacity as the former Director of Jail Health Services, ROLAND PICKENS, Chief Administrator for the San Francisco Health Network, in his official capacity, and DOEs 1 – 50,<br><br>Defendants. | **Case No.: 3:26-cv-5508 CRB**<br><br>**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES CLASS ACTION**<br><br>**42 U.S.C. 1983**<br><br>**CLASS ACTION**<br><br>**Violations of the 14th Amendments of the U.S. Constitution and Article I, Sections 7 and 17 of the California Constitution.**<br><br>**DEMAND FOR JURY TRIAL** |

**Style Definition:** Heading 1: Left, Space After: 6 pt, Outline numbered + Level: 1 + Numbering Style: I, II, III, … + Start at: 1 + Alignment: Left + Aligned at: 0" + Indent at: 0"

**Style Definition:** Heading 2: Outline numbered + Level: 2 + Numbering Style: A, B, C, … + Start at: 1 + Alignment: Left + Aligned at: 0.5" + Indent at: 0.5"

**Style Definition:** Heading 3: Outline numbered + Level: 3 + Numbering Style: 1, 2, 3, … + Start at: 1 + Alignment: Left + Aligned at: 1" + Indent at: 1"

**Style Definition:** Heading 4: Left, Space After: 6 pt, Outline numbered + Level: 4 + Numbering Style: a, b, c, … + Start at: 1 + Alignment: Left + Aligned at: 1.5" + Indent at: 1.5"

**Style Definition:** Footer: Font: 10 pt

**Style Definition:** Emphasis: Font: 12 pt

**Style Definition:** Body Text: Indent: Left: 0", Hanging: 0.25"

**Style Definition:** Block Text: Font: Italic, Centered, Indent: Left: 0", Right: 0", Space After: 0 pt, Line spacing: Exactly 22.75 pt

**Style Definition** ... [5]

**Style Definition** ... [4]

**Style Definition** ... [3]

**Style Definition** ... [2]

**Style Definition** ... [1]

**Deleted:** ALEXCIS HERRERA, THEA HOPKINS,

**Formatted:** Caption Title

**Deleted:** DAMENA PAGE,

**Deleted:** ¶ ... [6]

**Deleted:** KIMBERLY BOYD, and

**Formatted:** Font: 12 pt

**Formatted**

**Formatted:** Vs., Indent: Left: 0", Space Before: 0 pt

**Deleted:** ¶

**Formatted:** Space Before: 0 pt

**Deleted:** ¶

¶

**Deleted:** ¶

**Deleted:** and

**Formatted:** Font: 12 pt

**Formatted**

**Formatted:** Line spacing: single

**Deleted:** ¶

## I. INTRODUCTION

1) The City and County of San Francisco currently operates three (3) jail facilities; two custody facilities and an Intake and Release facility, where arrestees are booked and then either released or then transferred to a custody facility. The Intake and Release Center and County Jail 2 ("CJ2") are located at 425 7th Street in San Francisco. The San Bruno custody facility ("CJ3") is located at 1 Moreland Drive, San Bruno, on San Francisco watershed land.

2) In 2023, City and County defendants closed a major custody facility on the 6th and 7th floor of the Hall of Justice, at 850 Bryant Street.

3) As a result of the closure of the 850 Bryant facility, the two remaining custody facilities frequently operate at capacity, and CJ2, the subject of this lawsuit, does not meet the minimum constitutional standards for holding inmates. Most people held are pretrial detainees, who are presumed innocent and cannot be punished under the 14th Amendment of the United States Constitution.

4) Plaintiffs allege that CJ2 does not and has never met California building code requirements.

5) CJ2 houses both men and women.

6) CJ2 has no outdoor space for inmates. As a Type II facility, it is required to have an outdoor exercise area that accommodates large muscle activities and provides natural light and access to fresh air. Calif. Code of Regulations Title 24, §1231.2.10.

7) After the jail at 850 Bryant Street closed, City and County defendants lost its staging and holding cells for inmates coming from San Bruno to attend Court. Defendants converted the CJ2 gym into an overflow area for people waiting to be booked, and as a holding space for inmates transported from the CJ3 at San Bruno to attend court. (San Francisco Civil Grand Jury Report, June, 2026, "Grand Jury Report", p. 4) This means that the gym is frequently closed for inmate exercise from Monday through Friday up until 7:30 p.m. and can be unavailable on weekends, if there's more people waiting to be booked than can be accommodated in Intake and Booking. Id. At p. 4

8) All inmates in CJ2 suffer total deprivation of outdoor sunlight and outdoor fresh air.

Deleted: Francisco's
Formatted: Left: 1", Right: 1", Bottom: 1"
Deleted: does not
Formatted: Font: Not Bold
Formatted: Body Text 2,Body Text - Numbered 2
Deleted: and has never done so.
Deleted: primarily pretrial detainees.
Deleted: Both
Deleted: lacks both an outdoor yard and sufficient exercise space. There is
Deleted: access
Deleted: The exercise space is does not meet the size requirement of 24 Cal.
Deleted: Regs.
Deleted: , or the requirement of an outdoor exercise area with access to natural light and fresh air
Formatted: Body Text 2,Body Text - Numbered 2
Deleted: ¶ ... [7]
Formatted: Font: 9 pt
Formatted: Font: 9 pt

Inmates at CJ2 never receive outdoor access. They never have the opportunity to have sunlight on their skin. They live under artificial light all day, every day. Even at night, there are lights on. Some sleeping areas have a glass pane that is approximately the width of one hand, recessed 10 feet behind the exterior wall. A maintenance hallway, building pipes, and vents obstruct the space between the glass pane and the exterior wall. No sunlight that shines through any window. Many of the "windows" face north. Some of these windows are totally obscured.

9) The lack of outdoor light, the lack of sunlight, and the 24 hours of interior artificial light cause all prisoners to suffer injury to their circadian rhythm and suffer illnesses due to the lack of sunlight on their skin. These illnesses include skin issues, sleep disruption and sleep disorders, blood sugar and endocrine disorders, metabolic syndrome, digestive issues, immune system disruptions, headaches, lethargy, memory loss, dementia and impairment of their eyesight.

10) CJ2 also does not have the minimal space requirements for inmate exercise. The repurposing of the gym as an overflow space for people awaiting booking and as a holding area for San Bruno inmates waiting court hearings makes it impossible for CJ2 to provide inmates at CJ2 with the minimum amount of exercise, three hours per seven days, mandated by Title 15.

11) San Francisco's County Jail 2 ("CJ2") is now old and dilapidated, with deferred maintenance, a vent system that pumps particulates into the air and recurring plumbing issues included plumbing backups and insufficient hot water.

12) CJ2 depends on the Hall of Justice for its water. The hot water boilers, which are in the Hall of Justice, are undependable, resulting in unavailability of hot water. LaCarla Carr has been incarcerated as a pretrial detainee since 2015. For ten of those years, she was housed in Housing Unit B, where she never had a hot shower.

13) CJ2 has insect infestation and water damage in the walls and floors. Water drips down ceilings in individual cells and in inmate meeting rooms. Walls and ceilings are in disrepair, mold and mildew are present, especially underneath the linoleum floor.

14) Women inmates at CJ2 have fewer privileges, fewer jail jobs, and historically were housed in overcrowded housing units, with no access to programming. County Jail 3 ("CJ3") and County Jail 3 Annex ("CJ3 Annex"), located in San Bruno, have some outdoor space and are



Deleted: are
Deleted: permitted
Deleted: no
Deleted: be exposed to direct
Deleted: and
Deleted: 24 hours a day. Inmate
Deleted: glass in the walls, which permit a distant view of the outside, but no sunlight enters the jail.
Deleted: deprivation
Deleted: and
Deleted: combined with constant exposure to
Deleted: interior lighting, causes inmates
Deleted: harm
Deleted: rhythms
Deleted: a range of associated health conditions
Deleted: <#>In addition to failing to meet minimum physical requirements for an inmate exercise area, Defendants do not make, what inmate exercise space there is, available to inmates to use.¶
Deleted: ,
Formatted: Body Text 2,Body Text - Numbered 2
Deleted: and suffering from
Deleted: . Chronic
Deleted: malfunctions include
Deleted: inadequate
Deleted: <#>In CJ2, inmates at CJ2 are limited in being able to access toilets and to flush toilets.¶ CJ2 also
Deleted: ¶ The food at CJ2 is heavy on starch and sugar and low i ... [9]
Formatted: Body Text 2,Body Text - Numbered 2
Deleted: vegetables, further aggravating inmates' ch ... [10]
Deleted: suffer from
Deleted: less access to
Deleted: until recently, overcrowding and a total lack of
Deleted: as compared to male inmates. The other jail ... [11]
Deleted: ") both
Deleted: -
Deleted: at least
Deleted: ,
Deleted: ¶ ... [8]
Formatted: Font: 9 pt
Formatted: Font: 9 pt

therefore able to provide inmates with some access to sunlight. So, the men at CJ2 have the possibility of being transferred to CJ3 and obtaining sunlight access through transfer. Women inmates have no such option.

15) Plaintiffs allege that the jail health system relies on medication to help inmates tolerate unhealthy conditions rather than providing care that adequately addresses their health needs.

16) Inmates with psychiatric disabilities, because of their psychiatric disabilities, are held in various forms of locked downs, whether in Administrative Segregation, in Safety Cells, or in Housing Unit C, with minimal out of cell time, no gym time, no programming, and no meaningful mental health treatment.

17) This civil rights class action lawsuit seeks to remedy the unconstitutional conditions at CJ2, located at 425 7th Street, San Francisco; and to remedy the disparity in treatment and options between male inmates and female inmates at CJ2.

18) The named Plaintiffs are currently inmates in CJ2 and bring this action on behalf of themselves and those similarly situated against the City and County of San Francisco; the City and County of San Francisco Sheriff's Office; Sheriff Miyamoto, the Sheriff of the City and County of San Francisco; JENNIFER COLLINS , the Chief of Custody for the City and County of San Francisco Sheriff's Office in her personal capacity; and LISA PRATT, M.D., in her individual capacity as the medical director and head of the Jail Health Services; and against ROLAND PICKENS, Chief Administrator for the San Francisco Health Network, in his official capacity.

19) Plaintiffs seek to represent a class of inmates and seek a declaration that Defendants' ongoing policies and practices violate their constitutional and statutory rights, and further, seek injunctive relief compelling Defendants to:

a) Provide all inmates with of access to direct sunlight and outdoors;

b) Cease the harmful, excessive and unconstitutional use of lock-up, safety cells and isolation;

c) Provide inmates including inmates with psychiatric disabilities, with meaningful out of cell time, access to exercise, jail services jail activities and jail programming;

Deleted: Men

Deleted: where they may obtain some

Deleted: .

Deleted: available to them.

Deleted: <#>Defendants MIYAMOTO, COLLINS, PRATT and PICKENS through Jail Health Services respond to the unhealthy and illness-inducing conditions at CJ2 primarily by dispensing pharmaceuticals so that inmates can endure the unhealthy and chronic illness causing conditions of CJ2, and rather than addressing inmates' genuine health needs and welfare. ¶

Formatted: Body Text 2,Body Text - Numbered 2

Deleted: face as compared to male inmates incarcerated in

Deleted: ,

Deleted: ,

Deleted: in his individual capacity,

Deleted: individual

Deleted: the chief executive officer of

Deleted: of which Jail Health Services is a subsidiary agency…

Deleted: provide all prisoners in CJ2 with:

Deleted: Daily

Deleted: ,

Deleted: sunlight on their skin

Formatted: Body Text 2,Body Text - Numbered 2, Outline numbered + Level: 2 + Numbering Style: a, b, c, … + Start at: 1 + Alignment: Left + Aligned at: 0.25" + Indent at: 0.5"

Deleted: ¶ ... [12]

Formatted: Font: 9 pt

Formatted: Font: 9 pt

d) For inmates with psychiatric disabilities, provide meaningful access by housing them in the least restrictive setting appropriate to their needs;

e) Provide constitutionally adequate housing that does not have water intrusion, mold and mildew, insects, and air born pollutants;

f) Provide constitutionally adequate health care and mental health care; and

g) Damages.

## II. JURISDICTION AND VENUE

20) This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331 (in that Plaintiffs' claims arise under the Fourteenth Amendments to the United States Constitution) and 28 U.S.C. § 1343(a)(3)-(4), because Plaintiffs seek injunctive relief as well as compensatory and punitive damages for the deprivations, under color of state law, of their rights as citizens of the Unite States which are secured by the United States Constitution, pursuant to 42 U.S.C. §§1983 and 1988. This Court has supplemental jurisdiction of the state claims under 28 U.S.C. § 1367.

21) Venue is proper in the United State District Court for the Northern District of California pursuant to 28 U.S.C. § 1391(b) because Defendants are located in the Northern District of California and all or a substantial part of the events or omissions giving rise to the action occurred in the Northern District of California.

22) Intradistrict venue is proper in the San Francisco Division or the Oakland Division of the Northern District of California pursuant to Civil Local Rule 3-2(d), because all or a substantial part of the events or omissions giving rise to the action occurred in the County of San Francisco, California.

## III. EXHAUSTION

23) Plaintiffs and members of the class filed numerous grievances and exhausted available administrative remedies with the San Francisco Sheriff's Office. The San Francisco Sheriff's Office accepted some grievances and denied the grievances they permitted to be filed or refused to accept grievances. Defendants have not corrected these conditions.

24) Plaintiffs individually and as a group filed government claims with the CITY AND COUNTY OF SAN FRANCISCO regarding their claims and the claims on March 23, 2026. The

**Deleted:** <#>Sufficient space and access to exercise [24 CCF §1231.2.10];
Food sufficiently healthful to allow inmates to control maintain their health without pharmaceuticals;
Sufficient hot water so…

**Deleted:** all prisoners can obtain a hot shower, and maintain personal sanitation as mandated [Title 15];
Adequate maintenance and sanitation to provide living quarters with functioning toilets, free of insects, mold, bacteria,

**Formatted:** Body Text 2,Body Text - Numbered 2, Outline numbered + Level: 2 + Numbering Style: a, b, c, … + Start at: 1 + Alignment: Left + Aligned at: 0.25" + Indent at: 0.5"

**Deleted:** other pests

**Deleted:** pathogens;

**Deleted:** Genuine

**Deleted:** rather than pharmaceutical maintenance

**Formatted:** Body Text 2,Body Text - Numbered 2

**Deleted:** Fourth, Eighth, and

**Deleted:** )

**Deleted:** that

**Deleted:** )

**Deleted:** the

**Formatted:** Body Text 2,Body Text - Numbered 2

**Deleted:** taken no action to correct

**Deleted:** problems

**Deleted:** , which were rejected by the

**Deleted:** ... [13]

**Formatted:** Font: 9 pt

**Formatted:** Font: 9 pt

City and County of San Francisco rejected those claims on April 13, 2026.

## IV. JURY DEMAND

25) Plaintiffs respectfully demand a trial by jury of all issues in this matter pursuant to Fed. R. Civ. P. § 38(b).

## V. PARTIES

### A. Plaintiffs[1]

26) **LaCarla Carr** has been in custody since December 23, 2014. She was a pretrial detainee until September, 2026. She has since been convicted but not sentenced. Since incarceration, she has developed multiple, chronic, incurable illnesses for which she is prescribed medications by defendants. From December 2014 to March 2026, LaCarla Carr was housed in B Pod in CJ2. During that period, B Pod was the only housing pod for women and all the women – 70 or more – were overcrowded into B Pod. In B Pod, none of the women were provided programming. After protests, including community protest, from March 2026 onwards, she and some of the women inmates are being housed in D Pod and provided access to programming. Before incarceration she weighed 165 pounds. Her current weight is 230 pounds. In 2018, she was diagnosed with type 1 diabetes and receives insulin a total of 4 times a day, with each meal and before she sleeps. Since incarceration, she has developed severe sleep disturbance issues. She wakes up three to four times a night and is awake for 30 to 60 minutes each time. During the day, she has a hard time staying awake. After waking up at 7:30 am, during the morning wake up call, she generally has to take a nap at 10 am. The jail prescribes melatonin which is not effective. Carr, since incarceration, has also developed high blood pressure. She has been taking a prescription medication for hypertension once a day since 2018. Carr has also had recurring digestive issues since 2015 and is prescribed stool softeners. Since incarceration, she developed back problems. She stated that, during these times, the nurse in the jail prescribes her muscle relaxers. Since January 2025, Carr has also had vision changes and is now nearsighted. For 12 years, since her incarceration, Carr has been denied access to direct sunlight. Nor does she get

[1] Damena Page, Kimberly Boyd, Thea Hopkins and Alexcis Herrera are no longer in custody in CJ2.

Formatted: Body Text 2,Body Text - Numbered 2
Deleted: is a pretrial detainee and
Deleted:
Formatted: Heading 3 Char, Font: Not Bold
Formatted: Body Text 2,Body Text - Numbered 2
Deleted:
Deleted: La Carla
Deleted:
Deleted: sleep
Deleted: from
Deleted: walking
Deleted: She now has
Deleted: that have been going on and off from 2023 to the present.
Deleted: relaxer
Deleted: In the
Deleted: of
Deleted: she
Deleted: totally
Deleted: ¶ [... [14]]
Formatted: Font: 9 pt
Formatted: Font: 9 pt

access to fresh air. In the ten years she was housed in Housing Unit B she was provided access to the gym no more than once every two weeks, for one hour.

27) During her ten plus years in Housing Unit B, LaCarla Carr never had a hot shower. She has only been able to have a hot shower for the last 7 months, since being moved to Housing Unit D in March of 2026.

28) **Silvia Montoya** is a pretrial detainee and has been in custody for more than a decade– since June 30, 2015. She's been unable to maintain her weight and is presently 25 pounds heavier than when she was first incarcerated. She has migraine headaches almost every day. She now suffers from hypertension, which developed after she was incarcerated. She wakes up in the middle of the night, sometimes as many as four times a night. She is tired every day, during the day. After 11 years in jail, her body feels broken. Silvia Montoya worked for years as an inmate worker. Now, female inmates are limited to certain jail jobs, none of them outside the housing unit. The jail jobs which provide more freedom and out of cell time are provided only to men.

29) **Giovanna Ramirez-Hernandez** is a pretrial detainee and has been in custody since October 15, 2024. She was energetic and active before incarceration. She was thin: weighing 115 pounds. For 20 months, she only was provided gym access once or twice a month for an hour each time. She gained 25 pounds. She has frequent digestive issues, experiencing diarrhea and indigestion. In addition, she has developed breathing problems. She is provided triamcinolone acetonide nasal spray. She has to take a pharmaceutical medication to sleep. Even so, she has difficulty falling asleep and staying asleep, waking up twice most nights. She is dozy and sleepy during the day and has low energy. She has constant headaches, at least four to five times a week. The headaches last three to four hours. Since coming to jail, she has become nearsighted and needs glasses. She has regular urinary tract infections and yeast infections, first they were monthly, and now almost weekly. The medical staff stated she has allergies and/or developed an auto-immune illness since incarceration.

30) **Marilyn Sahagun** has been in custody since July 18, 2023. Her digestive system constantly causes her pain. It doesn't matter if she eats or doesn't eat. She has regular migraine headaches that lasts a couple of hours. On a scale of 1 to 10, her headaches are an 8/9. She

Deleted: Although CJ2 has a gym,

Deleted: is only

Deleted: <#>**Alexcis Herrera** is a pretrial detainee and has been in custody since April 2, 2024. For almost two years, she was housed in B Pod, and moved to D Pod sometime in March, 2026. Prior to incarceration, in her late 30s, she was diagnosed as diabetic. She was able to control her diabetes without medication, per the advice of her medical doctor by eating a well-rounded, low carbohydrate diet with plenty of fruits and vegetables and exercising regularly. In jail the diet is heavily starch and carbohydrate based with only minimal fruits and vegetables. There is no space to exercise, and she is only offered access to the gym once or twice a month. Since incarceration she has gained 50 to 60 pounds and the jail has placed her on a GLP medication. She is also prescribed insulin, and multiple pharmaceutical medications which she did not require before incarceration.
She has developed arthritis in her hip and has a pinched nerve from C5 to C6, which her doctor believes is likely due to the poor bunk quality. She has swelling in her right knee, which she has a lidocaine patch for. She has difficulty staying asleep throughout the night and often wakes up. For sleep, she is prescribed a pharmaceutical sleep medication.
Over the course of her incarceration, her dosage has ... [16]

Deleted: ,

Deleted: –

Formatted: Heading 3 Char, Font: Not Bold

Formatted: Body Text 2,Body Text - Numbered 2

Deleted: , losing

Deleted: gaining and at present

Deleted:

Deleted: and

Deleted:

Deleted:

Deleted: <#>**Damena Page** is a pretrial detainee and ... [17]

Formatted: Heading 3 Char, Font: Not Bold

Deleted: <#>remembers herself as

Deleted: <#>Before incarceration she

Deleted: <#>Now she has no motivation to move and has

Deleted: <#>There's no place to exercise, and she is ... [18]

Deleted: <#>. She frequently has

Deleted: <#> The medical staff diagnosed the issue a ... [19]

Deleted: <#>is now

Formatted: Heading 3 Char, Font: Not Bold

Deleted: The plumbing is horrible. The toilets do not ... [20]

Deleted: ... [15]

Formatted: Font: 9 pt

Formatted: Font: 9 pt

suffers from recurrent bacterial vaginosis and candidiasis, with urinary and bladder symptoms.

31) In Housing Unit B showers are cold. At most, there would be hot water, only for a minute or two. If there were ten women in line, only one woman would get some hot water during her shower. There was no predictability or pattern as to when hot water would be available. Marilyn Sahagun has developed a variety of skin issues, including a number of abscesses for which she has required over five courses of antibiotics. One of the abscesses on her right ear lobe grew to the size of a ping pong ball, and permanently deformed her earlobe.

32) **Katelyn Williams** was incarcerated in November 2025. Since incarceration she has suffered sleep disruption, waking up almost every night, and then has a difficult time falling back asleep. She has regularly developed headaches. She asked once to go to the gym and was denied. She has become listless. Housed in Housing Unit B, she endures cold showers. During the summer months, the shower is not icy, and tolerable for brief showers. During the winter months, especially December and January, the water is icy and too cold for showering.

33) When Katelyn Williams was arrested, San Francisco Jail Health did not record her vitals at the intake medical screening. (SFSD Policy 502.2.2) And contrary to the recommended standard practice by the National Commission on Correctional Health,[2] that screening results be reviewed with a comprehensive health assessment within 14 days, defendant Jail Health Services did not conduct a complete health assessment for Katelyn Williams. Therefore, she does not know her weight at the time of incarceration. Katelyn Williams' normal weight is 200 pounds. There is no record of her actual weight at the time of arrest. She currently weighs 237 pounds and believes she gained all the additional weight since her incarceration.

34) **Melody Windom** was most recently incarcerated in April, 2026. Throughout her adult life, she has been incarcerated multiple times. She suffers from a major depressive disorder and has been prescribed psychiatric medication for more than 20 years. During her incarcerations, she has had recurrent Trichomonas, bacterial vaginosis, and vulvovaginal candidiasis.

35) A month after her arrest, she developed pneumonia. She believes her lungs became

[2] National

**Deleted:** <#>**Kimberly Boyd** is a pretrial detainee and was incarcerated on October 13, 2024. Since incarceration she has gained 60 pounds. Digesting food gives her pain. She has difficulty falling asleep and staying asleep. She is prescribed melatonin. She is frequently sleepy throughout the day and has trouble keeping her energy levels up. She has regular low grad headaches for which she is given Tylenol and Ibuprofen. Her anxiety has gotten worse since incarceration. She had pre-existing high blood pressure, which is worsened. She now takes prescription medication for her anxiety and metformin for her high blood pressure. She has blood sugar issues, and the jail food causes her to be sick. In Mid-March she suffered severe vomiting, diarrhea from the food, which lasted weeks. ¶
**Kaitlyn**...

**Deleted:** ,

**Formatted:** Heading 3 Char, Font: Not Bold

**Formatted:** Body Text 2,Body Text - Numbered 2

**Deleted:**

**Deleted:** In the seven (7) months she has been incarcerated, she...

**Deleted:** In the seven (7) months she has been incarcerated, she has never been given access to the gym.

**Deleted:**

**Deleted:** ¶ ... [21]

**Formatted:** Font: 9 pt

**Formatted:** Font: 9 pt

infected from particulates blown in through the jail vents. All sleeping areas have an air vent through which particulates and dust blow and accumulates in inmate sleeping areas. In August of 2026, she was placed into one of Pod B's upper tier locked cells and given a roommate who was recently booked. Her roommate had lice, which was then transmitted to Melody. As a result, Melody was subjected to lockdown for 9 days. During these 9 days, she was not allowed out of the cell except for showers.

36) Since the August there have been 3 episodes of lice in Housing Unit B and one in Housing Unit C.

37) **Meredith Dechert** has been in custody since May, 2024. She has a DSM diagnosis and is psychiatrically disabled. During her 30 months in custody, she has spent the majority of the time in solitary confinement. Because of the filthy conditions in the cells and the lack of sunlight, she has – on multiple occasions – become depressed and suicidal.

38) When Meredith Dechert was first arrested, she was held in a cell in intake for five days. She was not let out except for showers. The cell was incredibly hot with no air. The only air flow was through the cracks under the door, and so to get air, was to lie on the floor with her face next to the bottom of the door.

39) Suicidal inmates are placed in safety cells, cells which are never properly cleaned. In December, 2024, after being held in a safety cell, Meredith Dechert contracted a staph infection. She has been placed in a safety cell more than 10 times.

40) In 2024, Meredith Dechert was housed in C pod, in a medical cell, for 6 months. She had no out of cell time and no gym time.

41) In 2025, Meredith Dechert spent 2-3 months in C pod in a psych cell. She received one hour per day of out of cell time, but no gym time at all. In 2025, all her showers were cold.

42) After C pod, Meredith Dechert was housed in solitary confinement cell for 9 months with no window, including being locked in her cell for 85 days straight, and only let out of a cell every other day for 20 minutes. In February, 2026, she cut herself because she couldn't take it anymore.

43) From August, 2026, to mid-October, 2026, Meredith was returned to the regular women's

Deleted: ¶ ... [22]
Formatted: Font: 9 pt
Formatted: Font: 9 pt

housing unit B pod. She was upstairs, locked in Cell 15. She has grieved the mold in Cell 15, and the jail says they know about it but did not clean the mold. While in B pod, she has only been given access to the gym once, for one hour. She requested additional gym time and was denied.

44) Because she never goes outside and never experiences sunlight on her skin, breathes fresh air, or sees the sky, Meredith Dechert pasted pictures of flowers in her cell. Defendant SF Sheriff ordered her to remove the pictures or be subject to disciplinary action.

### B. Defendants

45) Defendant **City and County of San Francisco** is both a city and a county located in the State of California. City and County of San Francisco is a "public entity," pursuant to California Government Code § 811.2.

46) Defendant **City and County of San Francisco Sheriff's Office** (hereinafter "**Sheriff's Office**") is a law enforcement agency within the City and County of San Francisco and, relevant here, is charged with operating all City and County of San Francisco jails ("SF Jails"), including County Jail 2 located in the City, and County Jail 3 and County 3 Annex which are located in San Bruno. Defendant Sheriff's Office is a "public entity" as defined by California Government Code § 811.2.

47) Defendant **Paul Miyamoto** (hereinafter "**Miyamoto**") is, and at all times relevant to this Complaint was, a law enforcement officer and the elected Sheriff of San Francisco City and County, acting under color of state law and within the scope of his employment. As the elected Sheriff of San Francisco County, Defendant Miyamoto holds the command and policy making position with regard to SF Jails, including CJ2, and is responsible for overseeing all San Francisco County detention facilities run by the San Francisco Sheriff's Office. Defendant Miyamoto has caused, created, authorized, condoned, ratified, approved, or knowingly acquiesced in the unconstitutional and inhumane conditions, actions, policies, customs and practices that prevail at the SF Jails, as described fully below. There is a direct causal link between the affirmative acts and omissions of Defendant Miyamoto, as the chief supervisory member of the Sheriff's Office and the injuries and violations of rights set forth fully below. Defendant Miyamoto has, wholly or in part, directly and proximately caused and will, in the

Formatted: Heading 3 Char, Font: Not Bold
Formatted: Body Text 2,Body Text - Numbered 2
Deleted:
Formatted: Heading 3 Char, Font: Not Bold
Deleted:
Formatted: Font: Not Bold
Formatted: Heading 3 Char, Font: Not Bold
Formatted: Font: Not Bold
Formatted: Font: Not Bold
Deleted:
Deleted: ¶ ... [23]
Formatted: Font: 9 pt
Formatted: Font: 9 pt

absence of the injunctive relief which Plaintiffs seek in this Complaint, continue in the future to proximately cause the injuries and violations of rights set forth fully below and is sued in his individual capacity.

48) Defendant **Jennifer Collins** (hereinafter **"Collins"**) is and at all times relevant to this Complaint was, a law enforcement officer and the Chief of Custody in charge of the Custody Operations for the Sheriff's Office, acting under color of state law and within the scope of employment. As the ranking officer in charge of the Custody Operations, she is the direct commander and policy maker position with regard to all of the County Jails operated by the Sheriff's Office, including County Jails 2. Defendant Collins has caused, created, authorized, condoned, ratified, approved or knowingly acquiesced in the unconstitutional and inhumane conditions, actions, policies, customs and practices that prevail at the Jails, as described fully below. There is a direct causal link between the affirmative acts and omissions of Defendant Collins, as the chief supervisory member of the Custody Division of the San Francisco Sheriff's Office and the injuries and violations of rights set forth fully below. Defendant Collins has, wholly or in part, directly and proximately caused and will, in the absence of the injunctive relief which Plaintiffs seek in this Complaint, continue in the future to proximately cause the injuries and violations of rights set forth fully below and is sued in her individual capacity.

49) Defendant **Lisa Pratt** (hereinafter **"Pratt"**) is a medical doctor and is and was, at all times material herein, the Director of Jail Health Services, for the San Francisco Sheriff's Office, acting under color of state law and within the scope of employment. Jail Health Services is the division that has the responsibility to provide direct medical care and does the direct medical care for all inmates in the custody of and under the control of the San Francisco Sheriff's Office operated jails. Defendant Pratt, is sued in her individual capacity.

50) Defendant **Roland Pickens** (hereinafter **"Pickens"**) is the Chief Executive Administrator for the San Francisco Health, which oversees Jail Health Services. As the CEO he is responsible for the provision of medical care to inmates in San Francisco jails. Defendant Pickens is sued in his official capacity only.

51) Each and every Defendant named herein was at all times relevant to this Complaint an

Formatted: Heading 3 Char, Font: Not Bold

Deleted: ,

Formatted: Heading 3 Char, Font: Not Bold

Formatted: Font: Not Bold

Formatted: Font: Not Bold

Deleted: ,

Formatted: Heading 3 Char, Font: Not Bold

Deleted:

Deleted:

Deleted: PICKENS

Deleted: ¶ ... [24]

Formatted: Font: 9 pt

Formatted: Font: 9 pt

officer or employee of the San Francisco County Sheriff's Office, acting under the color of law within the meaning of 42 U.S.C. § 1983, and acting pursuant to the authority of the Sheriff and within the scope of their employment with the Sheriff.

52) Each and every individual Defendant was a command officer who had within his or her own powers, to choose action or inaction, and had the power and authority for the training, supervision and control of his or her subordinates in the manner in which Plaintiffs and members of the Plaintiff class were held in custody. Every individual Defendant's action or inaction was a primary or significant causal factor in the constitutional deprivations alleged herein and the injuries and harms complained of. Each individual Defendant had the power to effectuate the necessary change to prevent the constitutional deprivations and injuries and harms complained of but failed and refused to do so. The actions or inactions of these individual, supervisory defendants set in motion a series of acts by others, including his or her subordinates, which the individual supervisors knew or reasonably should have known would cause others to inflict the constitutional injuries complained of herein. The actions or inactions each individual Defendant took, were demonstrations of reckless or callous indifference to the rights of Plaintiffs and members of the Plaintiff class.

53) Does 1 through 50 are supervisory staff who staff the Jails and all of whom contributed to the injuries, deprivations, and losses complained of herein. The Doe defendants are sued in their individual capacities.

## VI. GENERAL ALLEGATIONS

54) At all times relevant herein, all wrongful acts described were performed under color of state law and/or in concert with or on behalf of those acting under the color of state law.

55) The City and County of San Francisco operates active jails, incarcerating primarily pretrial detainees. County Jail 2 ("CJ2"), located at 425 7th Street, within the City limits, is a Level 2 facility defined by Title 24 as "a local detention facility used for the detention of persons pending arraignment, during trial and upon a sentence of commitment." Cal. Code Regs. §24, p. 4.

Deleted: were

Deleted: ,

Formatted: Body Text 2,Body Text - Numbered 2

Formatted: Font: Not Bold

Deleted: ¶ ... [25]

Formatted: Font: 9 pt

Formatted: Font: 9 pt

56) CJ2 is designed to hold maximum of 392 inmates[3] and is the only jail operated by the San Francisco Sheriff's Office that houses women. On average, there are 70-80 women incarcerated in CJ2.



57) CJ2, built in 1994, was designed and built in violation of then and current California Uniform Building Code and the San Francisco Building Code.

58) Before 2020, San Francisco had three County Jails. In 2020, the oldest of the three jails, located at the 6th and 7th floor of the Hall of Justice, at 850 Bryant Street, was closed by the city, due to dilapidation, and a chronic sewage overflow problem. The City and County defendants settled a class action lawsuit for two years of raw sewage overflows for $2.1 million Zayas et al. v. San Francisco County Sheriff's Department et al, No. 3:18-cv-06155 (ND, Cal.)

59) During covid, the overall inmate population remained low. However, in 2023, the City and County defendants began to address the fentanyl crisis resulting in an increase in the number of incarcerated individuals.

60) The City and County of San Francisco has known that its jail facilities were inadequate and insufficient. In 2015, former Sheriff Mirakarimi, recommended a new jail facility and

[3] https://sfsheriff.com/services/jail-services/jails/county-jail-2

Deleted: between 325 and
Deleted: primarily pretrial
Deleted: ,
Deleted: At present
Deleted: approximately 79
Deleted:



Deleted: was
Deleted: and
Deleted: ,
Deleted: the 1994 Code
Deleted: now
Deleted: : Title 24,
Formatted: Body Text 2,Body Text - Numbered 2
Deleted: ,
Deleted: <#>Lack of Sunlight¶
Deleted: ¶
... [26]
Formatted: Font: 9 pt
Formatted: Font: 9 pt

obtained grant funding from the California Board of State and Community Corrections. However, the Board of Supervisors unanimously rejected the $80 million grant in 2015, and no new facilities were developed. San Francisco Grand Civil Jury Report, "When Making Do Doesn't Work: San Francisco Jails in Crisis," June, 2026, p. 6.

## A. LACK OF HOT WATER

61) The hot water boilers for County Jail 2, is dependent on the Hall of Justice at 850 Bryant Street for hot water, but the hot water is not dependable. For all of 2025, there was at best intermittent hot water at CJ2 for all Housing Units. City and County defendants control all the hot water to which inmates have access, including the amount and the temperature. Showers are push-button, and the water comes out for a preset amount of time, approximately one minute. The water temperature is preset by the jail. Inmates have no controls. Sometime in 2026, some repairs were made to the hot water delivery system. Some of the Housing Units have hot water. However, in Housing Unit B, where most of the women inmates are housed, there is no hot water for showers.

62) Cold showers are tolerable in the warmer summer months, but the showers are icy and intolerable in the winter.

## B. LACK OF GYM SPACE

63) Currently CJ2 has very limited gym space for the inmates. Due to the closure of the jail at 850 Bryant Street in 2020, City and County Defendants now lack holding cells and staging areas for the approximately 120 inmates per day, who are transported from CJ3 at San Bruno to attend court. City and County Defendants have converted the gym as an overflow area for people waiting to be booked. The gym is also used as a staging and holding space for inmates waiting for their court hearing. (San Francisco Civil Grand Jury Report, June 2026, "Grand Jury Report", p. 4) This means that the gym is often unavailable for inmate exercise from Monday through Friday up until 7:30 p.m., and can be unavailable on weekends if there's more people waiting to be booked than can be accommodated in Intake and Booking. Id. At p. 4

64) When gym is available, it is available only for an hour.

Deleted: ¶ ... [27]

Formatted: Font: 9 pt

Formatted: Font: 9 pt

65) Because inmates are only entitled to showers once every other day, and because inmates are only provided clean clothing once a week, and clean underwear, twice a week, inmates are reluctant to exercise at 7:30 at night, because they will not have the opportunity to shower after exercise. will be required to wear their jail issued clothing while sweaty until the next clothing exchange. Plus, depending on the shower rotation, they might not access a shower for two days. Late gym use may also require inmates to miss pill calls for required medication. They Therefore, many inmates are reluctant to go to the gym in the evening.

66) It should be noted, that in *Pierce v. City and County of San Francisco*, 4:19-cv-07659-JSW, the defendants in their motion for summary judgment, stated that at the time of Pierce, all inmates received "three hours of gym time weekly"…, and "several hours of free time per day (generally 4.5 hours during weekdays and 8 hours during the weekend)" ECF 15, p. 14 l. 14-23. This is certainly not the case now.

## C. LACK OF SUNLIGHT

67) The Level 2 jail at 425 7th Street was deliberately designed and constructed with no inmate outdoor access. Inmates housed at CJ2 receive no exposure to direct sunlight. As a result, inmates housed at CJ2 suffer from chronic jet lag. Sunlight deprivation and the resulting chronic jet lag — manifests as sleep disruption, daytime fatigue, impaired concentration, digestive disturbance, mood changes, and a general sense of unwellness. Over time, these symptoms progress into chronic and potentially irreversible illness, including memory loss, dementia, insomnia, diabetes, endocrine and metabolic disorders, Crohn's disease, immune dysregulation, migraines, hypertension, depression, and impaired eyesight. Total deprivation of sunlight violates California Code of Regulations, title 15, section 1065, and inmates' rights under the Fourteenth Amendments.

68) Lack of sunlight creates vitamin D deficiency.

69) "Vitamin D deficiency not only causes an imbalance in calcium homeostasis and bone metabolism, but also has been associated with increased risk of hypertension,14 autoimmune disorders including type 1 diabetes,15 and increased risk of dying of breast, colon, ovarian and prostate cancer.16–19 It is now recognized that

Formatted: Body Text 2,Body Text - Numbered 2

Deleted: and no

Deleted: have never had outdoor recreation and cannot have direct sunlight on their skin, eyes, or bodies while in the custody of the San Francisco Sheriff's Office. Inmates are housed 24 hours day under artificial light. Even during nighttime hours, lights remain on. ¶
Some sleeping areas contain a window approximately the width of one hand; however, this window is recessed approximately ten feet behind the exterior wall, with a maintenance hallway and building pipes obstructing any view or light. Many of these windows face north, and most receive no direct sunlight. Some are entirely obscured. All inmates are subjected to a total deprivation of outdoor sunlight and outdoor fresh ¶
These conditions violate California Code of Regulations, title 15, section 1065, and inmates' rights under the Eighth and Fourteenth Amendments. Sunlight deprivation initially produces…

Deleted: — manifesting

Deleted: ¶ ... [28]

Formatted: Font: 9 pt

Formatted: Font: 9 pt

most tissues in the body, including brain, skin, breast, prostate, colon, etc. not only have a vitamin D receptor, but also have the enzymatic machinery to convert 25(OH)D to 1,25(OH)2D.2 1,25(OH)2D is one of the most potent inhibitors of cellular proliferation and has a multitude of subtle effects on the immune system. There is compelling evidence that 1,25(OH)2D, through its receptor in the kidney, is a potent negative regulator of the renin-angiotensin system. This is why patients with vitamin D deficiency have a higher risk of hypertension. In addition, the vitamin D receptor is present in cardiac muscle.21 Animal studies have shown that vitamin D deficiency causes increased cardiac contractility and myocardial hypertrophy. In addition, it has been observed that vitamin D deficiency increases vascular muscle contractility that appears to be caused by the hypocalcemia associated with vitamin D deficiency. The authors observed that 13% of the patients had hypocalcemia, which could have exacerbated the PAD (Peripheral artery disease) symptoms…."[4]

70) CJ3 is a county jail operated by the San Francisco Sheriff's Office located on San Francisco owned watershed land in San Bruno. There are two buildings at San Bruno used to incarcerate prisoners. "**CJ3 Main**" opened in 2006, and has a capacity of 768 inmates, only men. The "**CJ3 Annex**" is located on the same property, has a capacity of 372, again only men.

71) The CJ3 Annex has an outdoor space attached to the housing units, so that the male inmates housed in the CJ3 Annex can have access to direct sunlight.

---

[4] Michael F. Holick, Sunlight and Vitamin D. J. Gen Intern Med. 2002 Sep; 17(9):733-735. https://pmc.ncbi.nlm.nih.gov/articles/PMC1495109/

Formatted: Body Text 2,Body Text - Numbered 2

Deleted: ¶ ... [29]

Formatted: Font: 9 pt

Formatted: Font: 9 pt



72) Some of the inmates in CJ3 Main are provided access to direct sunlight, as a result of a prior litigation, *Brackens, et al. v. City and County of San Francisco, et al.* 3:19-cv-02724-SK (CAND) [July 2, 2024], "***Brackens***", wherein the trial court found "that Defendant violated Plaintiffs' rights under the Fourteenth Amendment of the U.S. Constitution and Article I Section 7 of the California Constitution by failing to provide any access to direct sunlight, defined as access to sunlight without any mediation through glass or plastic or other solid substance that blocks ultraviolet light, and thus orders the injunctive relief noted above." (Dkt. 478 at p. 67) The San Francisco Sheriff's Office was ordered to provide at least 15 minutes of direct daily sunlight to all prisoners who had been incarcerated for 1 year or longer. (Dkt.478 at p. 62)

73) Defendants Miyamoto and Pratt are both knowledgeable about the *Brackens* litigation, as both were witnesses at trial. Plaintiffs' expert witness, Dr. Charles Czeisler, testified that humans require direct sunlight in order to maintain a regular circadian rhythm and to maintain proper functioning of human endocrine, cardiopulmonary, and neurological systems.

74) Many inmates at CJ2 have been incarcerated pre-trial, for over a year, some for many years.

75) Male inmates at CJ2 who raise concerns about sunlight deprivation may request transfer to CJ3. Women inmates have no such option: CJ2 is the only San Francisco County jail that houses women.

76) Transfer to CJ3 provides limited relief even for men. Outdoor space at CJ3 is small and access is restricted, and transferring CJ2 inmates displaces CJ3 inmates from their own limited

Formatted: Image, Left

Formatted: Body Text 2,Body Text - Numbered 2

Deleted: ¶ ... [30]

Formatted: Font: 9 pt

Formatted: Font: 9 pt

sunlight access. As a result, transfers for the purpose of sunlight exposure rarely occur.

77) The most effective remedy for sunlight-deprivation illness is direct sunlight — on the skin and through the eyes. Defendants have not provided it. Instead, they dispense pharmaceuticals — psychotropic medications, sleep aids, cortisone cream, and vitamin D supplements — that marginally mitigate symptoms while leaving the underlying cause unaddressed. These interventions do not prevent or reverse the chronic illness caused by sunlight deprivation; but they allow Defendants to sustain the unconstitutional and cruel and unusual confinement conditions that result in chronic illness. Defendants' medical care merely maintains and manage the chronic illnesses that Defendants' deliberate indifference creates inmates' chronic illnesses by denying inmates access to direct sunlight, insufficient exercise, the lack of hot water and unsanitary conditions.

78) Defendants' pharmaceutical interventions carry independent iatrogenic risks. Psychotropic drugs alter perception, risk assessment, and judgment, with chronic reliance reshaping brain architecture. The use of pharmaceuticals - including psychotropic medication - as the sole means by which inmates are made to tolerate the harmful conditions at CJ2 constitutes chemical coercion. Upon release, inmates who have been subjected to long-term pharmaceutical regimens suffer diminished cognitive clarity and problem-solving ability, compounded by the physical sequelae of the medications themselves: liver toxicity, cardiovascular effects, hormonal disruption, and gut microbiome damage. These harms compound the underlying chronic illnesses caused by sunlight deprivation. Together, they impair reintegration into non-carceral life and increase the likelihood of re-offense.

79) Defendants' deliberate failure to provide sunlight access deprives all CJ2 inmates of their constitutional rights. It falls with particular force on women inmates, who, unlike their male counterparts, have no mechanism within the San Francisco County jail system to ever obtain sunlight exposure. Defendants have long possessed the specific knowledge that total sunlight deprivation causes chronic and irreversible human illness - including insomnia, myopia, diabetes, metabolic syndrome, hypertension, cardiac disease, digestive disease, memory loss, possible dementia, and exacerbation of eczema - and have – through deliberate indifference - taken no

Deleted: –

Deleted: –

Deleted: –

Deleted: maintain

Deleted: status quo in

Deleted: in creating inmates

Deleted: .

Deleted: ¶

Deleted: ¶

... [31]

Formatted: Font: 9 pt

Formatted: Font: 9 pt

action to provide CJ2 inmates with sunlight access.

80) Defendants have long possessed the specific knowledge that total sunlight deprivation causes chronic and irreversible human illness - including insomnia, myopia, diabetes, metabolic syndrome, hypertension, cardiac disease, digestive disease, memory loss, possible dementia, and exacerbation of eczema - and have – through deliberate indifference - taken no action to provide CJ2 inmates

81) Defendants have maintained a deliberate policy of palliative pharmaceutical care that addresses symptoms, ignores causes, and creates lifelong drug dependency – all while preserving the conditions that generate the harm in the first place.

D. HOUSING UNIT B

82) The majority of women are housed in Housing Unit B. Some women are housed in Housing Unit D, but Housing Unit D is smaller. For example, on October 1, 2026, there were approximately 70 women in County Jail 2, and only 10 were housed in Housing Unit D, while 60 or so women inmates were in Housing Unit B.

83) All housing units at CJ2 (except the medical units) are two floors and donut shaped. The donut hole is occupied by the deputy station. Half the donut is the entrance and exit to the unit, flanked by a linen closet, a medical exam room, a meeting room. In Housing Unit B, the upstairs are double occupancy locked cells. The left quarter of this donut are 10 administrative segregation cells, separated and isolated from the rest of the unit with locked steel doors. And the right quarter are 10 double occupancy cells considered to be general population cells. Each cell contains a metal bunk bed, a toilet with no lid, and a desk. Each cell is approximately 7 ft by 12 ft.

84) Upper B's locked general population cells face a hallway with two rectangular metal tables, with four round metal stools on each long side. The table and stools are bolted to the floor. There are three large concrete pillars, between 2 to 3 feet in diameter, which support the second story. There are two telephones attached to one of the pillars. Between the metal tables and the cells is a busy walkway.

85) When inmates housed upstairs in Housing Unit B are given out of cell time, exercise is

Deleted: –
Deleted: ,
Deleted: –
Deleted: ¶ ... [32]
Formatted: Font: 9 pt
Formatted: Font: 9 pt

not an option because the only space available is the hallway between the cells and the metal tables and chairs.

86) On the first floor, the sleeping areas are not locked, but there is a thick painted strip along the sleeping areas which delineates the inmates' sleeping areas. Other than during free time or shower time, inmates downstairs are required to stay in their sleeping area. Stepping outside the sleeping area perimeter subjects inmates to disciplinary actions and loss of privileges. The loss of privileges can include transfer to a locked cell. The sleeping areas contain metal bunk beds, no chairs, no desk, and no access to water or the bathroom.

87) For first floor inmates, there are four toilets, two at each end of the row of sleeping areas. There are four showers, two on each end, but only one set of showers are functional. The showers at the right end have been closed for years due to plumbing problems. If an inmate needs to use the toilet, they have to leave the sleeping area. To leave the sleeping area, inmates must alert the deputy and be given permission by the deputy to leave the sleeping area.

88) For both the downstairs and the right quarter upstairs general population cells, free time is supposed to be 10 to 11 am daily, and then for one hour in the evening on Sunday, Tuesday and Thursdays. Free time is when inmates can have access to the shower and the phone, and hot water for hot drinks. Upstairs inmates cannot go downstairs and downstairs inmates cannot go upstairs. Because there are only two showers on each floor and often 40 or more inmates downstairs, not all inmates can shower during any one-hour period of free time.

89) Because of the scheduling by City and County defendants, and the limited times permitted out of their cells and/or sleeping areas, most inmates do not have the ability to engage in recreation during their one hour out of cell, but are required to wait for the opportunity to shower or to make phone calls. For inmates who are parents, the calls to family, particularly children, are of paramount importance. Since, on the upstairs, there are only 2 phones for 10 women, getting access to the phones requires waiting.

90) Newly booked inmates can be housed either in the first floor sleeping area or the upstairs locked cells.

Deleted: ¶ ... [33]

Formatted: Font: 9 pt

Formatted: Font: 9 pt

E. **Insufficient Space and Opportunity to Exercise**

91) Title 24 of the California Code of Regulations governs the physical facilities of county jails. 24 CCR 13-102 defines exercise as "activity that requires physical exertion of the large muscle group."

92) 24 CCR §1231.2.10 requires that every jail such as CJ2 provide at least one exercise area of not less than 600 square feet, with a minimum number of square feet to be "computed by multiplying 80 percent of maximum rated population by 50 square feet (4.7 m2) and dividing the result by the number of one-hour exercise periods per day."

93) 15 California Code of Regulations §1000 et seq sets the minimum standards for county jails. Section 15 CCR Section 1006 defines exercise as the "opportunity for physical exertion;" "Out of cell time" as an opportunity outside of the sleeping area with an opportunity to exercise or participate in recreation; and "Recreation" is defined as "the individual's ability to choose from activities that occupy the attention and offer the opportunity for relaxation and may include reading, games, socialization, entertainment, education, and programs."

94) 15 CCR §1065 requires that every inmate be provided with the minimum of three hours per seven days for exercise and seven hours per seven days for recreation.

95) CJ2 has neither sufficient space to meet the requirements of 24 CCF §1231.2.10, nor do defendants comply with 15 CCR §1065, in providing inmates with 3 hours per seven days of the opportunity to exercise, in a place of sufficient size for large muscle physical exertion.

96) 15 CCF §1266 specifies that incarcerated persons be permitted to shower at least every other day.

97) Due to the lack of opportunity to engage in meaningful exercise due to the lack of space and lack of opportunity within the jail to exercise, inmates, particularly female inmates at CJ2 have uniformly gained significant. This weight gain has negatively impacted inmates' health included the development of metabolic syndrome, potential heart disease, hypertension, diabetes, and raises the women's risk of developing cancers including cancer of the lining of the uterus, gallbladder cancer, and breast cancer. By way of example, Silvia Montoya has gained 45 pounds during incarceration (170 to 214); Giovanna Ramirez gained 23 pounds (119 to 132); Katelyn

Deleted: To
Formatted: Body Text 2,Body Text - Numbered 2
Deleted: §
Deleted: , including
Deleted: establishes
Deleted: .
Deleted: "; defines
Deleted: to mean,
Deleted: .;
Deleted: of
Deleted: opportunity
Deleted: in a place of sufficient size for large muscle physical exertion. CJ2 has neither sufficient space to meet the requirements of 24 CCF §1231.2.10, nor do Defendants comply with 15 CCR §1065, by providing inmates with the opportunity to exercise three (3)
Deleted: As a direct result
Deleted: the inadequate exercise space and the lack of meaningful ...
Formatted: Body Text 2,Body Text - Numbered 2
Deleted: facility
Deleted: at CJ2 -
Deleted: -
Deleted: experienced
Deleted: weight gain
Deleted: elevates
Deleted: liming
Deleted: ¶ ... [34]
Formatted: Font: 9 pt
Formatted: Font: 9 pt

Williams gained 37 pounds (200 to 237); Marilyn Sahagun gained 15 pounds (150 to 165).

98) Inmates' right to exercise, and right to access outdoor recreation is a clearly established right. Defendants deliberate action to deprive plaintiffs and class members of exercise space and the right to access outdoor recreation space violates plaintiffs' and class members' liberty interest protected by due process.

99) Prior to March 2026, all women inmates were housed in one pod, with over-crowded sleeping areas, and denied total access to programming as compared to male inmates.

100) Women inmates are denied access to inmate jobs available to male inmates.

101) Women inmates were and are provided less access than male inmates to the gym and opportunities for recreation and exercise.

**F. Women's Specific Health Needs**

102) Women inmates have the gynecological anatomy unique to women and different from men. Women are subject to and susceptible to yeast and bacterial infections due to their specific gynecological anatomy. Women inmates incarcerated at CJ2 suffer from regular yeast and bacterial infections. On information and belief, plaintiffs assert that expert testimony would affirm that the following factors all contribute to the ongoing issues of women's fungal and bacterial infections, including:

h) The lack of sunlight has injured their immune systems;

i) The lack of and inadequate hot water prevents women from being able to maintain personal sanitation;

j) The facilities' lack of sanitation spreads micro-organisms which adversely affects women' health;

k) Clothing exchange of only once a week and underwear exchange of only twice a week is inadequate for female hygiene; and

l) The overall poor food quality and lack of adequate exercise.

103) As a result, plaintiffs and women members of the plaintiff class suffer from regular, monthly fungal and bacterial infections.

**Deleted:** . Defendants'

**Deleted:** deprivation of

**Deleted:** access

**Deleted:** were uniformly

**Deleted:** that were provided

**Deleted:** that are

**Deleted:** have been

**Deleted:** continue to be,

**Deleted:** to

**Deleted:** <#>Poor Quality, Unhealthy, and Inedible Food¶
Defendants City and County of San Francisco and the San Francisco Sheriff's Office control all food available to inmates in CJ2; and yet fail to provide the necessary and appropriate nutrition and menus for the prevention and management of the chronic illnesses inmates develop as a result of the total deprivation of sunlight - including hypertension, blood sugar irregularities and diabetes. This nutritional aggravates and compounds those chronic illnesses in many cases rendering them irreversible and requiring ever-increasing reliance on pharmaceuticals for management.¶
The jail food served is high in starch and lacking in fresh fruits and vegetables. Combined with the disruption to their endocrine system from the deprivation of sunlight, a majority of the inmates have gained significant weight since incarceration. Inmates, who prior to custody, could maintain control over their blood sugar and diabetes through food and exercise, can no longer do so, and have become insulin dependent.¶
Defendants contract with a for-profit corporation, Aramark, Inc., to procure and prepare the food. Aramark fails to ensure that the trays are properly cleaned. The used trays are picked up from the housing units with dry food residue still adhered to then, nominally rinsed before being run through a rapid-cycle dishwasher, a process insufficient to remove leftover food or soap residue. Food is then served on these inadequately cleaned trays, exposing inmates to old food debris and soap contamination. As a result, inmates develop stomach ailments.¶
Plaintiff Ramirez says she routinely avoids eating jail food and is compelled to purchase commissary because eating jail food causes her stomach illness.¶
Inmates are unable to access healthy and nutritious foods to manage chronic illnesses including diabetes, hypertension and other endocrine and metabolic illnesses.¶
Long-term inmates report that stomach illness from the food is a common and recurring problem at CJ2. The issue stems from food being improperly cooked to insufficient temperatures in the kitchen, compounded by inadequately sanitized food trays. Long term inmates state that ... [36]

**Deleted:** ¶ ... [35]

**Formatted:** Font: 9 pt

**Formatted:** Font: 9 pt

### G. Inmates with Psychiatric Disabilities

104) Prisoners with psychiatric disabilities are housed in even more restrictive settings because of their psychiatric disabilities. Most do not even get one hour out of cell per day and never get access to the gym. Meredith Dechert reports that in 85 days in administrative segregation she only received 20 minutes of out of cell time, every other day. Her mental health appointments were done at the locked door of her cell and consists of a pre-set check list, lasting only 3-5 minutes. There was no therapy or counseling.

105) Dechert has attempted suicide, and there have been multiple suicide attempts in Housing Unit B in the last 4 months, including inmates jumping off the second story. The jail's response is to throw these individuals into what is euphemistically termed "safety cells," where inmates are stripped naked and given only a smock to cover themselves. The safety cells contain no furniture and only a hole in the ground for prisoners to use as a bathroom, meaning that prisoners have to sleep and eat on the same floor that they must also urinate and defecate on and are also unable to wash their hands after going to the bathroom. Prisoners in the safety cells are not allowed any out of cell time and are not allowed to keep any personal possessions in the safety cells, including reading material and toilet paper.

106) Often, Prisoners with psychiatric disabilities are then moved from the safety cell to a "medical" cell, where they are kept locked in with no opportunities for exercise, and greatly reduced, if any, out of cell time.

107) Over the last several decades, mental health and correctional experts have documented the harmful effects of prolonged isolation. Common side effects of prolonged isolation include anxiety, panic, withdrawal, hallucinations, self-mutilation, and suicidal thoughts and behaviors. Due to these side effects, prolonged isolation is known to worsen existing psychiatric disabilities and can cause prisoners without pre-existing psychiatric disabilities to develop them.

108) Placement in isolation imposes an atypical and significant hardship on the prisoner in relation to the ordinary incidents of incarcerated life, so as to create a liberty interest protected by due process. Defendants fail to provide process adequate to protect that liberty interest. Despite the harmful and punitive conditions in these units, Defendants lack an effective, accurate

Deleted: ¶ ... [37]

Formatted: Font: 9 pt

Formatted: Font: 9 pt

classification system to determine who gets placed in isolation.

109) Prisoners are placed in isolation indefinitely, with some individuals held in isolation for years while they resolve pending criminal cases. Defendants offer prisoners no meaningful way to challenge their placement in isolation, despite purporting to conduct regular review of these placements. Defendants assign prisoners to isolation units due to Defendants' lack of training, lack of staffing, and inability to provide meaningful accommodations for these psychiatric disabilities.

110) Approximately 20 to 30% of the inmates at CJ2 are held in isolation of some form. There are inmates, who despite being held in a "general population" cell, do not leave their cell for meals, do not receive out of recreation, and rarely if ever are provided gym access. Some inmates have been held in isolation for such an extremely long period of time, that they no longer are able to interact or socialize with others.

Isolation significantly increases the risk that prisoners with psychiatric disabilities will have their condition decompensate when placed in isolation. A significantly disproportionate percentage of suicides attempts occur by inmates held in isolation units. Because of the risks posed by isolation to prisoners with psychiatric disabilities, a consensus has been reached in mental health correctional communities that prisoners with psychiatric disabilities should only be placed in isolation if absolutely necessary. In addition, if prisoners with mental illness are placed in isolation, there must be limits on the amount of time they remain in such units, they must be monitored closely, and they must be provided with significant structured and unstructured out-of-cell time.

111) Defendants do not have adequate safeguards in place to ensure that prisoners with psychiatric disabilities are only placed in isolation when absolutely necessary. Instead, Defendants have a policy and practice of placing mentally ill prisoners in isolation because of their disabilities and keeping them there for long periods of time. Meredith Dechert has been held in isolation for the majority of her time in custody over the last three years. She states that she was once held in a cell for 85 days, with only 20 minutes out of cell time every other day.

112) Defendants lack policies and practices to reevaluate whether prisoners with mental illness

Deleted: ¶ ... [38]

Formatted: Font: 9 pt

Formatted: Font: 9 pt

placed in isolation should remain in isolation. The amount of unstructured out-of-cell time that Defendants provide to prisoners in Administrative Segregation—less than one hour per day—falls below the standard of care and constitutes cruel and unusual punishment. And no amount of structured out-of-cell time, such as group therapy of formal group programming, is provided to prisoners in isolation including to prisoners with psychiatric disabilities in any of the housing units. The cumulative effects of prolonged isolation, along with the denial of opportunities for vocational, recreational, educational, and religious programming, plus being housed in a small cramped and filthy cell, have caused and continue to cause prisoners at the Jails, including prisoners with psychiatric disabilities, serious physical and psychological harm and puts them at substantial risk of continued significant harm in the future.

## H. Lack of Sanitation, Mold, and Air Particulate Matter

113) Water intrusion into Housing Units is a regular occurrence. In Housing D, the legal meeting room has a persistent water leak. Meetings have to take place with a bucket catching drips. In Housing Unit B, there is mold under the linoleum in the upper floor's cells.

114) Unidentified bugs proliferate, and inmates have to sleep with a covering over their mouth and nose as the bugs fly onto their faces during sleep. While there is an exterminator who puts small sticky traps into the cells, the traps do not eliminate the bugs, and perhaps temporarily reduce bug population.

115) Particulate matter blows into the housing unit through the air vents in all inmates' sleeping areas. Each of the sleeping areas has an intake vent, and inmates spend 23 hours or more per day within 5 to 6 feet of this air vent.

Deleted: ¶ ... [39]
Formatted: Font: 9 pt
Formatted: Font: 9 pt




116) Each inmate sleeping area has an air vent. Through this air vent, particulate matter comes into the housing units. All inmates sleep within 6 to 7 feet of this air vent. For inmates in cells and in ad seg, they live 23 hours a day, breathing air that is contaminated with particulates.

117) Under magnification, these particulates appear to be synthetic fibers that are mechanically damaged, heat damaged, and have fragmented into pieces. Some of these fragments have diameters under 10 µm. Particulate Matter 10 (PM10) refers to particulate matter in the air that is 10 microns or smaller, while Particulate Matter 2.5 (PM 2.5) refers to particulate matter in the air that is 2.5 microns or smaller. Particulate matter 10 micrometers or less is inhalable into the lungs and causes adverse health effects.

Deleted: ¶ ... [40]
Formatted: Font: 9 pt
Formatted: Font: 9 pt

118) Photo of collected particulates:



119) As a result of Defendants' neglect and failure to properly maintain the building and failure to provide safe and clean quarters, inmates and class members experience an increase in breathing disorders including pneumonia, asthma, and allergies.

120) Defendants fail and have failed to provide appropriate supervision; and screening, and move newly booked inmates, directly from in-take into the housing units. These new arrestees, many of whom are homeless and lacked access to personal sanitation and showers prior to their arrest, bring with them communicable diseases including lice and scabies to the inmates who are already housed in CJ2.

121) Sheriff deputies are poorly trained, broadcast incidents of lice and scabies, bringing shame, ridicule, ostracism, harassment and sometimes even physical violence on inmates who bring the lice and scabies into the jail and to the inmates who contract lice and scabies.

122) Inmates have no choice regarding with whom they share sleeping space. When a new book with lice or scabies is introduced and causes an existing inmate to contract lice or scabies, the result is to suffer a lock down from 7 to 9 days with total loss of out of cell time until the infestation is eradicated.

123) Newly booked inmates who are detoxing from drugs, opioids or fentanyl are not housed in a medical unit under medical supervision but are placed in the housing units. Withdrawal from

Deleted: ¶ ... [41]
Formatted: Font: 9 pt
Formatted: Font: 9 pt

substances often entails loss of bowel control and vomiting. Inmates who are detoxing are forced to remain in their sleeping area. The open sleeping areas in CJ2 do not have direct access to toilets, and at night these inmates are forced to vomit next to their beds or soil the area next to their beds. They do not have cleaning supplies in their sleeping areas, so they are forced to clean-up the vomit and diarrhea with their blankets. Other inmates sharing the sleeping area are forced to endure and care for newly booked inmates undergoing substance withdrawal — including enduring the sounds of someone being sick and the smells of vomit and diarrhea, in addition to cleaning up human biological waste such as vomit and excrement — in a facility that lacks reliable hot water.

## I. LISA PRATT

124) Defendant Lisa Pratt is a board-certified medical doctor and is aware that human beings require sunlight for circadian rhythm regulation. She knows that medical science has demonstrated that with a dysregulated circadian rhythm human beings suffer from:

a) Sleep disruption resulting in impaired memory and loss of mental acuity;
b) Damage to metabolic health. Including damage to glucose tolerance, lowering insulin sensitivity with higher rates of obesity, metabolic syndrome and type 2 diabetes;
c) Cardiovascular disease including increased hypertension, coronary heart disease, stroke and inflammation;
d) Mood and psychiatric disorders associated with depression and bipolar disorder;
e) Immune disfunction with higher infections;
f) Neurodegeneration including Alzheimer's and Parkinson's.

125) These are all chronic and currently irreversible illnesses. The damage to memory and decision making is especially harmful as inmates are in custody and blamed for poor decision making. Yet, the conditions of confinement continually damage their decision making and cognitive capabilities.

126) Lisa Pratt is aware that low levels of Vitamin D result from lack of exposure to sunlight, and that every single inmate who has been incarcerated for more than a few months exhibits low Vitamin D levels. She is also well aware of the scientific and medical research that while low

Formatted: Heading 2
Deleted:
Deleted: who
Deleted: ¶
... [42]
Formatted: Font: 9 pt
Formatted: Font: 9 pt

Vitamin D levels are indicative of insufficient sunlight, supplementing with Vitamin D does not mediate the adverse health effects of deprivation of solar light exposure.

127) In addition to sunlight, exercise and diet are a key and fundamental components of managing both pre-diabetes and diabetes, often rivaling medication in their effectiveness. In pre-diabetes, in addition to dietary controls such as reducing refined carbohydrates and sugars, emphasizing fiber-rich vegetables, legumes, and whole grains, and controlling portion sizes can directly lower blood glucose and insulin resistance, in many cases reversing the condition before it progresses to insulin dependent diabetes. Regular physical activity, particularly a combination of aerobic exercise and resistance training, increases insulin sensitivity by driving glucose into muscle cells independently of insulin, lowering blood sugar both immediately after exercise and over the long term.

128) Defendant Pratt is aware that, for those with established diabetes, exercise and diet and sunlight help stabilize glycemic control, reduce dependence on medication, and lower the risk of serious complications including cardiovascular disease, neuropathy, and kidney damage. The two work synergistically – a well-structured diet reduces the glycemic load the body must manage, while exercise improves the body's capacity to manage it – making their combined practice more powerful than either alone. Exercise and diet are primary therapeutic tools that address the underlying metabolic dysfunction rather than merely managing its symptoms.

129) Defendant Pratt, as a board-certified medical doctor, is well aware that particulate matter in the air can cause pulmonary illness and that many inmates report breathing issues. Yet, Pratt dispenses asthma inhalers and other pharmaceuticals but never addresses the jail's primary contribution of particulate contamination in the air inmates breathe.

130) Defendant Pratt is aware that there is a high incidence of viral and bacterial infections among the women inmates, higher than among average populations. She directs staff to dispense pharmaceuticals, and blames women for having a poor immune system, but does not consider that the unsanitary conditions in the jail, and the insufficient hot water for showers are the primary causes of these infections, and instead blames the women themselves.

131) Defendant Pratt as the primary policy maker of Jail Medical's policy and practice directs

Formatted: Body Text 2,Body Text - Numbered 2
Deleted: therapeutic
Deleted:
Deleted: intervention – including
Deleted: –
Deleted: interventions - diet and exercise -
Deleted: . A
Deleted: Together, exercise
Deleted: Despite this knowledge,
Deleted: provided
Deleted: ¶ ... [43]
Formatted: Font: 9 pt
Formatted: Font: 9 pt

that detoxing inmates are placed into the housing units without medical supervision, rather than into a medical unit with medical supervision.

132) Defendant Pratt as the head policy maker and leader of Prison Health, only directed Prison Health to provide pharmaceuticals in order to enable inmates to tolerate these illness causing conditions. She failed to employ effective therapeutic tools to address the root causes of the illness, thereby causing inmates to develop illnesses, which progress with more severity and complications, resulting in these illnesses becoming chronic and irreversible.

133) Defendant Pratt trained the Prison Health staff to offer only palliative care or symptomatic care, while knowing that palliative care offered would only lead to chronic, irreversible illness. Defendant Pratt never raised the need of inmates for direct sunlight in order to maintain basic health and took no steps to provide inmates with access to direct sunlight; she never requested that inmates be provided direct sunlight; she did not seek to provide her patients, plaintiffs and class members with greater access to exercise; and she never sought better quality and healthier foods for her patients. She never requested that the jail provide better and increased access to exercise. She never requested that the jail provide sufficient hot water so inmates could maintain personal sanitation and avoid and prevent microbial contagion. She never requested that the jail take affirmative action to remove particulates from the jail vent system or the jail air.

134) Defendant Sheriff's Policy 717.2 states that "[c]linical decisions and actions regarding incarcerated person health care are the sole responsibility of qualified health care professionals and will not be countermanded by others. The Responsible Physician shall be responsible for arranging for appropriate health resources and for determining what services are needed." SFSD Policy 717.

135) Defendant Pratt is responsible for the decision of Jail Medical's policy and practice to which cause and exacerbates the harms to inmates.

## J. SHERIFF MIYAMOTO

136) Sheriff Miyamoto admitted under sworn testimony that being outside is good for inmates. He knew and understood the expert testimony in *Brackens, et al. v. City and County of San Francisco, et al.* that sunlight on the skin is necessary to human health. Yet, he took minimal

Deleted: pharmaceutical treatments
Formatted: Body Text 2,Body Text - Numbered 2
Deleted:
Deleted: chronic
Deleted: illnesses
Deleted: which led to
Deleted: chronic
Deleted: with full knowledge
Deleted: such an approach
Deleted: result in
Deleted:
Deleted: for
Deleted: to have access to
Deleted: as a
Deleted: requirement of
Deleted: ,
Deleted: secure such
Deleted: , and
Deleted: advocated for it. She similarly failed to
Deleted: greater exercise opportunities for
Deleted: made no effort to secure
Formatted: Heading 2
Moved (insertion) [2]
Formatted: Font: Italic
Deleted: more nutritious food
Deleted: their behalf
Deleted: ¶ ... [44]
Formatted: Font: 9 pt
Formatted: Font: 9 pt

actions to provide outdoor access to inmates. His directions at CJ3 were to provide small, cramped dog kennels for inmates to stand in, without verification or the effort to ensure that, when inmates were in the dog kennels, that they would be able to access sunlight that was shining, rather than often having the dog kennels shadowed by the building. Withdrawal from substances often entails loss of control of body fluids and secretions including loss of bowel control and vomiting.

137) As the Chief Executive for the San Francisco Sheriff's Office, Defendant Miyamoto knew, that CJ2 has no outdoor access for inmates. As the Chief Executive for the San Francisco Sheriff's Office, Defendant Miyamoto knew, that inmates in CJ2 spent years in custody as pretrial detainees. And despite knowing that deprivation of sunlight can cause chronic illnesses health, defendant Miyamoto took no action to make sunlight available for inmates at CJ2.

138) As the Chief Executive for the San Francisco Sheriff's Office, Defendant Miyamoto, as a result of *Brackens, et al. v. City and County of San Francisco, et al.*, is intimately familiar with the CJ2 facility and knew that the gym space is too small and does not meet the minimum requirements of California Regulations

**K. Poorly Maintained and Unsanitary Premises**

139) Defendants are responsible for maintenance of CJ2, including:

a) 15 CCR 1231.3.4 requires defendants to provide one shower for every 20 inmates, and each shower must have either hot and cold water, or tempered water.

b) 15 CCR 1266 mandates that every inmate shall be provided access to a shower upon assignment to a housing unit, and thereafter "at least" every other day."

c) Defendant City and County of San Francisco and the San Francisco Sheriff's Office are required by 24 CCF 1280 with maintaining CJ2 in an acceptable level of cleanliness, repair and safety.

140) Defendant Miyamoto has adopted and approved the policies and procedures for the San Francisco Sheriff's Department, including Chapter 8 on Facility Maintenance and Inspections. Policy 800.1 acknowledges that the San Francisco Sheriff's Department has an obligation to maintain "safe and sanitary facilities." Yet Defendants have failed to properly maintain the

Deleted: Inadequate Building Maintenance and Sanitation

Formatted: Body Text 2,Body Text - Numbered 2

Formatted: Body Text 2,Body Text - Numbered 2, Outline numbered + Level: 2 + Numbering Style: a, b, c, … + Start at: 1 + Alignment: Left + Aligned at: 0.25" + Indent at: 0.5"

Deleted: ... [45]

Formatted: Font: 9 pt

Formatted: Font: 9 pt

building.

141) Ongoing problems include:

a) insufficient hot water for inmates to take showers;

b) insect infestation in the inmates' living quarters,

c) water intrusion into ceilings, walls and floors with resulting mold and bacteria in walls and floors; and

d) particulate pollution in the air vent system.

## VII. DELIBERATE INDIFFERENCE / SPECIAL RELATIONSHIP

142) *Individual Liability*: Defendants PAUL MIYAMOTO, JENNIFER COLLINS, and LISA PRATT, exhibited deliberate indifference to plaintiffs and class members serious medical needs, including the chronic jet lag resulting from daily disturbance to their circadian rhythm, the development of serious chronic illnesses resulting from the continual deprivation of access to sunlight, putting them at substantial risk of suffering serious harm, and did not take reasonable available measures to abate that risk, where a reasonable official in the circumstances would have appreciated the high degree of risk involved, with deliberate indifference or reckless disregard, in violation of the Fourteenth Amendment to the United States Constitution and Article I, Section 7(a) of the California Constitution.

143) Municipal / Supervisory Liability: Defendants CITY AND COUNTY OF SAN FRANCISCO, SAN FRANCISCO SHERIFF'S OFFICE, and ROLAND PICKENS maintained policies or customs of action and inaction and knew or should have known that jail staff and Jail Health staff under their command were inadequately trained, supervised, or disciplined resulting from either the lack of proper training, pursuant to policy, or the result of the lack of policy, with deliberate indifference or reckless disregard, in violation of the Fourteenth Amendment to the United States Constitution and Article I, Section 7(a) of the California Constitution.

144) Vicarious Liability: Defendants CITY AND COUNTY OF SAN FRANCISCO, SAN FRANCISCO SHERIFF'S OFFICE, and ROLAND PICKENS are vicariously liable, through the principles of respondeat superior and pursuant to California Government Code §§ 815.2(a), 845.6, for injuries proximately caused by the acts and omissions of agents, employees, and

**Deleted:** and on information and belief plaintiffs allege that beginning in 2021 there has been a consistent lack of sufficient

**Deleted:** inmate

**Deleted:** .

**Formatted:** Body Text 2,Body Text - Numbered 2, Outline numbered + Level: 2 + Numbering Style: a, b, c, … + Start at: 1 + Alignment: Left + Aligned at: 0.25" + Indent at: 0.5"

**Deleted:** Defendants City and County of San Francisco, the Sheriff's Office, Miyamoto, and Collins have failed to properly maintain the building so that there is a constant and chronic state of

**Deleted:** so that the

**Deleted:** are crumbling and emit dust and particulate matter into the air, so that there are regular water intrusions for

**Deleted:** ,

**Formatted:** Body Text 2,Body Text - Numbered 2, Outline numbered + Level: 2 + Numbering Style: a, b, c, … + Start at: 1 + Alignment: Left + Aligned at: 0.25" + Indent at: 0.5"

**Deleted:** the plumbing regularly backs up.

**Deleted:** ¶ ... [46]

**Formatted:** Font: 9 pt

**Formatted:** Font: 9 pt

contractors acting within the scope of employment, including Defendants PAUL MIYAMOTO, JENNIFER COLLINS, LISA PRATT, and DOEs 1 to 20.

145) Defendants PAUL MIYAMOTO, JENNIFER COLLINS, LISA PRATT, and DOEs 1 to 20's actions and inactions constituted oppression, fraud, and/or malice resulting in great harm.

146) Plaintiffs and all class members were and continue to be injured as a direct and proximate result of Defendants CITY AND COUNTY OF SAN FRANCISCO, SAN FRANCISCO SHERIFF'S OFFICE, ROLAND PICKENS, PAUL MIYAMOTO, JENNIFER COLLINS, LISA PRATT, and DOE 1 to 20's actions and inactions, entitling Plaintiffs and class members to receive compensatory and treble damages and civil penalties against Defendants CITY AND COUNTY OF SAN FRANCISCO, SAN FRANCISCO SHERIFF'S OFFICE, ROLAND PICKENS, PAUL MIYAMOTO, JENNIFER COLLINS, LISA PRATT, and DOEs 1 to 20, and punitive damages against Defendants CITY AND COUNTY OF SAN FRANCISCO, SAN FRANCISCO SHERIFF'S OFFICE, ROLAND PICKENS, PAUL MIYAMOTO, JENNIFER COLLINS, LISA PRATT, and DOE 1 to 20.

## VIII. CLASS ACTION ALLEGATIONS

147) Plaintiffs seek to represent a class of people housed at CJ2 who allegedly experience denial of outdoor access and sunlight, inadequate hot water, insect infestations, and inadequate food. They also seek to represent a women's subclass, alleging that women have no meaningful opportunity to obtain outdoor access or sunlight while housed at CJ2, unlike men who may, in limited circumstances, be transferred to CJ3.

### A. CJ2 Inmate Class

148) All Plaintiffs bring this action on their own behalf and, pursuant to Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, on behalf of a class of all men and women who are now, or will be incarcerated in the San Francisco County Jail 2. ("CJ2 Inmate Class").

#### 1. Numerosity: Fed. R. Civ. P. § 23(a)(1)

149) The CJ2 Inmate Class is sufficiently numerous that joinder of all members of the class is impracticable and unfeasible. The inmate population in San Francisco Jails on October 19, 2026 is 1140, with an average daily population of 1166 in the last 180 days. Over 271 inmates have

**Formatted:** Body Text 2,Body Text - Numbered 2

**Moved up [2]:** <#> Miyamoto admitted under sworn testimony that being outside is good for inmates. He knew and understood the expert testimony in *Brackens, et al. v. City and County of San Francisco, et al.*

**Deleted:** <#>As a result of Defendants' neglect, inmates and class members experience an increase in breathing disorders including asthma, skin disorders, and other health impairments.¶
As a result of Defendants' neglect, inmates and class members, suffer toilet overflows or toilets are inoperable or frequently back up, and women in the dormitory settings are denied access to toilets, while those incarcerated in cells are ordered not to flush toilets, are forced to live with urine and feces in their cells as the toilets do not have lids, and sleep within two feet of toilets filled with feces and urine.¶
Defendants fail and have failed to provide appropriate supervision; and screening, frequently moving newly booked female inmates, many of whom are homeless and who lacked access to personal sanitation and showers prior to their arrest. These newly booked inmates are directly moved from in-take into the housing unit with existing women inmates, causing the transmission of lice and scabies to the women inmates who are already housed in CJ2.¶
Sheriff deputies are poorly trained, broadcast incidents of lice and scabies, bring shame, ridicule, ostracism, harassment and sometimes even causing physical violence on women inmates who contract lice and scabies.¶
Due to the lack of maintenance, insects have found purchase inside CJ2.¶
Defendants fail to provide adequate medical care to newly booked female inmates, many of whom have substance abuse issues, and upon incarceration are forced to undergo withdrawal. Withdrawal from substances often entails loss of control of body fluids and secretions including loss of bowel control and vomiting. Because Defendants fail to provide adequate medical care and maintain no in-custody medical pods for women, female inmates are forced to care for newly booked inmates undergoing substance withdrawal ... [48]

**Deleted:** <#>As the Chief Executive for the San Francisco Sheriff's Office, Defendant Miyamoto knew, is very familiar with the CJ2 facility, that there is no outdoor access f ... [49]

**Deleted:** <#> that sunlight on the skin is necessary to human health. Yet, he took minimal actions to provide outdoor access to inmates. even when required to do so, at CJ ... [50]

**Formatted:** No underline

**Formatted:** Font: Italic

**Formatted:** Body Text 2,Body Text - Numbered 2

**Deleted:** adult

**Deleted:** in the future,

**Deleted:** Currently, Defendant City and County of San Francisco reports a total of 1249 individuals in its jails.

**Deleted:** ¶ ... [47]

**Formatted:** Font: 9 pt

**Formatted:** Font: 9 pt

been in custody for one year or longer.[5] CJ2 has a maximum capacity of 392 inmates, and based upon defendants' reporting, CJ2 has between 325 and 392 inmates in the last 180 days.[6] Over 271 inmates have been in custody for one year or longer.

150) The CJ2 Inmate Class members are identifiable using records maintained in the ordinary course of business by Defendants.

**2. Commonality: Fed. R. Civ. P. 23(a)(2)**

151) There are multiple questions of law and fact common to the CJ2 Inmate Class including, but not limited to:

152) Whether Defendants' use of a physical facility that is not in compliance with California Building Code, and denies all class members access to sunlight, so that class members develop chronic illnesses, or are forced to exist with chronic jet lag syndrome, or see their illnesses become more severe and serious, violates the Due Process Clause of the Fourteenth Amendment and the Cruel and Unusual Punishment Clause of the of the Eighth Amendment to the United States Constitution, and Article I, Sections 7 and 17 of the California constitution.

153) Whether Defendants' use of a physical facility that is not in compliance with California Building Code denies all class members' adequate access to exercise and violates the Due Process Clause of the Fourteenth Amendment and the Cruel and Unusual Punishment Clause of the of the Eighth Amendment to the United States Constitution, and Article I, Sections 7 and 17 of the California constitution.

154) Whether Defendants have been deliberately indifferent to the CJ2 Inmate Class members' risk of injury and harm from the denial of sunlight.

155) Whether Defendants have been deliberately indifferent to the CJ2 Inmate Class members' risk of injury and harm from insufficient access to exercise.

156) Whether Defendants have been deliberately indifferent to the CJ2 Inmate Class members' risk of injury and harm from insufficient hot water for showers;

---

5 https://sfsheriff.com/services/jail-services/current-and-historical-jail-data/current-jail-data-and-trends

6 Defendant only reports on total incarceration. Defendants' reporting of its incarceration numbers fluctuates with the numbers it claims as its capacity in CJ3, and the CJ3 annex.

Deleted: or

Deleted: , and

Deleted: members

Deleted: ,

Deleted: <#>Whether Defendants failure to maintain adequate and necessary repairs including to the hot water system, violates the Due Process Clause of the Fourteenth Amendment and the Cruel and Unusual Punishment Clause of the of the Eighth Amendment to the United States Constitution, and Article I, Sections 7 and 17 of the California constitution.¶

Deleted: <#>due to CJ2 Inmate Class members'

Deleted: .

Formatted: Font: 10 pt

Formatted: Footer

Deleted: ¶ ... [51]

Formatted: Font: 9 pt

Formatted: Font: 9 pt

157) Whether Defendants have been deliberately indifferent to the CJ2 Inmate Class members due to the delayed and inadequate building maintenance resulting in water intrusion, mold, insect infestations and dust and particulate matter in the air;

158) Whether Defendants have been deliberately indifferent by failing to provide medical supervision to newly booked inmates who are detoxing from opioids or fentanyl and forcing said inmates to detox in their sleeping areas.

159) Whether Defendants have been deliberately indifferent by forcing inmates to care for and clean up after newly booked inmates who are detoxing.

160) Whether Defendants' failure to provide minimally adequate medical care to prisoners for their injuries resulting from the lack of sunlight violates the Due Process Clause of the Fourteenth Amendment and the Cruel and Unusual Punishment Clause of the Eighth Amendment to the United States Constitution, and Article I, Sections 7 and 17 of the California Constitution.

161) Defendants are expected to raise common defenses to these claims, including denying that their actions violate the law.

**3. Typicality: Fed R. Civ. Po. 23(a)(3)**

162) The named Plaintiffs' claims are typical of those of the proposed class because they arise from the same policies, practices, and courses of conduct and are based on the same legal theories.

**4. Adequacy: Fed. R. Civ. P. 23(a)(4)**

163) Plaintiffs will fairly and adequately represent and protect the interests of the putative CJ2 Inmate Class members and diligently serve as Class Representatives. Plaintiffs' interests are co-extensive with those of the CJ2 Inmate Class and Plaintiffs have no conflict(s) of interest that would be antagonistic to those of the other class members. Plaintiffs have retained counsel who are competent and experienced in complex class action litigation and prisoner's rights litigation and who possess the resources necessary to fairly and adequately represent the CJ2 Inmate Class.

Deleted: ;

Formatted: Body Text 2,Body Text - Numbered 2

Deleted: of the named Plaintiffs

Deleted: the claims of the members

Deleted: as their claims

Deleted: ,

Deleted: their claims

Deleted: theory of law as the CJ2 Inmate Class claims.

Deleted: service

Deleted: ¶ ... [52]

Formatted: Font: 9 pt

Formatted: Font: 9 pt

5. **Fed. R. Civ. P. 23(b)**

164) This action is also maintainable as a class action pursuant to Federal Rule of Civil Procedure 23(b)(2) because Defendants' policies, practices, actions, and omissions that form the basis of the claims of the CJ2 Inmate Class are common to and apply generally to all members of the CJ2 Inmate Class. All of the Jails' policies are centrally promulgated, disseminated, and enforced by Defendants. The injunctive and declaratory relief sought is appropriate and will apply to the class as a whole.

**B. All Women Inmates**

165) All Plaintiffs bring this action on their own behalf and, pursuant to Rule 23(a), and (b)(2) of the Federal Rules of Civil Procedure, on behalf of a subclass of all women inmates incarcerated at CJ2.

1. **Numerosity: Fed. R. Civ. P. 23(a)(1)**

166) The CJ2 Women's Subclass is sufficiently numerous that joinder of all members of the subclass is impracticable and unfeasible. On October 19, 2026 there were 85 members of the CJ2 Women's Subclass.

167) The Women's Subclass members are identifiable using records maintained in the ordinary course of business by Defendants.

2. **Commonality: Fed. R. Civ. P. 23(a)(2)**

168) There are questions of law and fact common to the CJ2 Women's Subclass, including, but not limited to:

a) Whether Defendants' provided women inmates at CJ2 with fewer privileges, including fewer access to jail jobs; fewer opportunities to exercise; less access to programming; and subjected women inmates at CJ2 to greater over-crowding, and most importantly, while male inmates had the possibility and were in fact provided some sunlight at CJ2, women inmates were not and could not be provided any direct sunlight;

b) Whether this conduct by Defendants was and continues to be discrimination in violation of the Fourteenth Amendment for Equal Protection and Due Process;

**Deleted:** to all members of the CJ2 Inmate Class

**Deleted:** CJ2

**Deleted:** Subclass

**Formatted:** Body Text 2,Body Text - Numbered 2

**Deleted:** Currently

**Deleted:** are 79

**Deleted:** Disability

**Deleted:** whether

**Formatted:** Body Text 2,Body Text - Numbered 2, Outline numbered + Level: 2 + Numbering Style: a, b, c, … + Start at: 1 + Alignment: Left + Aligned at: 0.25" + Indent at: 0.5"

**Deleted:** .

**Deleted:** ¶ ... [53]

**Formatted:** Font: 9 pt

**Formatted:** Font: 9 pt

c) Whether as a result of the poor and delayed maintenance; the insufficient clean laundry, the insufficient hot water for showers, in addition to the lack of direct sunlight, women have had more frequent fungal and bacterial infections in their feminine anatomy;

169) Defendants are expected to raise common defenses to these claims, including denying that their actions violate the law.

**3. Typicality: Fed R. Civ. Po. 23(a)(3)**

170) The claims of the named Plaintiffs are typical of the claims of the members of the proposed sub-class as their claims arise from the same policies, practices, and courses of conduct, and their claims are based on the same theory of law as the CJ2 Women' subclass claims. All of the named plaintiffs are in fact women inmates at CJ2.

**4. Adequacy: Fed. R. Civ. P. 23(a)(4)**

171) Named Plaintiffs will fairly and adequately represent and protect the interests of the putative CJ2 Women's Subclass members and diligently service as representatives of the proposed subclass. Plaintiffs' interests are co-extensive with those of the subclass and Plaintiffs have no conflict(s) of interest that would be antagonistic to those of the other subclass members. Plaintiffs have retained counsel who are competent and experienced in complex class action litigation and prisoner's rights litigation and who possess the resources necessary to fairly and adequately represent the CJ2 Women's Subclass.

**5. Fed. R. Civ. P. 23(b)(2)**

172) This action is also maintainable as a class action pursuant to Fed. R. Civ. Proc. §23(b)(2) because Defendants policies, practices, actions, and omissions that form the basis of the claims of the CJ2 Women's Subclass are common to and apply generally to all members of the proposed subclass. All of the Jails' policies regarding prisoners who are female are centrally promulgated, disseminated, and enforced by Defendants. The injunctive and declaratory relief sought is appropriate and will apply as a whole to all members of the Women's Subclass.

**C. CJ2 Inmates with Psychiatric Disabilities**

173) All Plaintiffs bring this action on their own behalf and, pursuant to Rule 23(a), and (b)(2)

Formatted: Body Text 2,Body Text - Numbered 2

Deleted: Defendants'

Deleted: ¶ ... [54]

Formatted: Font: 9 pt

Formatted: Font: 9 pt

of the Federal Rules of Civil Procedure, on behalf of a subclass of all inmates incarcerated at CJ2 with psychiatric disabilities.[7]

**1. Numerosity: Fed. R. Civ. P. 23(a)(1)**

Moved (insertion) [4]

Deleted: Disability Subclass.

174) The CJ2 Inmates with Psychiatric Disability Subclass is sufficiently numerous that joinder of all members of the subclass is impracticable and unfeasible. Plaintiffs allege on information and belief that 10-20% (70-140) of the CJ2 Inmates have a psychiatric disability. In addition, the class is fluid as new prisoners enter the Jails and others are released on a daily basis. All prisoners in the Jails are subject to Defendants policies and procedures regarding the use of isolation and the provision of mental health care. Due to these policies and procedures, all prisoners in the Jails are currently harmed or are at substantial risk of being harmed, by excessive placement in isolation without due process and all prisoners in the Jails receive or are at substantial risk of receiving inadequate mental health care.

175) The Inmates with Psychiatric Disability Subclass members are identifiable using records maintained in the ordinary course of business by Defendants.

**2. Commonality: Fed. R. Civ. P. 23(a)(2)**

176) There are questions of law and fact common to the CJ2 Psychiatric Disability Subclass including, but not limited to:

a) Whether Defendants' use of isolation violates the Due Process Clause of the Fourteenth Amendment and the Cruel and Unusual Punishment Clause of the of the Eighth Amendment to the United States Constitution, and Article I, Sections 7 and 17 of the California Constitution.

b) Whether Defendants' policies and practices of not providing a housing environment free of debilitating and inhumane conditions to prisoners subjected to isolation poses a substantial risk of serious harm

c) Whether Defendants have been deliberately indifferent to the Prisoner Class members' risk of injury and harm from the debilitating isolation and inhumane conditions to which

Deleted: ¶ ... [55]

Formatted: Font: 9 pt

Formatted: Font: 9 pt

[7] SF Civil Grand Jury Report 2026, "[D]rug abuse…co-occuring mental disorders."p. 8

they are subjected.

d) Whether Defendants' failure to provide minimally adequate mental health care to prisoners violates the Due Process Clause of the Fourteenth Amendment and the Cruel and Unusual Punishment Clause of the Eighth Amendment to the United States Constitution, and Article I, Sections 7 and 17 of the California Constitution.

e) Whether Defendants' failure to operate a system that provides minimally adequate mental health care poses a substantial risk of harm.

f) Whether Defendants have been deliberately indifferent to the serious mental health care needs of class members.

177) Defendants are expected to raise common defenses to these claims, including denying that their actions violate the law.

**3. Typicality: Fed R. Civ. Po. 23(a)(3)**

178) The claims of the named Plaintiffs are typical of the claims of the members of the proposed sub-class as their claims arise from the same policies, practices, and courses of conduct, and their claims are based on the same theory of law as the Prisoners with Psychiatric Disability subclass claims.

**4. Adequacy: Fed. R. Civ. P. 23(a)(4)**

179) Named Plaintiffs will fairly and adequately represent and protect the interests of the putative CJ2 Prisoners with Psychiatric Disability Subclass members and diligently service as representatives of the proposed subclass. Plaintiffs' interests are co-extensive with those of the subclass and Plaintiffs have no conflict(s) of interest that would be antagonistic to those of the other subclass members. Plaintiffs have retained counsel who are competent and experienced in complex class action litigation and prisoner's rights litigation and who possess the resources necessary to fairly and adequately represent the CJ2 Women's Subclass.

**5. Fed. R. Civ. P. 23(b)(2)**

180) This action is also maintainable as a class action pursuant to Fed. R. Civ. Proc. §23(b)(2) because Defendants policies, practices, actions, and omissions that form the basis of the claims

Deleted: ¶ ... [56]

Formatted: Font: 9 pt

Formatted: Font: 9 pt

of the CJ2 Prisoners with Psychiatric Disability are common to and apply generally to all members of the proposed subclass. All of the Jails' policies regarding prisoners who have psychiatric disabilities are centrally promulgated, disseminated, and enforced by Defendants. The injunctive and declaratory relief sought is appropriate and will apply as a whole to all members of the Subclass.

### D. CJ2 Damages Subclass

181) All Plaintiffs bring this action on their own behalf and, pursuant to Rule 23(a), and (b)(3) of the Federal Rules of Civil Procedure, on behalf of a subclass of all inmates incarcerated at CJ2.

#### 1. Numerosity: Fed. R. Civ. P. 23(a)(1)

182) The CJ2 Damages Subclass is sufficiently numerous that joinder of all members of the subclass is impracticable and unfeasible. The incarcerated population at CJ2 ranges from 325 to 396. Because inmates are continually booked and continually released, the number of the total members of the CJ2 Damages Subclass is substantially greater in the aggregate than the custody capacity for CJ2.

183) The CJ2 Damages Subclass members are identifiable using records maintained in the ordinary course of business by Defendants.

#### 2. Commonality: Fed. R. Civ. P. 23(a)(2)

184) The CJ2 Damages Subclass presents common questions of law and fact, including the nature and extent of damages suffered by each subclass member for each day of incarceration during which insufficient hot water prevented access to a minimum a warm or tempered shower. The deprivation of adequate shower facilities constitutes a uniform and ascertainable experience shared by all members of the CJ2 Damages Subclass and is therefore capable of common proof and quantification.

185) Defendants, knowing that denial of sunlight caused chronic illness, have issued the policy that the only medical care provided for inmates suffering from this condition was and is Vitamin D supplementation which is completely ineffective for either the symptoms or the underlying

Formatted: Normal

Formatted: Body Text 2,Body Text - Numbered 2

Deleted: On a daily basis, the

Deleted: range

Deleted: However,

Deleted: cycle in

Deleted: out of CJ2, some being

Deleted: as new inmates are taken into custody. Therefore,

Deleted: fluid and

Deleted: limits

Deleted: The fact that

Deleted: ¶ ... [57]

Formatted: Font: 9 pt

Formatted: Font: 9 pt

cause.

186) The fact that Defendants know that denial of sunlight on the skin causes chronic, irreversible injuries, took no steps to provide sunlight, and continued to incarcerate individuals at CJ2 on the basis of total denial of sunlight.

187) The fact that Defendants know that denial of sunlight on the skin causes chronic, irreversible injuries, and only prescribe pharmaceutical palliative care to enable inmates to endure these harmful conditions while providing no genuine medical care to prevent the development of chronic illnesses that inevitably arise.

188) That all inmates incarcerated in CJ2 develop illness which arise from the chronic denial of sunlight.

189) That the deferred maintenance has caused unsanitary conditions and bugs to proliferate in inmate cells and housing units.

190) That the deferred maintenance has caused particulates of PM10 or smaller to blow into Plaintiffs' living quarters causing Plaintiffs to develop lung and breathing issues including allergies and asthma.

### 3. Typicality: Fed R. Civ. P. 23(a)(3)

191) The claims of the named Plaintiffs are typical of the claims of the members of the CJ2 Damages Subclass as their claims arise from the same policies, practices, and courses of conduct, and their claims are based on the same theory of law as the CJ2 Damages subclass claims.

192) Named Plaintiffs will fairly and adequately represent and protect the interests of the CJ2 Damages Subclass members and diligently service as representatives of the subclass. Plaintiffs' interests are co-extensive with those of the subclass and Plaintiffs have no conflict(s) of interest that would be antagonistic to those of the other subclass members. Plaintiffs have retained counsel who are competent and experienced in complex class action litigation and prisoner's rights litigation and who possess the resources necessary to fairly and adequately represent the CJ2 Damages Subclass.

Formatted: Body Text 2,Body Text - Numbered 2

Formatted: Body Text 2,Body Text - Numbered 2

Formatted: Heading 3

Deleted: ¶ ... [58]

Formatted: Font: 9 pt

Formatted: Font: 9 pt

**4. Adequacy: Fed. R. Civ. P. 23(a)(4)**

193) Named Plaintiffs will fairly and adequately represent and protect the interests of the putative CJ2 Damages Subclass members and diligently serve as representatives of the proposed subclass. Plaintiffs' interests are co-extensive with those of the subclass and Plaintiffs have no conflict(s) of interest that would be antagonistic to those of the other subclass members. Plaintiffs have retained counsel who is competent and experienced in complex class action litigation and prisoner's rights litigation and who possesses the resources necessary to fairly and adequately represent the CJ2 Damages Subclass.

**FIRST CAUSE OF ACTION FOR RELIEF**

*Fourteenth Amendment - Deprivation of Federal Civil Rights Under 42 U.S.C. §1983*

*(All Plaintiffs and CJ2 Inmate Class Against All Defendants)*

194) Plaintiffs re-allege and incorporate by reference herein all allegations made in this Complaint.

195) By their policies and practices described above, Defendants and each of them subjected and continue to subject Plaintiffs and the CJ2 Inmate Class they represent, to a substantial risk of serious harm and injury from the harmful and inhumane effects of their housing decisions to subject all inmates at CJ2 to total denial of sunlight, no natural air, inadequate access to exercise and recreation, insufficient exercise space, lack of hot water and insufficient hot water for showers; sewage backups and overflows; inadequate maintenance so that water intrusion, and mold has developed inside the housing units, unhealthy dust and particulates matter in the air; insufficient clean laundry, failure to provide newly booked inmates who are detoxing with medical supervision or adequate medical supervision and further subject Plaintiffs and the CJ2 Inmate Class to a substantial risk of serious harm and injury by providing inadequate medical care that relies on psychotropic drugs and pharmaceutical drugs to chemically coerce inmates to tolerate conditions that cause ill health. This creates chemical dependence with its own attendant health risks and iatrogenic effects. This is especially damaging in a population cohort that already suffers from drug dependency issues, and housing instability. These policies and practices have been, and continue to be, implemented by Defendants and their agents, officials,

Deleted: service

Deleted: are

Deleted: possess

Formatted: No underline

Formatted: Centered

Deleted: *Eighth*

Deleted: . §

Formatted: Block Text

Deleted: no outdoor

Deleted: and limited access to exercise,

Deleted: , and

Deleted: , insect infestations,

Deleted: food

Deleted: maintain health. Defendants

Deleted: . These policies and practices have been, and continue to be, implemented by Defendants and their agents, officials, employees and all persons acting in concert with them under color of state law, in their official capacities, and are the proximate cause of Plaintiffs' and the CJ2 Inmate Class's ongoing deprivation of rights secured by the United States Constitution under the Eighth Amendment.¶
By their policies and practices described above, Defendants subject Plaintiffs and the CJ2 Inmate Class they represent, to a substantial risk of serious harm from the provision of inadequate and inhumane living conditions, insufficient access to exercise, lack of sufficient healthy food to maintain health, and lack of appropriate and necessary medical care.

Deleted: ¶ ... [59]

Formatted: Font: 9 pt

Formatted: Font: 9 pt

employees and all persons acting in concert with them under color of state law, in their official capacities, and are the proximate cause of Plaintiffs' and the CJ2 Inmate Class's ongoing deprivation of rights secured by the United States Constitution under the Fourteenth Amendment.

196) The policies, practices and customs described above are the official policies, practices and customs of Defendants and are the direct and proximate cause of Plaintiffs being subjected to known risks of serious harms in violation of the Fourteenth Amendment. The policies, practices and customs described above include Defendants and each of their failure to train its staff in the face of an obvious need for training to prevent the violations described above.

197) Defendants have been and are aware of all of the deprivations complained of herein, and have condoned or been deliberately indifferent to such conduct.

WHEREFORE, Plaintiffs and the Prisoner Class they represent request relief as outlined below.

**SECOND CAUSE OF ACTION**

*Fourteenth Amendment to the United States Constitution, 42 U.S.C. § 1983 (Equal Protection)*

*(CJ2 Women Subclass Against All Defendants)*

198) Plaintiffs re-allege and incorporate by reference herein all allegations previously made above.

199) Women prisoners are held in CJ2 with fewer rights than men. Women prisoners are denied certain jail jobs which afford privileges and greater freedoms. Women prisoners were and are denied equal access to inmate programming and jail jobs. Women prisoners were forced to house in overcrowded sleeping areas. Women's reproductive systems are more susceptible to microbial infection and the conditions of confinement cause women prisoners to develop frequent, more severe and longer lasting viral and bacterial infections, particularly in their feminine anatomy in contrast to male prisoners. Women prisoners are afforded less access to recreation and exercise than the male prisoners. And while access to sunlight for male prisoners is highly limited, some male prisoners are provided access to sunlight, while no women prisoners have access to sunlight. These conditions create a liberty interest protected by due process.

Deleted: Eighth

Deleted: <#>The policies, practices and customs described above are the official policies, practices and customs of Defendants and are the direct and proximate cause of Plaintiffs being subjected to known risks of serious harms in violation of the Eighth Amendment. The policies, practices and customs described above include Defendants and each of their failure to train its staff in the face of an obvious need for training to prevent the violations described above.
Defendants have been and are aware of all of the deprivations complained of herein, and have condoned or been deliberately indifferent to such conduct.
SECOND CAUSE OF ACTION FOR RELIEF
Fourteenth Amendment to the United States Constitution, 42 U.S.C. § 1983 (Due Process)
(All Plaintiffs and the CJ2 Inmate Class Against All Defendants)

Deleted: <#>

Deleted: <#>
By their policies and practices described above, Defendants and each of them subjected and continue to subject Plaintiffs and the CJ2 Inmate Class they represent, to a substantial risk of harm due to the denial of due process in relation to the conditions of confinement from being incarcerated in a jail that violates basic California building code that has no space for direct sunlight for inmates and inadequate space for exercise; due to defendants' conduct of pharmaceutical coercion in order to force inmates to tolerate these unhealthy and unnatural, and code violating conditions; due to conditions without adequate sanitation and plumbing; imposes an atypical, substantial, and different hardship on the prisoner in relation to the ordinary incidents of incarcerated life, so as to create a liberty interest protected by due process.. These policies and practices have been, and continue to be, implemented by Defendants and their agents or employees in their official capacities, and are the proximate cause of Plaintiffs' and the CJ2 Inmate Class's ongoing deprivation of rights secured by the United States Constitution under the Fourteenth Amendment.

Formatted: Font color: Black

Formatted: Font color: Black

Deleted: <#>Defendants'

Deleted: THIRD

Formatted: No underline

Formatted: Centered

Formatted: Block Text

Moved (insertion) [7]

Deleted: ... [60]

Formatted: Font: 9 pt

Formatted: Font: 9 pt

200) By their policies and practices described above, Defendants and each of them subject Plaintiffs and the CJ2 Women Sub-Class they represent, to a substantial risk of harm due to the denial of due process in relationship to housing decisions, access to programming decisions, inmate job decisions, access to recreation and opportunities to exercise and the complete lack of available sunlight. These policies and practices have been, and continue to be, implemented by Defendants and their agents or employees in their official capacities, and are the proximate cause of Plaintiffs' and the CJ2 Women Sub-Class's ongoing deprivation of rights under the 14th Amendment of the United States Constitution.

201) Women prisoners have unique and different anatomy from male prisoners. Women's gynecological anatomy subjects women to increased risk of fungal and bacterial infection and, as a result of the lack of sanitation, insufficient hot water for showers, insufficient clean clothing, especially clean and sanitary underwear, compounds and increases the harms from the lack of sunlight, lack of exercise and insufficient diet, resulting in frequent infections and illnesses, many of which are and have become resistant to anti-biotics.

202) The policies, practices and customs described above are the official policies, practices and customs of Defendants and each of them and are the direct and proximate cause of Plaintiffs and the CJ2 Women Sub-Class being subjected to known risks of serious harms in violation of the Fourteenth Amendment. The policies, practices and customs described above include Defendants and each of their failure to train their staff in the face of an obvious need for training to prevent the violations described above.

203) Defendants have been and are aware of all of the deprivations complained of herein, and have condoned or been deliberately indifferent to such conduct.

204) WHEREFORE, the Women's Sub-Class requests relief as outlined below.

## THIRD CAUSE OF ACTION

*Article I, Section 7 of the California Constitution*

*(All Plaintiffs and the CJ2 Inmate Class Against All Defendants)*

205) Plaintiffs re-allege and incorporate by reference herein all allegations previously made above.

Deleted: City and County of San Francisco, San Francisco Sheriff's Office, Miyamoto and Collins,

Formatted: Body Text 2,Body Text - Numbered 2

Moved up [7]: Women prisoners are denied certain jail jobs which afford privileges and greater freedoms.

Deleted: because women inmates have fewer privileges and rights than men.

Deleted: Women prisoners were and are denied access to programming and fewer jail jobs. Women prisoners were forced to house in overcrowded sleeping areas. Women prisoners are afforded even less access to recreation and exercise than the male prisoners. And while access to sunlight for male prisoners is highly limited, some male prisoners are provided access to sunlight, while no women prisoner has access to sunlight. These conditions create a liberty interest protected by due process.¶

Formatted: Body Text 2,Body Text - Numbered 2

Deleted: City and County of San Francisco, San Francisco Sheriff's Office, Miyamoto and Collins,

Deleted: City

Deleted: County

Deleted: San Francisco, San Francisco Sheriff's Office, Miyamoto and Collins'

Deleted: its

Moved (insertion) [8]

Formatted: Block Text

Deleted: ¶ ... [61]

Formatted: Font: 9 pt

Formatted: Font: 9 pt

206) Placement in a jail that violates basic California building code in that it has no space for direct sunlight for inmates, inadequate space for exercise, and subjugation to a medical system that engages in chemical coercion in order to force inmates to tolerate these unhealthy and unnatural, and code violating conditions, imposes an atypical, substantial, and different hardship on the prisoner in relation to the ordinary incidents of incarcerated life, so as to create a liberty interest protected by due process.

207) These policies and practices have been, and continue to be, implemented by Defendants and each of them and their agents or employees in their official capacities, and are the proximate cause of Plaintiffs' and the CJ2 Inmate Class's ongoing deprivation of rights secured by the California Constitution, Article I, Section 7.

208) Defendants and each of them have been and are aware of all of the deprivations complained of herein, and have condoned or been deliberately indifferent to such conduct.

209) WHEREFORE, Plaintiffs and the CJ2 Inmate Class they represent request relief as outlined below.

## FOURTH CAUSE OF ACTION

*Article I, Section 17 of the California Constitution*

*(All Plaintiffs and the CJ2 Inmate Class Against All Defendants)*

210) Plaintiffs re-allege and incorporate by reference herein all allegations previously made above.

211) Placement in a jail that violates basic California building code in that it has no space for direct sunlight for inmates, inadequate space for exercise, and subjugation to a medical system that engages in chemical coercion in order to force inmates to tolerate these unhealthy and unnatural, and code violating conditions, imposes an atypical, substantial, and different hardship on the prisoner in relation to the ordinary incidents of incarcerated life, so as to create a liberty interest protected by due process.

212) These policies and practices have been, and continue to be, implemented by Defendants and each of them and their agents or employees in their official capacities, and are the proximate cause of Plaintiffs' and the CJ2 Inmate Class's ongoing deprivation of rights secured by the

**Moved (insertion) [9]**

**Formatted:** Body Text 2,Body Text - Numbered 2

**Formatted:** No underline

**Formatted:** Centered

**Deleted:** *7*

**Formatted:** Block Text

**Moved down [10]:** <#> have been and are aware of all of the deprivations complained of herein, and have condoned or been deliberately indifferent to such conduct. ¶ WHEREFORE, Plaintiffs and the CJ2 Inmate Class they represent request relief as outlined below. ¶ **FIFTH CAUSE OF ACTION**¶

**Moved up [8]:** <#> *of the California Constitution*¶ *(All Plaintiffs and the CJ2 Inmate Class Against All Defendants)*¶ Plaintiffs re-allege and incorporate by reference herein all allegations previously made above.¶

**Deleted:** <#>By their policies and practices described above, Defendants subject the CJ2 Inmate Class by incarceration in a jail that violates basic California building code in that it has no space for direct sunlight for inmates, inadequate space for exercise, and subjugation to a medical system that engages in chemical coercion in order to force inmates to tolerate these unhealthy and unnatural. These policies and practices impose an atypical, substantial, and different hardship on the prisoner in relation to the ordinary incidents of incarcerated life, so as to create a liberty interest protected by due process. ¶ These policies and practices have been, and continue to be, implemented by Defendants and their agents or employees in their official capacities, and are the proximate cause of Plaintiffs' and the CJ2 Inmate Class's ongoing deprivation of rights secured by the California Constitution, Article I, Section 7.¶ Defendants

**Deleted:** <#>*Article I, Section 17*

**Deleted:** <#>By their policies and practices of incarcerating pretrial detainees

**Deleted:** Class's

**Deleted:** ¶ ... [62]

**Formatted:** Font: 9 pt

**Formatted:** Font: 9 pt

California Constitution, Article I, Section 17.

213) Defendants and each of them have been and are aware of all of the deprivations complained of herein, and have condoned or been deliberately indifferent to such conduct.

214) WHEREFORE, Plaintiffs and the CJ2 Inmate Class they represent request relief as outlined below.

## FIFTH CAUSE OF ACTION

*Fourteenth Amendment to the United States Constitution, 42 U.S.C. § 1983 (Equal Protection)*

*(CJ2 Prisoners with Psychiatric Disabilities Against All Defendants)*

215) Plaintiffs re-allege and incorporate by reference herein all allegations previously made above.

216) Placement in isolation imposes an atypical, substantial, and different hardship on the prisoner in relation to the ordinary incidents of incarcerated life, so as to create a liberty interest protected by due process. By their policies and practices described above, Defendants subject the Prisoners with Psychiatric Disabilities Sub-Class they represent, to a substantial risk of harm due to the denial of due process in relationship to classification and housing decisions, including placement in isolation and the use of safety cells. These policies and practices have been, and continue to be, implemented by Defendants and their agents or employees in their official capacities, and are the proximate cause of Plaintiffs' and the Prisoner Class's ongoing deprivation of rights secured by the United States Constitution under the Fourteenth Amendment.

217) The policies, practices and customs described above are the official policies, practices and customs of Defendants and each of them, are the direct and proximate cause of Plaintiffs being subjected to known risks of serious harms in violation of the Eighth Amendment. The policies, practices and customs described above include Defendants and each of their failure to train its staff in the face of an obvious need for training to prevent the violations described above. Defendants and each of them, have been and are aware of all the deprivations complained of herein, and have condoned or been deliberately indifferent to such conduct.

218) WHEREFORE, Prisoners with Psychiatric Disability sub- Class requests relief as

Moved (insertion) [10]

Formatted: No underline

Formatted: Centered

Moved up [9]: <#> have been and are aware of all of the deprivations complained of herein, and have condoned or been deliberately indifferent to such conduct. ¶ WHEREFORE, Plaintiffs and the CJ2 Inmate Class they represent request relief as outlined below. ¶

Deleted: <#>Defendants

Formatted: Font color: Black

Formatted: Font color: Black

Deleted: ¶ ... [63]

Formatted: Font: 9 pt

Formatted: Font: 9 pt

outlined below.

## SIXTH CAUSE OF ACTION

*Plaintiff MEREDITH DECHERT and the Prisoners with Disability Subclass Against ALL DEFENDANTS – American Disabilities Act*

219) Plaintiffs re-allege and incorporate by reference herein all allegations previously made above.

220) The Americans with Disabilities Act ("ADA") prohibits public entities, including Defendants from denying "a qualified individual with a disability … the benefits of the services, programs, or activities of [the] public entity" because of the individual's disability. 42 U.S.C. § 12132. Defendants are legally responsible for all violations of the ADA committed by County staff and contractors who provide programs, services, or activities, including but not limited to mental health care to prisoners in the Jails.

221) The ADA defines "a qualified individual with a disability" as a person who suffers from a "physical or mental impairment that substantially limits one or more major life activities," including, but not limited to, "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. §12102(1)(A), (2)(A). Plaintiff Meredith Dechert and members of the Disability Subclass are individuals with disabilities as defined in the ADA, as they have mental impairments that substantially limit one or more major life activities. Plaintiff Meredith Dechert is qualified – with or without reasonable modifications – to participate in the programs, services, and activities offered by Defendants and are therefore qualified individuals with disabilities within the meaning of 42 U.S.C. §§ 12102, 12131, and 28 C.F.R. § 35.104.

222) The programs, services, and activities that Defendants provide to prisoners include, but are not limited to, sleeping, eating, showering, toileting, communicating with those outside the Jail by mail and telephone, exercising, entertainment, safety and security, the Jail's administrative, disciplinary, and classification proceedings, medical, mental health, and dental

Formatted: Centered

Deleted: <#>Tom Bane Civil Rights Act¶

Moved up [4]: <#>Civ.

Deleted: <#>Code § 52.1)¶

Formatted: Body Text 2,Body Text - Numbered 2

Deleted: <#>in this Complaint

Moved up [3]: <#>Defendants PAUL MIYAMOTO, JENNIFER COLLINS, LISA PRATT, and DOEs 1 to 20's actions and inactions constituted oppression, fraud, and/or malice resulting in great harm.¶

Deleted: <#>The Sixth Cause of Action is asserted by Plaintiffs and the CJ2 Inmate Class.¶
Deliberate Indifference / Special Relationship¶
*Individual Liability:* Defendants PAUL MIYAMOTO, JENNIFER COLLINS, and LISA PRATT, exhibited deliberate indifference to plaintiffs and class members serious medical needs, including the chronic jet lag, the development of serious chronic illnesses resulting from the continual deprivation of access to sunlight, putting them at substantial risk of suffering serious harm, and did not take reasonable available measures to abate that risk, where a reasonable official in the circumstances would have appreciated the high degree of risk involved, with deliberate indifference or reckless disregard, in violation of the Fourteenth Amendment to the United States Constitution and Article I, Section 7(a) of the California Constitution. ¶
Municipal / Supervisory Liability: Defendants CITY AND COUNTY OF SAN FRANCISCO, SAN FRANCISCO SHERIFF'S OFFICE, and ROLAND PICKENS of the San Francisco Health Network/ Jail Health Services maintained policies or customs of action and inaction and knew or should have known that jail staff and Jail Health staff under their command were inadequately trained, supervised, or disciplined resulting from either the lack of proper training, pursuant to policy, or the result of the lack of policy, with deliberate indifference or reckless disregard, in violation of the Fourteenth Amendment to the United States Constitution and Article I, Section 7(a) of the California Constitution.¶
Vicarious Liability: Defendants CITY AND COUNTY OF SAN FRANCISCO, SAN FRANCISCO SHERIFF'S OFFICE, and ROLAND PICKENS are vicariously liable, through the principles of respondeat superior and pursuant to California Government Code §§ 815.2(a), 845.6, for injuries proximately caused by the acts and omissions of agents, employees, and contractors acting within the scope of employment, including Defendants PAUL MIYAMOTO, JENNIFER COLLINS, LISA PRATT, and DOEs 1 to 20.¶

Deleted: <#>Plaintiffs and all class members were and continue to be injured as a direct and proximate result of Defendants CITY AND COUNTY OF SAN FRANCISCO, SAN FRANCISCO SHERIFF'S OFFICE, ROLAND PICKENS, PAUL MIYAMOTO, JENNIFER COLLINS, LISA PRATT, and DOE 1 to 20's actions and inactio ... [65]

Deleted: ¶ ... [64]

Formatted: Font: 9 pt

Formatted: Font: 9 pt

services, library, educational, vocational, substance abuse treatment, parenting classes, and anger management classes, and discharge services. Defendants' programs, services, and activities are covered by the ADA.

223) Under the ADA, Defendants must provide prisoners with disabilities reasonable accommodations and modifications to policies and procedures so that they can avail themselves of and participate in all programs and activities offered by Defendants.

224) Congress directed the United States Department of Justice ("DOJ") to write regulations implementing Title II's prohibition against discrimination. 42 U.S.C. § 12134.

225) Pursuant to this mandate, the DOJ has issued regulations defining the forms of discrimination prohibited by Title II of the ADA. 28 C.F.R. § 35.101 *et seq*. These regulations include regulations specific to adult detention and correctional facilities. 28 C.F.R. § 35.152.

226) A public entity must "administer services, programs, and activities in the most integrated setting appropriate to" an individual's needs and is therefore prohibited from unnecessarily segregating or isolating the individual. 28 C.F.R. § 35.130(d). Public entities responsible for the operation or management of adult detention and correctional facilities "shall ensure that [prisoners] or detainees with disabilities are housed in the most integrated setting appropriate to the needs of the individuals. Unless it is appropriate to make an exception, a public entity—(i) Shall not place [prisoners] or detainees with disabilities in inappropriate security classifications because no accessible cells or beds are available; (ii) Shall not place [prisoners] or detainees with disabilities in designated medical areas unless they are actually receiving medical care or treatment; (iii) Shall not place [prisoners] or detainees with disabilities in facilities that do not offer the same programs as the facilities where they would otherwise be housed; and (iv) Shall not deprive [prisoners] or detainees with disabilities of visitation with family members by placing them in distant facilities where they would not otherwise be housed." 28 C.F.R. §35.152(b)(2). Furthermore, a public entity may not "deny a qualified individual with a disability the opportunity to participate in services, programs, or activities that are not separate or different, despite the existence of permissibly separate or different programs or activities." 28 C.F.R. § 35.130(b)(2).

**Deleted:** ¶ ... [66]

**Formatted:** Font: 9 pt

**Formatted:** Font: 9 pt

227) In providing any aid, benefit, or service, a public entity "may not . . . [d]eny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit, or service," "[a]fford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others," "[p]rovide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity . . . as that provided to others," "[o]therwise limit a qualified individual with a disability in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others," or "provide different or separate aids, benefits, or services to individuals with disabilities or to any class of individuals with disabilities than is provided to others unless such action is necessary to provide qualified individuals with disabilities with aids, benefits, or services that are as effective as those provided to others." 28 C.F.R. § 35.130(b)(1)(i)-(iv).

228) When Defendants house individuals with disabilities in isolation due to their disabilities, Defendants deny Plaintiffs and the Disability Subclass the opportunity to participate in services, programs, or activities that are in the most integrated setting appropriate to their needs, that are as effective in affording equal opportunity as those provided to others, and that are not separate or different from those offered to their nondisabled peers.

229) A public entity may not (1) "impose or apply eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any service, program, or activity, unless such criteria can be shown to be necessary[,]" 28 C.F.R. § 35.130(b)(8); or (2) "utilize criteria or methods of administration . . . that have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability . . . or the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities[.]" 28 C.F.R. §35.130(b)(3)(i)(ii).

230) Defendants have imposed eligibility criteria and methods of administration that screen out persons with disabilities and subject them to discrimination by housing prisoners with disabilities in isolation due to their disabilities and disability-related behaviors. Defendants have

Deleted: ¶ ... [67]
Formatted: Font: 9 pt
Formatted: Font: 9 pt

not shown that such criteria are necessary for the provision of the service, program, or activity being offered or that such requirements are based on actual risks, not on mere speculation, stereotypes, or generalizations about individuals with disabilities, as required by 28 C.F.R. § 35.130(h).

231) A public entity "shall make reasonable modifications in policies, practices, or procedure when the modifications are necessary to avoid discrimination on the basis of disability[.]" 28 C.F.R. § 35.130(b)(7). Defendants fail to make reasonable modifications to avoid discrimination, including but not limited to: (1) implementing an identification/tracking system to track prisoners with psychiatric disabilities and their disability-related needs; (2) modifying policies and procedures to provide prisoners with disabilities with meaningful access to programs and services; and modifying policies and procedures to prohibit prisoners with psychiatric disabilities from being placed in isolation. Defendants have failed to make available information to the Disability Subclass about their rights under the ADA while detained in the Jails. *See* 28 C.F.R. §35.106.

232) As a result of Defendants' policy and practice of discriminating against and failing to provide reasonable accommodations to prisoners with disabilities, Plaintiffs and the Prisoners with Disabilities Subclass they represent do not have equal access to Jail activities, programs, and services for which they are otherwise qualified.

233) WHEREFORE, Plaintiffs and the Prisoners with Disabilities Subclass they represent request relief as outlined below.

**SEVENTH CAUSE OF ACTION**

*(Rehabilitation Act, 29 U.S.C. § 794)*

*(Plaintiffs Meredith Dechert and the Prisoner Disability Sub-Class Against ALL DEFENDANTS)*

234) Plaintiffs re-allege and incorporate by reference herein all allegations previously made above.

235) Section 504 of the Rehabilitation Act provides, in pertinent part that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to

**Deleted:** on behalf of themselves and class members pray for
**Formatted:** Body Text 2,Body Text - Numbered 2
**Deleted:** hereunder appears
**Formatted:** Font: Bold
**Deleted:** ¶ ... [68]
**Formatted:** Font: 9 pt
**Formatted:** Font: 9 pt

discrimination under any program or activity receiving federal financial assistance[.]" 29 U.S.C. § 794(a).

236) At all times relevant to this action, Defendants are and have been recipients of federal financial assistance within the meaning of the Rehabilitation Act including for programs or activities offered at the Jails.

237) Plaintiffs DECHERT and the Disability Subclass they represent are qualified individuals with disabilities as defined in the Rehabilitation Act as they all have impairments that substantially limit a major life activity, and they were and/or are all residents of the Jails qualified—with or without reasonable accommodation—to participate in the programs, services, and activities offered by Defendants. 29 U.S.C. § 705(20)(B); 28 C.F.R. § 41.32.

238) By their policy and practice of discriminating against and failing to reasonably accommodate prisoners with disabilities, Defendants violate Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

239) The DOJ is charged under Executive Order 12250 with coordinating the implementation of Section 504 of the Rehabilitation Act of 1973. 28 C.F.R. § 41.1.

240) 192. In providing any aid, benefit, or service, a recipient of federal financial assistance "may not . . . [d]eny a qualified handicapped person the opportunity to participate in or benefit from the aid, benefit or service," "[a]fford a qualified handicapped person an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others," "[p]rovide a qualified handicapped person with an aid, benefit, or service that is not as effective in affording equal opportunity . . . as that provided to others," "[o]therwise limit a qualified handicapped person in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others," or "provide different or separate aids, benefits, or services to individuals with disabilities or to any class of individuals with disabilities than is provided to others unless such action is necessary to provide qualified individuals with disabilities with aids, benefits, or services that are as effective as those provided to others." 45 C.F.R. § 84.4(b)(i)(iv), (vii). A public entity also may not "deny a qualified individual with a disability the opportunity to participate in services, programs, or activities that are not separate or different, despite the

Deleted: ¶ ... [69]

Formatted: Font: 9 pt

Formatted: Font: 9 pt

existence of permissibly separate or different programs or activities." 45 C.F.R. § 84.4(b)(3).

241) By housing Plaintiffs and members of the Disability Subclass in more restrictive housing, Defendants exclude them from participating in and deny them the benefits of Defendants' education and rehabilitative programs, services, and activities solely by reason of their disabilities.

242) As a result of Defendants' discriminating against and failing to provide a grievance procedure and reasonable accommodations, Plaintiffs and the Prisoners with Disabilities Subclass they represent do not have equal access to the Jails' activities, programs, and services for which they are otherwise qualified.

243) 195. Because Defendants' discriminatory conduct is ongoing, declaratory relief and injunctive relief are appropriate remedies. Further, as a direct result of Defendants' actions, Plaintiffs and members of the Plaintiff Class are suffering irreparable harm, including lost education and rehabilitative opportunities. Therefore, speedy and immediate relief is appropriate.

244) 196. Pursuant to 29 U.S.C. § 794a, Plaintiffs are entitled to declaratory and injunctive relief and to recover from Defendants the reasonable attorneys' fees and costs incurred in bringing this action.

245) WHEREFORE, Plaintiffs and the Prisoners with Disabilities Subclass they represent request relief as outlined below.

## EIGHTH CAUSE OF ACTION

*(Cal. Gov't Code § 11135)*

*(By Plaintiff Dechert and the Disability Subclass Against ALL DEFENDANTS)*

246) Plaintiffs re-allege and incorporate by reference herein all allegations previously made above.

247) Upon information and belief, each Defendant was, at all times relevant to this action, and is currently operating or administering a program or activity that receives state financial assistance within the meaning of section 11135, including educational and rehabilitative programs and activities offered in the Jails.

Formatted: No underline

Formatted: Centered

Moved (insertion) [11]

Formatted: Body Text 2,Body Text - Numbered 2

Deleted: ¶ ... [70]

Formatted: Font: 9 pt

Formatted: Font: 9 pt

248) Plaintiffs DECHERT and the Disability Subclass were, at all times relevant to this action, and are currently "persons in the State of California" within the meaning of California Government Code section 11135. Plaintiffs DECHERT and the Disability Subclass all have disabilities as defined by California Government Code section 12926, and they were and/or are all residents of the County Jails qualified to participate in the programs, services and activities of the County Jails.

249) Defendants have violated the rights of Plaintiffs and members of the Plaintiff Class secured by Section 11135 et seq. and the regulations promulgated thereunder, 22 Cal. Code Regs. § 98100, et seq.

250) WHEREFORE, Plaintiffs and the Prisoners with Disabilities Subclass they represent request relief as outlined below.

## NINTH CAUSE OF ACTION

*Negligence*

*(All Plaintiffs and CJ2 Damages Subclass Against All Defendants)*

251) Plaintiffs re-allege and incorporate by reference herein all allegations made in this Complaint.

252) The Sixth Cause of Action is asserted by Plaintiffs and the CJ2 Damages Subclass against all Defendants.

253) Each Defendant had a legal duty to maintain custody and control of Plaintiffs and the class members they represent, so as to not violate their constitutional rights, including the right to not to be subjected to cruel and unusual punishment, or to have their rights violated so as to raise a due process claim including the right to maintain their health; not be subjected to developing chronic, irreversible illness; direct sunlight; outdoor recreation; exercise; sunlight and sunshine; not be subjected to medical coercion; to live in jails free of vermin; and, to have access to adequate hot water and toilets in order to maintain personal cleanliness and sanitation.

254) At all relevant times herein, each Defendant failed to exercise the ordinary care or skill in the management of CJ2 by failing or refusing to provide Plaintiffs and the class members they represent with access to the outdoors and sunshine, and forcing members of the sub-class to

Formatted: No underline
Formatted: Centered
Formatted: Block Text
Deleted: ¶ ... [71]
Formatted: Font: 9 pt
Formatted: Font: 9 pt

suffer social and environmental deprivation through confinement in 24 hours of artificial light, deprivation of lack of fresh air, insufficient space and access to exercise, frequent denial of hot water and working plumbing, inappropriate and inadequate food to maintain health and medical coercion in order to tolerate these conditions.

255) At all relevant times herein, named Plaintiffs and class members herein have been injured by the regular and daily social and environmental and physical deprivations that was and continues to be caused by Defendants and each of their failure to exercise the ordinary care or skill in the management of the properties and facilities commonly known as CJ2.

256) At all relevant times herein, named Plaintiffs' and CJ2 Damages Subclass members' injuries were proximately caused by Defendants and each of their failures to exercise ordinary care or skill in the management of the properties and facilities commonly known as CJ2. These injuries include, but are not limited to, headaches, severe depletion of Vitamin D, increased body pain, headaches, loss of mental acuity, depression, anxiety, and depletion of melanin in their skin.

## REQUEST FOR RELIEF

Plaintiffs and the class and subclasses they represent have no adequate remedy at law to redress the wrongs suffered as set forth in this Complaint. Plaintiffs have suffered and will continue to suffer irreparable injury as a result of the unlawful acts, omissions, policies, and practices of the Defendants as alleged herein, unless Plaintiffs are granted the relief they request. Plaintiffs and Defendants have an actual controversy and opposing legal positions as to Defendants' violations of the constitutions and laws of the United States and the State of California. The need for relief is critical because the rights at issue are paramount under the constitutions and laws of the United States and the State of California.

WHEREFORE, PLAINTIFFS and all class members pray for judgment and the following relief against DEFENDANTS as follows:

a) An order certifying that this action may be maintained as a class action pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(2);

b) A finding that the conditions, acts, omissions, policies, and practices described above are

Deleted: needed sanitation,

Deleted: Plaintiffs'

Deleted: members'

Deleted:

Moved up [13]: Plaintiffs re-allege and incorporate by reference herein all allegations previously made above.¶

Deleted: **Intentional Infliction of Emotional Distress**¶ **(Cal. Gov. Code § 820(a))**¶ **(All Plaintiffs and CJ2 Damages Subclass Against All Defendants)**¶

Deleted: The Seventh Cause of Action is asserted by Plaintiffs and the CJ2 Damages Subclass members against all Defendants. ¶
Defendants' conduct in adopting a policies, customs, and practices of incarcerating inmates where they are completely denied all access to outdoor recreation, to sunshine and sunlight; where inmates have inadequate access to exercise; where some inmates are forced to live, eat and sleep in living quarters infested with vermin, and then subjected to chemical coercion labeled as medical care, is extreme and outrageous conduct that intentionally or recklessly disregards the probability of causing emotional distress.¶
Defendants and their policies, customs, and practices of incarcerating inmates where they are completely denied all access to outdoor recreation, to outdoor light, sunshine and sunlight; where inmates have inadequate access to exercise; where some inmates are forced to live, eat and sleep in living quarters infested with vermin, and then subjected to chemical coercion labeled as medical care, are the proximate cause of severe and extreme emotional trauma and distress suffered by Plaintiffs and class members.¶
Defendants and their policies, customs, and practices of incarcerating inmates where they are completely denied all access to outdoor recreation, to outdoor light, sunshine and sunlight; where inmates have inadequate access to exercise; where some inmates are forced to live, eat and sleep in living quarters infested with vermin, and then subjected to chemical coercion labeled as medical care, exceed all bounds of conduct that is usually tolerated in a civilized community for treatment of persons who are pre-trial, not been convicted, and presumed innocent.¶

Formatted: No underline

Formatted: Centered

Formatted: Body Text 2,Body Text - Numbered 2, Indent: First line: 0.5"

Deleted: Defendants'

Formatted: Indent: First line: 0.25"

Deleted: <#>Injunctive relief directing DEFENDANTS, absent exigent circumstances to:¶
Provide all inmates at CJ2 with access to direct sunlight;¶
Provide every inmate adequate opportunity and ... [73]

Deleted: ¶ ... [72]

Formatted: Font: 9 pt

Formatted: Font: 9 pt

in violation of the rights of Plaintiffs and the class and subclasses they represent under the Fourteenth Amendments to the United States Constitution, the ADA, the Rehabilitation Act, Article I, Sections 7 and 17 of the California Constitution, and California Government Code Section 11135;

c) An order requiring Defendants, their agents, officials, employees, and all persons acting in concert with them under color of state law or otherwise to cease inhumane use of prolonged isolation, to cease indefinitely placing prisoners with psychiatric disabilities in isolation, to establish a constitutionally adequate process for determination of prisoner classification and housing placement, to cease violating the due process rights of prisoners; to provide minimally adequate mental health care to prisoners; to provide minimally adequate housing with daily access to sunlight, regular exercise, hot water for showers, working toilets and free from mold, pests, particulates and pollutants; to provide sufficient clean clothing to prevent fungal and bacterial infections; to provide every inmate with the opportunity to program;

d) An order enjoining Defendants, their agents, officials, employees, and all persons acting in concert with them under color of state law or otherwise, from continuing the unlawful acts, conditions, and practices described in this Complaint;

e) For an award of actual damages, civil penalties, and any other available relief against Defendants CITY AND COUNTY OF SAN FRANCISCO, SAN FRANCISCO SHERIFF'S OFFICE, PAUL MIYAMOTO; JENNIFER COLLINS; LISA PRATT, ROLAND PICKENS, and DOE 1 to 20, pursuant to California Civil Code §§ 52, 52.1, and any other statute as may be applicable

f) For an award of reasonable attorneys' fees and costs, pursuant to 42 U.S.C. § 1988, 29 U.S.C. §794, 42 U.S.C. § 12205, California Civil Code §§ 52.1, 52 et seq., California Code of Civil Procedure § 1021.5, and any other statute as may be applicable;

g) An order retaining jurisdiction of this case until Defendants have fully complied with the orders of this Court, and there is a reasonable assurance that Defendants will continue to comply in the future absent continuing jurisdiction; and

Deleted: damages, treble damages, punitive

Formatted: Body Text 2,Body Text - Numbered 2, Outline numbered + Level: 2 + Numbering Style: a, b, c, … + Start at: 1 + Alignment: Left + Aligned at: 0.25" + Indent at: 0.5"

Deleted: SHERIFF'S

Deleted:

Deleted: (except that no punitive damages are sought against Defendants CITY AND COUNTY OF SAN FRANCISCO, SAN FRANCISCO SHERIFF'S OFFICE, pursuant to California Civil Code § 818);

Deleted: attorneys'

Deleted:

Deleted: <#>Award compensatory and punitive damages to Plaintiffs and the CJ2 Damages Subclass;¶
Award declaratory relief according to proof;¶

Deleted: ¶ ... [24]

Formatted: Font: 9 pt

Formatted: Font: 9 pt

h) Such other and further relief as the case requires and the Court deems just and proper.

Respectfully Submitted,

Dated: October 30, 2026 LAW OFFICE OF YOLANDA HUANG

By: /s/ Yolanda Huang
Yolanda Huang
ATTORNEY FOR PLAINTIFFS

**Deleted:** Respectfully Submitted,

**Deleted Cells**

**Formatted:** Font: Times New Roman

**Formatted:** Font: Times New Roman, Font color: Custom Color(RGB(34,34,34)), Pattern: Clear (White)

**Formatted:** Body Text 2,Body Text - Numbered 2

**Formatted Table**

**Formatted:** Font: Times New Roman

**Deleted:**

**Deleted:** ... [76]

**Deleted Cells**

**Formatted:** Font: Times New Roman, Font color: Custom Color(RGB(34,34,34)), Pattern: Clear (White)

**Formatted:** Font: Times New Roman, Not Italic, Font color: Custom Color(RGB(34,34,34)), Pattern: Clear (White)

**Formatted:** Normal, Right, Tab stops: 1.8", Left

**Formatted:** Normal, Tab stops: 1.8", Left

**Deleted:** LAW OFFICE OF YOLANDA HUANG
Yolanda Huang

*Attorneys for Plaintiffs*

**Deleted Cells**

**Formatted:** Normal, Right: 0.11"

**Formatted:** Font: Times New Roman, Font color: Custom Color(RGB(34,34,34)), Pattern: Clear (White)

**Formatted:** Normal, Right, Tab stops: 1.8", Left

**Formatted:** Font: Times New Roman, Font color: Black

**Formatted:** Font color: Black

**Formatted:** Normal, Right: 0.11"

**Formatted:** Body Text

**Formatted:** Kern at 16 pt

**Formatted:** Normal, Tab stops: 4.33", Left

**Deleted:** ... [75]

**Formatted:** Font: 9 pt

**Formatted:** Font: 9 pt

| Page 1: [1] Style Definition | Yo Huang | 10/30/26 3:11:00 PM |
|---|---|---|

List 3: Line spacing: Exactly 22.75 pt, Numbered + Level: 1 + Numbering Style: a, b, c, … + Start at: 1 + Alignment: Left + Aligned at: 0.75" + Indent at: 1"

| Page 1: [2] Style Definition | Yo Huang | 10/30/26 3:11:00 PM |
|---|---|---|

List Number 2: Line spacing: Exactly 22.75 pt

| Page 1: [3] Style Definition | Yo Huang | 10/30/26 3:11:00 PM |
|---|---|---|

Body Text - Numbered: Indent: Left: 1", First line: 0", Line spacing: Exactly 22.75 pt, Numbered + Level: 1 + Numbering Style: a, b, c, … + Start at: 1 + Alignment: Left + Aligned at: 1" + Indent at: 1.25"

| Page 1: [4] Style Definition | Yo Huang | 10/30/26 3:11:00 PM |
|---|---|---|

List Number: Line spacing: Exactly 22.75 pt, No bullets or numbering

| Page 1: [5] Style Definition | Yo Huang | 10/30/26 3:11:00 PM |
|---|---|---|

Body Text 2,Body Text - Numbered 2: Indent: Left: 0", First line: 0", Line spacing: Exactly 22.75 pt, Outline numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 1 + Alignment: Left + Aligned at: 0" + Indent at: 0.25", No widow/orphan contr

| Page 1: [6] Deleted | Yo Huang | 10/30/26 3:11:00 PM |
|---|---|---|

| Page 1: [7] Deleted | Yo Huang | 10/30/26 3:11:00 PM |
|---|---|---|

| Page 1: [8] Deleted | Yo Huang | 10/30/26 3:11:00 PM |
|---|---|---|

| Page 2: [9] Deleted | Yo Huang | 10/30/26 3:11:00 PM |
|---|---|---|

| Page 2: [10] Deleted | Yo Huang | 10/30/26 3:11:00 PM |
|---|---|---|

| Page 2: [11] Deleted | Yo Huang | 10/30/26 3:11:00 PM |
|---|---|---|

| Page 1: [12] Deleted | Yo Huang | 10/30/26 3:11:00 PM |
|---|---|---|

| Page 1: [13] Deleted | Yo Huang | 10/30/26 3:11:00 PM |
|---|---|---|

| Page 1: [14] Deleted | Yo Huang | 10/30/26 3:11:00 PM |
|---|---|---|

| Page 1: [15] Deleted | Yo Huang | 10/30/26 3:11:00 PM |
|---|---|---|

| Page 6: [16] Deleted | Yo Huang | 10/30/26 3:11:00 PM |
|---|---|---|

| Page 6: [17] Deleted | Yo Huang | 10/30/26 3:11:00 PM |
|---|---|---|

| | | |
|---|---|---|
| Page 6: [18] Deleted | Yo Huang | 10/30/26 3:11:00 PM |
| Page 6: [19] Deleted | Yo Huang | 10/30/26 3:11:00 PM |
| Page 6: [20] Deleted | Yo Huang | 10/30/26 3:11:00 PM |
| Page 1: [21] Deleted | Yo Huang | 10/30/26 3:11:00 PM |
| Page 1: [22] Deleted | Yo Huang | 10/30/26 3:11:00 PM |
| Page 1: [23] Deleted | Yo Huang | 10/30/26 3:11:00 PM |
| Page 1: [24] Deleted | Yo Huang | 10/30/26 3:11:00 PM |
| Page 1: [25] Deleted | Yo Huang | 10/30/26 3:11:00 PM |
| Page 1: [26] Deleted | Yo Huang | 10/30/26 3:11:00 PM |
| Page 1: [27] Deleted | Yo Huang | 10/30/26 3:11:00 PM |
| Page 1: [28] Deleted | Yo Huang | 10/30/26 3:11:00 PM |
| Page 1: [29] Deleted | Yo Huang | 10/30/26 3:11:00 PM |
| Page 1: [30] Deleted | Yo Huang | 10/30/26 3:11:00 PM |
| Page 1: [31] Deleted | Yo Huang | 10/30/26 3:11:00 PM |
| Page 1: [32] Deleted | Yo Huang | 10/30/26 3:11:00 PM |
| Page 1: [33] Deleted | Yo Huang | 10/30/26 3:11:00 PM |
| Page 1: [34] Deleted | Yo Huang | 10/30/26 3:11:00 PM |
| Page 1: [35] Deleted | Yo Huang | 10/30/26 3:11:00 PM |
| Page 21: [36] Deleted | Yo Huang | 10/30/26 3:11:00 PM |
| Page 1: [37] Deleted | Yo Huang | 10/30/26 3:11:00 PM |
| Page 1: [38] Deleted | Yo Huang | 10/30/26 3:11:00 PM |
| Page 1: [39] Deleted | Yo Huang | 10/30/26 3:11:00 PM |
| Page 1: [40] Deleted | Yo Huang | 10/30/26 3:11:00 PM |
| Page 1: [41] Deleted | Yo Huang | 10/30/26 3:11:00 PM |
| Page 1: [42] Deleted | Yo Huang | 10/30/26 3:11:00 PM |

| | | |
|---|---|---|
| **Page 1: [43] Deleted** | **Yo Huang** | **10/30/26 3:11:00 PM** |
| **Page 1: [44] Deleted** | **Yo Huang** | **10/30/26 3:11:00 PM** |
| **Page 1: [45] Deleted** | **Yo Huang** | **10/30/26 3:11:00 PM** |
| **Page 1: [46] Deleted** | **Yo Huang** | **10/30/26 3:11:00 PM** |
| **Page 1: [47] Deleted** | **Yo Huang** | **10/30/26 3:11:00 PM** |
| **Page 32: [48] Deleted** | **Yo Huang** | **10/30/26 3:11:00 PM** |
| **Page 32: [49] Deleted** | **Yo Huang** | **10/30/26 3:11:00 PM** |

| | | |
|---|---|---|
| **Page 32: [50] Deleted** | **Yo Huang** | **10/30/26 3:11:00 PM** |
| **Page 1: [51] Deleted** | **Yo Huang** | **10/30/26 3:11:00 PM** |
| **Page 1: [52] Deleted** | **Yo Huang** | **10/30/26 3:11:00 PM** |
| **Page 1: [53] Deleted** | **Yo Huang** | **10/30/26 3:11:00 PM** |
| **Page 1: [54] Deleted** | **Yo Huang** | **10/30/26 3:11:00 PM** |
| **Page 1: [55] Deleted** | **Yo Huang** | **10/30/26 3:11:00 PM** |
| **Page 1: [56] Deleted** | **Yo Huang** | **10/30/26 3:11:00 PM** |
| **Page 1: [57] Deleted** | **Yo Huang** | **10/30/26 3:11:00 PM** |
| **Page 1: [58] Deleted** | **Yo Huang** | **10/30/26 3:11:00 PM** |
| **Page 1: [59] Deleted** | **Yo Huang** | **10/30/26 3:11:00 PM** |
| **Page 1: [60] Deleted** | **Yo Huang** | **10/30/26 3:11:00 PM** |
| **Page 1: [61] Deleted** | **Yo Huang** | **10/30/26 3:11:00 PM** |
| **Page 1: [62] Deleted** | **Yo Huang** | **10/30/26 3:11:00 PM** |
| **Page 1: [63] Deleted** | **Yo Huang** | **10/30/26 3:11:00 PM** |
| **Page 1: [64] Deleted** | **Yo Huang** | **10/30/26 3:11:00 PM** |
| **Page 46: [65] Deleted** | **Yo Huang** | **10/30/26 3:11:00 PM** |
| **Page 1: [66] Deleted** | **Yo Huang** | **10/30/26 3:11:00 PM** |
| **Page 1: [67] Deleted** | **Yo Huang** | **10/30/26 3:11:00 PM** |
| **Page 1: [68] Deleted** | **Yo Huang** | **10/30/26 3:11:00 PM** |
| **Page 1: [69] Deleted** | **Yo Huang** | **10/30/26 3:11:00 PM** |
| **Page 1: [70] Deleted** | **Yo Huang** | **10/30/26 3:11:00 PM** |
| **Page 1: [71] Deleted** | **Yo Huang** | **10/30/26 3:11:00 PM** |

| | | |
|---|---|---|
| **Page 1: [72] Deleted** | **Yo Huang** | **10/30/26 3:11:00 PM** |
| **Page 53: [73] Deleted** | **Yo Huang** | **10/30/26 3:11:00 PM** |
| **Page 1: [74] Deleted** | **Yo Huang** | **10/30/26 3:11:00 PM** |
| **Page 1: [75] Deleted** | **Yo Huang** | **10/30/26 3:11:00 PM** |
| **Page 55: [76] Deleted** | **Yo Huang** | **10/30/26 3:11:00 PM** |